No. 22-1168

------------------------------------------------------------

## United States Court of Appeals
## for the Fourth Circuit

------------------------------------------------------------

PATTI MENDERS, SCOTT MINEO, AND JANE DOE #3,

*Plaintiffs–Appellants,*

v.

LOUDOUN COUNTY SCHOOL BOARD,

*Defendant–Appellee.*

------------------------------------------------------------

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:21-cv-00669-AJT-TCB

------------------------------------------------------------

## BRIEF OF APPELLANTS

------------------------------------------------------------

Daniel R. Suhr, *Counsel of Record*
Jeffrey D. Jennings
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
312-263-7668
dsuhr@libertyjusticecenter.org
jjennings@libertyjusticecenter.org

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, all Plaintiffs-Appellants in this case are natural persons, and therefore, have no corporate interests to disclose.

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................. i

Table of Authorities ........................................................................... iii

Jurisdictional Statement ....................................................................1

Statement of the Issues ......................................................................1

Statement of the Case..........................................................................2

I.    The Student Equity Ambassador Program .....................................2

II.    The Bias Incident Reporting System...........................................6

III.    The school children's dissenting views ........................................8

IV.    The district court's opinion ......................................................9

Summary of the Argument .................................................................14

Standard of Review.............................................................................17

Argument .........................................................................................17

I.    The SEA Program violates the Equal Protection Clause because racial considerations improperly motived it................................17

    A.    Race motivated the SEA Program. ......................................17

    B.    The SEA Program is subject to strict scrutiny. ....................23

    C.    The SEA Program fails strict scrutiny. ...............................24

II.    The SEA Program violates the First Amendment and the Equal Protection Clause by discriminating based on viewpoint. ...........26

    A.    LCPS discriminates based on viewpoint in the SEA Program. .......................................................................26

B.    The district court erred when it held that the SEA Program discriminates based on content and not viewpoint. .............27

C.    The district court erred by concluding that school-sponsored fora may discriminate based on viewpoint. ..........................30

D.    The district court's reliance on *Buxton v. Kurtinitis* was misplaced because that case did not involve a government-created forum. .............................................................................33

III.  The Parents' First Amendment claims against the Bias Incident Reporting System are viable because they allege a credible threat of enforcement. ...............................................................................35

A.    The district court erred when it held that the Parents had to allege instances where bias incident reports have led to investigation or discipline. ...................................................37

1.    The existence of the Bias Incident Reporting System in and of itself chills speech. ..........................................................37

2.    The young ages of the children involved heightens the chilling effects the Bias Incident Reporting System has on their speech. ......................................................................41

Conclusion. ...............................................................................................44

Statement Regarding Oral Argument ...................................................46

Certificate of Compliance. ......................................................................47

iii

# TABLE OF AUTHORITIES

*Abbott v. Pastides,*
  900 F.3d 160 (4th Cir. 2018) .............................................. 35, 39, 41

*ACLU v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) .......................................................40

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.,*
  978 F.3d 481 (6th Cir. 2020) .......................................................26

*Bauer v. Shepard,*
  620 F.3d 704 (7th Cir. 2010) .......................................................40

*Buxton v. Kurtinitis,*
  862 F.3d 423 (4th Cir. 2017) .................................... 12, 13, 33, 34

*Busch v. Marple Newtown Sch. Dist.,*
  567 F.3d 89 (3d Cir. 2009) .....................................................31, 32

*C.H. v. Oliva,*
  226 F.3d 198 (3d Cir. 2000) .......................................................32

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.,*
  457 F.3d 376 (4th Cir. 2006) .................................................30, 31

*Coal. for Tj v. Fairfax Cty. Sch. Bd.,*
  No. 22-1280, 2022 U.S. App. LEXIS 8682
  (4th Cir. Mar. 31, 2022) .........................................................20, 21

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) .......................................................35

*Crozier v. Westside Cmty. Sch. Dist.,*
  973 F.3d 882 (8th Cir. 2020) .......................................................35

*Downs v. Los Angeles Unified Sch. Dist.*,
  228 F.3d 1003 (9th Cir. 2000) .........................................32

*Hazelwood Sch. Dist. v Kuhlmeier*
  484 U.S. 260 (1988)................................... 12, 13, 30, 32

*Lee v. Weisman*,
  505 U.S. 577 (1992)............................... 16, 17, 41, 42, 43

*Mahanoy Area Sch. Dist. v. B.L.*,
  141 S. Ct. 2038 (2021)......................................43, 44

*Matter of Macula v. Bd. of Educ.*,
  75 A.D.3d 1118 (App. Div. 4th Dept. 2010) .................................32

*Morgan v. Caliber Home Loans, Inc.*,
  No. 20-1745, 2022 U.S. App. LEXIS 4728
  (4th Cir. Feb. 22, 2022) ...................................42

*Morgan v. Swanson*,
  659 F.3d 359 (5th Cir. 2011) .........................................32

*Myers v. Loudoun Cty. Pub. Schs.*,
  418 F.3d 395 (4th Cir. 2005) .........................................41

*N.C. State Conf. of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ...................................18, 21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ...................................17, 23

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007)................................... 15, 24, 25, 26

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*,
  426 F.3d 617 (2d Cir. 2005) .........................................32

v

*Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist.*,
   941 F.2d 817 (9th Cir. 1991) .........................................................32

*Ramos v. Louisiana*,
   139 S. Ct. 1318 (2019) ...................................................................21

*Richmond v. J. A. Croson Co.*,
   488 U.S. 469 (1989)..................................................................24, 25

*Robertson v. Anderson Mill Elem. Sch.*,
   989 F.3d 282 (4th Cir. 2021) .......................................................30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)................................................... 15, 26, 29, 30

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973)..........................................................................17

*Searcey v. Harris*,
   888 F.2d 1314 (11th Cir. 1989) ...................................................32

*Shaw v. Reno*,
   509 U.S. 630 (1993)......................................................................24

*Starbuck v. Williamsburg James City Cty. Sch. Bd.*,
   No. 20-2334, 2022 U.S. App. LEXIS 6706
   (4th Cir. Mar. 15, 2022) ..............................................................37

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ..................................................38, 41

*Speech First, Inc. v. Killeen*,
   968 F.3d 628 (7th Cir. 2020) ..................................................38, 41

*Speech First, Inc. v. Schlissel*,
   939 F.3d 756 (6th Cir. 2019) ............................................38, 39, 41

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................40

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503, 506 (1969) ...........................................................31

*Washington v. Davis*,
   426 U.S. 229 (1976)...................................................................21

*Wofford v. Evans*,
   390 F.3d 318 (4th Cir. 2004) ......................................................14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).............................................................18, 21

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) ......................................................23

## Statutes and Rules

28 U.S.C. § 1331.............................................................................1

28 U.S.C. § 1343.............................................................................1

42 U.S.C. § 1983.............................................................................1

28 U.S.C. § 1291.............................................................................1

Fed. R. Civ. P. 8(a)(2)....................................................................22

## Other authorities

David Randall, *Social Justice Education in America, Nat'l Ass'n of
Scholars* (Nov. 29, 2019),
   https://www.nas.org/reports/social-justice-education-in-
   america/full-report........................................................................28

Mollie A. Gambone, *Teaching the Possible: Justice-Oriented Professional Development for Progressive Educators*,
   27 Brock Ed. J. 53 (2017) ......................................................28, 29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to

28 U.S.C. § 1331, because it arises under the U.S. Constitution, and

pursuant to 28 U.S.C. § 1343 because relief is sought under

42 U.S.C. § 1983. On February 17, 2022, the Plaintiffs-Appellants filed

a notice of appeal (D. Ct. Dkt. 56) from the district court's Memorandum

Opinion and Order (Jan. 19, 2022, D. Ct. Dkt. 52) and Judgment (Feb.

15, 2022, D. Ct. Dkt. 55) dismissing all of their claims. J.A. 147. The

order and judgment dismissing the case are final. This Court has

jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   Does Defendant-Appellee violate the Fourteenth Amendment's Equal Protection Clause because race motivated its creation and administration of the Student Equity Ambassador Program.

II.  Does the Defendant-Appellee violate the First Amendment's Free Speech Clause and Equal Protection Clause by engaging in viewpoint discrimination when it selected students for its Student Equity Ambassador Program and administered that program.

III. Does the Defendant-Appellee's Bias Incident Reporting System violate the Free Speech Clause by chilling the speech of its school children through content-based and viewpoint-based restrictions.

**STATEMENT OF THE CASE**

## I.  The Student Equity Ambassador Program

Around June 23, 2020, Defendant-Appellee Loudoun County School Board, which oversees Loudoun County Public Schools ("LCPS"), published its "Action Plan to Combat Systemic Racism" ("Action Plan"), which outlines a complex set of initiatives to implement a new ideology across its schools. J.A. 15 (First Am. Compl. ("FAC") ¶ 24).

As part of LCPS's Action Plan, it developed the "Student Equity Ambassador Program" ("SEA Program"), a shadow student government the school endows with authority to speak on behalf of the student body but focused solely on equity issues. J.A. 16-17, 21 (*Id.* at ¶¶ 28, 29, 31, 44). Each school principal selects two to three students to serve in the SEA Program. J.A. 16-17 (*Id.* at ¶ 28). Students are selected based on designated criteria, and they collaborate with the district-wide Supervisor of Equity during regularly occurring student "*Share, Speak-up, Speak-out* meetings." J.A. 17 (*Id.* ¶ 31). These meetings and the program generally are "a forum to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination." J.A. 24 (*Id.* at ¶ 58).

2

Multiple documents from LCPS made clear the original intention to limit participation in the SEA Program to students of color. *See, e.g.,* J.A. 6, 83 (FAC ¶ 24 & Ex. B at 19). The Action Plan said four different times on a single slide that the program was for "students of color." J.A. 83 (FAC Ex. B at 19). Indeed, the very first criterion originally stated that "[t]his opportunity is open to all Students of Color." J.A. 18 (*Id.* at ¶ 33). And the LCPS's accompanying Frequently Asked Questions ("FAQ") included this exchange:

> [Question:] My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
>
> [Answer:] Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.

J.A. 18 (*Id.* at ¶ 34).

But LCPS revised the program's description after facing backlash over the "student of color" requirement and removed it but did not change anything else or explain the change. J.A. 19 (FAC at ¶ 38). After this revision, a parent asked whether their child (who is not a student of color) could apply for the SEA Program. J.A. 19-20 (*Id.* at ¶¶ 40-41). An LCPS official responded: "[t]hough all students (white or otherwise)

3

are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings." J.A. 20 (*Id.* at ¶ 41). Elsewhere in the revised FAQs, LCPS stated that the SEA Program is focusing on race instead of other forms of minority status, like faith or disability, because it is important to "recognize students who have been marginalized." J.A. 20 (*Id.* at ¶ 42). And the revised documents maintained that ambassadors "will be responsible for amplifying the voice of Students of Color . . . ." J.A. 10, 115 (FAC ¶ 38 & Ex. E, at 2); *see also* J.A. 18-19, 117 (FAC ¶¶ 36, 39 & Ex. E, at 4).

The revised version retains other criteria upon which principals are supposed to select students, such as "a passion for social justice." J.A. 20 (*Id.* at ¶ 43). The flyer inviting students to engage in the program similarly solicits applicants who "want to be a voice for social justice." J.A. 20 (*Id.*). LCPS's equity director described the program as part of LCPS's work to "empower students to make meaningful contributions to their world through a social justice lens," J.A. 20 (*id.*), echoing the Action Plan itself, which described equity ambassadors as using a "social justice lens to develop greater awareness and build student empathy . . ." J.A. 83 (FAC Ex. B at 19). A high school announcing the

4

SEA Program told parents that having "a passion for social justice" is the first quality students "serving in th[e] role" of Student Equity Ambassador must possess. J.A. 123 (FAC Ex. G). One school's "equity lead" teacher says student equity ambassadors "are promoting cultural awareness and growth by . . . be[ing] a voice for social justice." J.A. 21 (*Id.* at ¶ 43).

After principals applied the revised criteria, only 17 percent of students selected for the SEA Program "identified as 'white only,' despite 'white only' students making up forty-seven percent of the LCPS enrollment." J.A. 21 (FAC ¶ 45).

The Plaintiffs-Appellants' children would not have qualified for the SEA Program as originally conceived or practically implemented. J.A. 24-26 (*Id.* at ¶¶ 59-65). None of them identify as students of color, and they and their children hold views about important public issues that they believe conflict with LCPS's definition of social justice. J.A. 25 (*Id.* at ¶ 62-65). They challenge the SEA Program on equal protection grounds (Count I) for its racial preferences, and on First Amendment and equal protection grounds for its viewpoint discrimination (Counts II and III).

5

## II.    The Bias Incident Reporting System

Alongside the SEA Program, LCPS also implemented the Bias Incident Reporting System. LCPS distributed a form to parents and students to "capture incidents of bias in an anonymous manner." J.A. 22 (FAC ¶ 47); *see also* J.A. 126 (FAC Ex. H). The form includes check boxes for the "Type of Bias Incident" being reported, including "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation." J.A. 22 (*Id.* at FAC ¶ 49); *see also* J.A. 126 (FAC Ex. H).

The LCPS equity director further explained that a "bias incident" is an "act of discrimination, harassment, [or] intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias." J.A. 23 (FAC ¶ 53). The equity director continued: "Such are usually associated with negative feelings and beliefs with respect to others [sic] race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability." J.A. 53 (*Id.*).

6

LCPS will investigate "bias incidents" if the person submitting the form provides his or her name and indicates on the form that they would like school administrators to investigate the "particular incident" they are reporting. J.A. 22 (*Id.* at ¶ 48); *see also* J.A. 126 (FAC Ex. H). The incidents reported on this form are also used in the "*Share, Speak-up, Speak-out*" meetings with the Student Equity Ambassadors. J.A. 22 (FAC ¶ 47). Nothing about the form limits its application to only on-campus speech; students can report incidents involving other students for off-campus speech as well. J.A. 23 (*Id.* at ¶ 54).

As part of the fight against bias incidents, Student Equity Ambassadors "work to identify microaggressions" within their school. J.A. 22 (*Id.* at ¶ 50). Three Student Equity Ambassadors gave a presentation to the LCPS Board where they said: "Microaggressions are defined as the everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups." J.A. 23 (*Id.* at ¶ 51). Some example "microaggressions" they identified included: "denial[s] of racial reality," such as the statement "I don't think that white privilege exists" or an

assertion of the value of "colorblindness," which sees people as individuals rather than members of a race. J.A. 23 (*Id.* at ¶ 52).

## III.  The school children's dissenting views

The Plaintiffs-Appellants are parents of children attending LCPS ("Parents"). The Parents raise their children to be active, engaged citizens in their community and country. J.A. 25 (*Id.* at ¶ 62). The Parents encourage and teach their children to share their views with their peers. J.A. 25 (*Id.*). Their children want to speak out on Critical Race Theory, race, and gender identity, and other controversial political issues within the LCPS school community. J.A. 24-25 (FAC at ¶¶ 61-65).

As such, the Parents are concerned that if their students share their views about political or social issues, including those touching on religion, race, and human sexuality, they will be reported and investigated for bias incidents. J.A. 24-25 (*Id.* at ¶¶ 60-65). They fear that such a report, investigation, or public disclosure could negatively impact their standing in the school community and ruin their children's college or career prospects. J.A. 25 (*Id.* at ¶ 65). They are aware that in other school settings nationwide "bias incident" response or disciplinary

systems have been invoked against students based on similarly worded standards for sharing their political or religious views. J.A. 25 (*Id.* at ¶ 64). Indeed, as the district court recognized by granting the Parents' motion to proceed anonymously, the environment in Loudoun County surrounding hot-button political issues such as Critical Race Theory is intense. J.A. 3, 5 (D. Ct. Dkt. Nos. 7 and 22).

Given that these parents and their children believe that their views conflict with LCPS's definition of "social justice" and that their views may provoke a "heckler's report" by students or others who disagree with their views, they challenge the Bias Incident Reporting System on First Amendment grounds.

## IV.  The district court's opinion

On January 19, 2022, the district court dismissed all of the Parents' claims. J.A. 145. In dismissing the Parents' claim that the SEA Program violated the Equal Protection Clause because race motivated the Board when it created the Program, the district court held that "[t]he Amended Complaint also fails to allege facts that make plausible that the SEA program has a discriminatory impact." J.A. 139. The court acknowledged that the Parents had alleged that 17 percent of SEA

9

Program participants were white even though they constitute 47 percent of enrollment in the school system. J.A. 139. Nonetheless, the court held that the parents had failed to allege "the racial/ethnic makeup of the schools from which the two to three students were selected or who applied or were considered from those schools or to what extent the two to three slots from each of the schools were filled through a competitive process." J.A. 139. It also reasoned that the disparity was because "white students may have decided not to apply for reasons other than race." J.A. 139.

Additionally, the district court reasoned that LCPS created the SEA Program to "promote a more inclusive educational environment by addressing discrimination and the lingering effects of past discrimination." J.A. 139. It then concluded that this meant the program was not created "to be at the expense of white students or . . . intended to disadvantage white students." J.A. 139. It pointed to an outside consultant's report that "'there are limited opportunities for Black/African-American and Muslim students [in LCPS] to convene in a network of social cultural support[].'" J.A. 138-39 (quoting FAC ¶ 22). The district court also cited the consultant's recommendation that

10

LCPS "establish student affinity groups at all levels to support the social and cultural identities of students of color[]' to serve as 'a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social cultural conflict.'" J.A. 138-39.

When dismissing the Parents' claim that the SEA Program violated the First Amendment by discriminating based on viewpoint, the court evaluated the program as a "nonpublic forum." J.A. 142. The court then held that LCPS's selection criteria for the SEA Program, such as a "'passion for social justice,'" did not amount to viewpoint discrimination. J.A. 142-43. The court reasoned that "passion for social justice" references "certain subject matter" rather than a specific political viewpoint. J.A. 142. The court stated that "there are no allegations that SEA candidates are questioned or investigated about what their 'social justice' views are or should be." J.A. 143.

The court further held that, even if the SEA Program's selection criteria "reference[] particular viewpoints" LCPS was justified in using them. J.A. 143. The court pointed to LCPS' interests in "allocating a limited number of slots within a competitive process . . . ." J.A. 143. It

11

also noted "the broad range of substantive views that can be embraced within that selection criteria . . . ." J.A. 143. And it pointed to "the clear pedagogical concerns over which the SEA program was adopted and the close relationship between the section criteria and the purpose of the non-public forum in which those viewpoints are to be expressed." J.A. 143-44 (citing *Buxton v. Kurtinitis*, 862 F.3d 423, 429-30 (4th Cir. 2017)).

The court also rejected the Parents' claim that the SEA Program's viewpoint discrimination violated the Equal Protection Clause because it deemed the selection criteria to be "rationally and substantially related to" "addressing the effects of invidious discrimination within the educational environment . . . ." J.A. 140-41. The court held that this was "clearly a legitimate pedagogical concern . . . ." J.A. 141. The court clarified that its decision would be the same even if having a "'passion for social justice' is viewed as having embedded in it some aspects of a substantive viewpoint.'" J.A. 141. The court acknowledged a circuit split on whether school-sponsored student speech must be viewpoint neutral under *Hazelwood School District v Kuhlmeier* and then sided with the minority of circuits that have held that such speech does not need to be

12

viewpoint neutral. J.A. 141 (citing 484 U.S. 260, 273 (1988)). It also

cited *Buxton* for the proposition that "the school system is permitted 'to

take the viewpoints expressed in an interview into consideration when

choosing between candidates in a competitive process.'" J.A. 141 (citing

862 F.3d at 430).

Lastly, the district court dismissed the Parents' free-speech claims

because it concluded that they "failed to allege facts that make plausible

that the Bias Incident Reporting System will harm them in any way."

J.A. 144. The court noted that there were no allegations that "there

have been any disciplinary incidents initiated as a result of the

reporting forms; or that any alleged incidents have even passed beyond

the Equity Office for an investigation." J.A. 144. It also stated that the

children were not at "any greater risk of discipline through the Bias

Reporting System than the School's disciplinary system . . . ." J.A. 144.

The court also suggested that the children would engage in "self-

censorship" "separate and apart from the Bias Reporting system." J.A.

145. Regarding the Parents' allegations that the views of their children

prompt "vitriolic, threatening, and persecutorial responses from others"

in the LCPS community, J.A. 13-14 (FAC ¶ 18), the court concluded

that the "mere prospect of future injury through the Bias Reporting System is not sufficient to confer standing." J.A. 145. The court then entered judgment in favor of LCPS on February 15, 2022. App. J.A. 146.

The Parents filed a timely notice of appeal on February 17, 2022. J.A. 147.

## SUMMARY OF THE ARGUMENT

"It is now a commonplace that students do not shed their constitutional rights at the schoolhouse gate." *Wofford v. Evans*, 390 F.3d 318, 322 (4th Cir. 2004) (cleaned up). This includes their right to equal treatment under the law and freedom of speech and thought. A public school may not deny educational opportunities to students because of the color of their skin or their viewpoints on contemporary issues. But here LCPS has crossed these constitutional red lines in three ways, and the district court should be reversed.

*First*, the SEA Program violates the Equal Protection Clause because LCPS created the program with a racially discriminatory intent. Although LCPS formally dropped the initial racial requirement, LCPS still selects students based on their willingness to "amplify the voices of

students of color." LCPS's implementation of the revised criteria shows that the original stain of racial discrimination remains.

The district court also erred in holding that creating a unique education benefit for "students of color" either does not trigger strict scrutiny or satisfies strict scrutiny as an attempt to remedy past discrimination. Neither is true under Supreme Court precedent, which teaches that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality).

*Second*, the SEA Program violates the First Amendment and Equal Protection Clause's prohibition on viewpoint discrimination. The SEA Program is a nonpublic forum, where viewpoint discrimination is forbidden. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Nevertheless, LCPS selects students for the SEA Program based on their desire to "amplify the voices of students of color" and "passion for social justice." The district court erred by following a minority of circuits in holding that the rule against viewpoint discrimination in the K-12 education setting does not apply. The

15

majority of circuits are correct as a matter of Supreme Court precedent and first principles.

*Third*, the Bias Incident Reporting System chills the speech of school-age children by allowing them to report their classmates to LCPS for "bias incidents" that are "motivated by prejudice or bias." LCPS shares these reports with Student Equity Ambassadors whose job is to identify "microaggressions," which at least three of the student ambassadors define as denying that white privilege exists or asserting that society should be colorblind. Such overbroad definitions of "bias incidents," combined with the possibility of formal and informal sanctions for holding dissenting views, chills speech, prompts self-censorship, and violates the First Amendment. The district court erred when it required the Parents to allege instances of LCPS disciplining students because of a bias incident report. The Bias Incident Reporting System's very existence is enough to chill speech. That is especially true given that this case involves school-age children and "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*

*v. Weisman*, 505 U.S. 577, 592 (1992). The district court's failure to take this into account was error.

## STANDARD OF REVIEW

"Because the district court granted [LCPS's] motion to dismiss, [this Court's] review is de novo." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "[L]ike the district court," this Court "must assume all [well-pled facts] to be true." *Id.* The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.*

## ARGUMENT

### I. The SEA Program violates the Equal Protection Clause because racial considerations improperly motived it.

#### A. Race motivated the SEA Program.

A school policy that "involve[s] suspect classifications," such as race, is subject to strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). LCPS's initial policy was racially discriminatory on its face, but this appeal concerns the revised policy, which is substantially identical to the initial policy except with the explicit "students of color" criterion removed. The revised policy is nevertheless infected by the same discriminatory purpose.

17

To determine whether a policy was adopted for a racially discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Courts look at factors such as the historical background of the challenged decision, the events leading up to its adoption, the legislative history of the decision, and whether the decision has a disproportionate racial impact. *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016) (citing *Arlington Heights*). Plaintiffs-Appellants "need not show that [race] was the sole or even a primary motive for the legislation, just that it was a motivating factor." *Id.* at 220 (cleaned up) (emphasis in original). Here, the history, the events preceding the SEA Program's current iteration, and the legislative history all show that this Program was motivated by a desire to benefit "students of color" *but not others*.

The SEA Program first appeared in the June 23, 2020, LCPS "Action Plan to Combat Systemic Racism." J.A. 16-17 (FAC ¶ 28). The fifteenth item in the Action Plan consistently described the SEA Program as limited to "students of color." J.A. 17, 83 (FAC ¶ 24 & Ex. B at 19). The

18

Program's information packet originally stated that the leadership position "is open to all Students of Color," J.A. 17-18, 110 (*Id.* at ¶¶ 32-33 & Ex. D), and the accompanying FAQs stated that white students could not participate. J.A. 18 (*Id.* at ¶¶ 34-35).

LCPS dropped the SEA Program's explicit racial classification after an outcry from parents that it was engaging in explicit racial discrimination. J.A. 19 (*Id.* at ¶ 37). Despite that revision, an administrator still wrote a parent: "Though all students (white or otherwise) are more than welcome to potentially serve as ambassadors, [the ambassadors'] focus is to raise the voice of their classmates of color during these meetings." J.A. 20, 120 (*Id.* at ¶ 41 & Ex. F). Numerous other LCPS documents echo this focus on "amplifying the Student Voice of Color." J.A. 18-19, 115 (FAC ¶¶ 36, 39 & Ex. E, at 5). The revised packet says ambassadors "will be responsible for amplifying the voice of Students of Color . . . ." J.A. 19, 115 (FAC ¶ 38 & Ex. E, at 3). And an LCPS high school sent a letter stating that the SEA Program's "goal is to provide a forum to amplify the voice of Students of Color . . . ." J.A. 21, 123 (*Id.* at ¶ 43 & Ex. G at 2). Thus, the SEA Program remains tainted with a desire to prefer "Students of Color" over all others.

The Parents' theory is simple. LCPS created the SEA Program with an explicit racial criterion. All principals were told to use this criterion. Then all principals were sent a revised set of criteria with the racial criterion removed but all the other criteria still in place, and with a new emphasis on "amplifying the voice of students of color." The principals took the hint and still overwhelmingly selected students of color for the Program. No wonder the Program has had an actual discriminatory impact, as white students are substantially underrepresented among student ambassadors. J.A. 21 (FAC at ¶ 45). Thus, taking the First Amended Complaint and attached exhibits as true, the Parents have shown that the desire to benefit some races (Students of Color) over others motivated the SEA Program.

The district court discounted this disparity between the raw numbers and said that the Parents did not allege facts showing that the SEA Program has discriminatory impact, but this is wrong for at least three reasons. J.A. 139.

*First*, and most fundamentally, the law does not require the Parents to show that the SEA Program has a discriminatory impact. *Coal. for Tj v. Fairfax Cty. Sch. Bd.*, No. 22-1280, 2022 U.S. App. LEXIS 8682, at

*23 (4th Cir. Mar. 31, 2022) (Rushing, J., dissenting) ("[W]hen a plaintiff contends a law is motivated by discriminatory intent, proof of disproportionate impact is but one factor to consider 'in the totality of the circumstances'; it is not 'the sole touchstone' of the claim." (quoting *McCrory*, 831 F.3d at 231)). Disproportionate impact is simply one of five factors from *Arlington Heights* that courts consider as part of a "holistic approach" to discern discriminatory purpose. *Id.* at 220-21. There is no requirement that a plaintiff allege and prove each of five factors. *See Washington v. Davis*, 426 U.S. 229, 242 (1976). Here, the totality of the relevant facts shows that benefiting Students of Color motivated the SEA Program regardless of its discriminatory impact.

*Second*, LCPS has not complied with the Supreme Court's precedent for revisions to a law adopted with racial motivations. Fixing a discriminatory law or policy requires more than just a silent change. A government must "grapple[] with the laws' sordid history in reenacting them." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring). A revised law is only "free of discriminatory taint" if the legislature "actually confronts a law's tawdry past in reenacting it." *Id.* Getting caught with criteria that overtly violated the Equal Protection

Clause, and then dropping the racial criteria after a public outcry without any comment, while retaining and perpetuating all the other race-based aspects of the program, does not amount to grappling with the sordid history of the SEA Program.

*Third*, the SEA Program does in fact have a discriminatory impact, as only 17 percent of students that LCPS selected "identified as 'white only,' despite 'white only' students making up forty-seven percent of the LCPS enrollment." J.A. 21 (FAC ¶ 45). Contrary to the district court's reasoning, the law did not require the Parents to allege "the racial/ethnic makeup of the schools from which the two to three students were selected or who applied or were considered from those schools or to what extent the two to three slots from each of the schools were filled through a competitive process." J.A. 139. At the pleading stage, Federal Rule of Civil Procedure 8(a)(2) only requires a "a short and plain statement of the claim showing that the pleader is entitled to relief." Likewise, the district court's reasoning that "white students may have decided not to apply for reasons other than race" is speculative and departs from the requirement to "draw all reasonable inferences in

22

the favor of the plaintiff." *Nemet Chevrolet, Ltd.*, 591 F.3d at 253; J.A. 139.

**B.    The SEA Program is subject to strict scrutiny.**

The SEA Program is subject to strict scrutiny. The district court lacked support for its conclusion that the SEA Program's design to benefit "students of color" should not receive strict scrutiny given its desire to address "past discrimination." J.A. 139 ("The substance of the Action Plan does not make plausible that these initiatives are intended to be at the expense of white students or are intended to disadvantage white students, but rather to promote a more inclusive educational environment by addressing discrimination and the lingering effects of past discrimination.").

Even when the government creates a program to benefit specific races (but not all races), strict scrutiny still applies. *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). White people can be victims of race-based discrimination because of their exclusions from a governmental program, even if the program was intended to provide a positive benefit to people of color whose racial groups had experienced past discrimination. *Id.* When government grants benefits in a manner that

23

prefers one race over another, it must show that its discrimination

serves a compelling state interest. *Id.* at 361. Indeed, the Supreme

Court has several times rejected an effort to provide "relaxed judicial

scrutiny" for racial preferences stemming from "benign" or "remedial"

motives. *Parents Involved in Cmty. Sch.*, 551 U.S. at 759-60; *Shaw v.*

*Reno*, 509 U.S. 630, 653 (1993); *Richmond v. J. A. Croson Co.*, 488 U.S.

469, 494 (1989).

### C.    The SEA Program fails strict scrutiny.

The SEA Program fails strict scrutiny. To the extent the district

court concluded otherwise because the Program supposedly "promote[s]

a more inclusive educational environment by addressing discrimination

and the lingering effects of past discrimination," it was incorrect for two

reasons. J.A. 139.

*First*, LCPS never attempted to defend its program under the

standard the Supreme Court laid out in *Croson* for when remedying

past discrimination can satisfy strict scrutiny. In *Croson*, the Court held

that a government must show that there is private discrimination in the

community that the remedial program targets as opposed to a

"generalized assertion that there has been past discrimination in an

24

entire industry . . . ." 488 U.S. at 498. LCPS has not established that there is rampant private discrimination within its school system. Nor can it at the motion-to-dismiss stage, where the focus is only the Complaint.

*Second*, attempting to remedy past discrimination is not a compelling state interest in the K-12 context. In *Parents Involved in Community Schools*, the Supreme Court considered a school district that set minimum and maximum percentages for black student enrollment in nonmagnet schools a year after a district court had dissolved a desegregation order the school had operated under for decades. 551 U.S. at 716. The school argued that the racial balancing plan complied with the Equal Protection Clause because it promoted diversity. *Id.* at 733. A plurality of justices disagreed and in doing so they also reasoned that the school could not rely on remedying past discrimination as a compelling state interest. *Id.* at 737. They reasoned that "race-conscious remedies" can only be used "to disestablish a school system segregated by law" and the school had already achieved desegregation. *Id.* at 737. In writing for the plurality, Chief Justice Roberts concluded that "[t]he

way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Id.* at 748.

So too here. Given that LCPS cannot claim the SEA Program is an attempt to comply with a desegregation order or otherwise end *de jure* segregation, it does not have a compelling state interest in remedying past discrimination. Therefore, the SEA Program fails strict scrutiny.

## II.   The SEA Program violates the First Amendment and the Equal Protection Clause by discriminating based on viewpoint.

The district court correctly found that the SEA Program is a nonpublic forum. J.A. 139. And "even in nonpublic forums—the forums in which the government has the most leeway to regulate speech—the government may still not engage in viewpoint discrimination." *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 501 (6th Cir. 2020); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

### A.   LCPS discriminates based on viewpoint in the SEA Program.

To become a student equity ambassador, a candidate must check two explicitly ideological boxes. He or she must promise to "amplify the

26

voices of students of color" and must have a proven track record of "passion for social justice." J.A. 17, 20 (FAC ¶¶ 30, 43).

LCPS now says that white students qualify for the program, but only if their "focus is to raise the voice of their classmates of color during these meetings." J.A. 20 (*Id.* at ¶ 41). LCPS says that the ambassadors must "represent [their] peers of color" and "amplify the voices of students of color." J.A. 18-20, 24 (*Id.* ¶¶ 36, 39, 43, 57). The expectation that any student who comes to the forum must "amplify" or "represent" or "raise" "the voices of students of color" is a viewpoint-check at the admission gate.

Students are equally expected to be youthful social justice warriors. LCPS materials tell principals to appoint students "who want to be a Voice for Social Justice," and "who have a passion for social justice." J.A. 17, 25-26 (*Id.* at ¶ 29, 30, 66). That is also viewpoint discrimination.

### B. The district court erred when it held that the SEA Program discriminates based on content and not viewpoint.

The district court's conclusion that the SEA Program selection factors target a "certain subject matter" rather than viewpoints

27

incorrectly focused only on the "passion for social justice" criterion. J.A. 143. It ignored the other requirements of being interested in "amplifying the Student Voice of Color" and "Representing your Peers of Color." J.A. 18-19 (FAC ¶¶ 36, 39). Selecting students who only want to amplify the voices of students of color and not all students targets viewpoints and not content.

Additionally, the Parents have reasonably alleged that social justice *is* a viewpoint, and they deserve the opportunity to develop facts to prove that theory. They may do this with, for example, testimony from district officials about what they believe it means for a student to have a demonstrated "passion for social justice." They may explore in depositions what the equity director means by a "social justice lens." They may introduce expert testimony, drawing from documents in the education field, to demonstrate that "social justice" is a term of art in the equity education space associated with a specific set of political views and values. *See, e.g.,* David Randall, *Social Justice Education in America*, Nat'l Ass'n of Scholars (Nov. 29, 2019);[1] Mollie A. Gambone,

---

[1] https://www.nas.org/reports/social-justice-education-in-america/full-report.

*Teaching the Possible: Justice-Oriented Professional Development for Progressive Educators*, 27 Brock Ed. J. 53 (2017).[2] In other words, they can show that, although "social justice" is a term many scholars and speakers have used, which might have generic meanings in a dictionary, the term *in this context* refers to a particular ideology associated with progressive politics.

And *Rosenberger* shows that excluding conservative views on "social justice" is forbidden viewpoint discrimination. There, the Supreme Court rejected the argument that the nonpublic forum at issue in that case was viewpoint neutral by excluding all religious viewpoints because "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." 515 U.S. at 831. So too here. LCPS is not having an open forum on race where a variety of views on how to respond to racial issues are welcome, which would merely be defining a forum's content scope. Instead, like the forum in *Rosenberger* excluding all religious views, LCPS solicits only students who wish to amplify the voices of students of color and promote progressive

---

[2] https://files.eric.ed.gov/fulltext/EJ1165958.pdf.

29

ideologies. Under the logic of *Rosenberger*, this is viewpoint

discrimination.

**C.    The district court erred by concluding that school-sponsored fora may discriminate based on viewpoint.**

The district court erred in concluding that viewpoint discrimination

is permissible for school-sponsored speech. J.A. 143. "Neither the

Supreme Court nor [this Court] has decided whether restrictions on

school-sponsored student speech must be viewpoint neutral under

*Hazelwood*, and other circuits are split on this question." *Robertson v.*

*Anderson Mill Elem. Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (discussing

484 U.S. at 260). This Court should follow the majority of circuits that

have considered the issue and hold that *Hazelwood* does not permit

viewpoint discrimination in school-sponsored programs, for two reasons.

*First*, this Court's precedents favor viewpoint neutrality. In

considering extra-curricular activities in a school building, this Court

held that "even in a nonpublic forum, government regulation must be

not only reasonable but also viewpoint neutral." *Child Evangelism*

*Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376,

384 (4th Cir. 2006). It also noted that "viewpoint neutrality requires not

just that a government refrain from explicit viewpoint discrimination,

30

but also that it provide adequate safeguards to protect against the improper exclusion of viewpoints." *Id.* Though *Child Evangelism Fellowship* concerned an after-school program rather than an in-school program, it is still tightly analogous to the in-school, non-classroom speech at issue here.[3]

*Second*, the majority rule that viewpoint discrimination is prohibited is right for simple matters of doctrine and constitutional law: "if schools could impose viewpoint-based restrictions on all student speech that might be perceived as school-sponsored, the promise of *Tinker*—that students 'do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate'—would mean very little." *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 108 (3d Cir. 2009) (Hardiman, J., concurring/dissenting) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Thus, this court should follow the majority rule and recognize that First Amendment rights, including their protection against viewpoint discrimination, remain in force in school-sponsored fora.

---

[3] This case does not call for the Court to decide whether classroom speech has the same protection as in-school out-of-class speech.

31

Indeed, this Court would be in good company by doing so. *See Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist*., 426 F.3d 617, 632-33 & n.9 (2d Cir. 2005); *Downs v. Los Angeles Unified Sch. Dist*., 228 F.3d 1003, 1011 (9th Cir. 2000); *Planned Parenthood of S. Nev., Inc. v. Clark Cty. Sch. Dist*., 941 F.2d 817, 829 (9th Cir. 1991)*; Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989). A number of other circuit judges, writing in instances where their colleagues avoided the question, have concluded that viewpoint neutrality applies to student speech in school fora. *See C.H. v. Oliva,* 226 F.3d 198, 210-12 (3d Cir. 2000) (Alito, J., dissenting); *Busch*, 567 F.3d at 109 (Hardiman, J., concurring/dissenting); *Morgan v. Swanson*, 659 F.3d 359, 390 n.1 (5th Cir. 2011) (en banc) (Jones, C.J., concurring); *Matter of Macula v. Bd. of Educ*., 75 A.D.3d 1118, 1120, 906 N.Y.S.2d 193, 194 (App. Div. 4th Dept. 2010). Moreover, in *Hazelwood* itself, the petitioners conceded that the school had to act in a viewpoint-neutral way, a point Justice Brennan noted in his concurrence. 484 U.S. at 287 n.3 (Brennan, J., concurring).

**D.    The district court's reliance on *Buxton v. Kurtinitis* was misplaced because that case did not involve a government-created forum.**

The district court erred in concluding that the SEA Program's discrimination is permissible because the Program supposedly is not a forum but rather a competitive selection process like the college admissions interview at issue in *Buxton*. J.A. 141 (D. Ct. Dkt. No. 52 at 14 (citing 862 F.3d at 429–30).

In *Buxton*, a student alleged retaliation based on his viewpoints when a public college denied his admission to a competitive radiology program after he mentioned his faith during the admission process. *Id.* at 425. This Court rejected forum analysis because the student "ha[d] not pointed to a single case in which a court applied—as he requests here—forum analysis to a Free Speech retaliation claim." *Id.* at 428.

The Court noted that "[e]xcluding a speaker from participating and retaliating against the speaker for his speech are two different actions, to which we apply different analytical frameworks." 862 F.3d at 428.

Unlike *Buxton*, this case does not involve a retaliation claim. Rather, it involves exclusion from participation: LCPS is excluding the Parents' children from participating before they have ever spoken. *Buxton*

33

therefore does not provide the correct framework and does not control here.

Additionally, in *Buxton*, the radiology program's purpose was not to promote speech. Here, however, everything about the SEA Program pertains to speech. Speech in a "speak up, speak out" session. J.A. 17, 21-22 (FAC ¶¶ 29, 46-47). Speech "to amplify student voices." J.A. 17, 24 (*Id.* at ¶¶ 29, 58). Speech "to share their stories." J.A. 15, 82 (*Id.* at ¶ 24 & Ex. B, at 19). Speech "to build forward motion in using student voice." J.A. 15, 83 (*Id.* at ¶ 24 & Ex. B, at 20). No wonder, then, that LCPS employees themselves refer to the program as a whole as a "forum." J.A. 24, 28 (*Id.* at ¶¶ 57-58, 85).

LCPS cannot claim that the admissions process is separate from the "speak up, speak out" sessions; they are two sides of the same coin. To be a student equity ambassador is to be admitted to the "share, speak up, speak out" sessions; to be denied the designation of student equity ambassador is to be excluded from participating in the sessions.

This Court should therefore apply forum analysis to the entire SEA Program and apply the constitutional rule against viewpoint discrimination.

34

### III. The Parents' First Amendment claims against the Bias Incident Reporting System are viable because they allege a credible threat of enforcement.

The Parents have stated a plausible First Amendment overbreadth claim by alleging that the Bias Incident Reporting System's existence chills their children's speech.

To establish a First Amendment overbreadth claim, "a claimant need not show [they] ceased [speech] activities altogether to demonstrate an injury in fact." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013). Maintaining a broad speech code violates the First Amendment when it chills speech by encouraging self-censorship, i.e., where it is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.*; *see also Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018). In this case, the question is how a middle- or high-school student would react in this situation. *Crozier v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020).

The district court held that the Parents failed to show a credible threat that the Bias Incident Reporting System would harm their children, but the Complaint shows otherwise. J.A. 144. The Parents have alleged with particularity that their school children wish to speak

out on Critical Race Theory, race, gender identity, and other controversial political issues. J.A. 24-25 (FAC at ¶¶ 61-65). They desire to share these views within the LCPS school community. J.A. 25 (*Id.* at ¶ 62). They are aware that views like this have prompted bias incident reports in other educational settings. J.A. 25 (*Id.* at ¶ 64).

The Bias Incident Reporting System sweeps in speech of these views because it defines a "bias incident" as an "act of discrimination, harassment, [or] intimidation" that "appears to be intentional and motivated by prejudice or bias." J.A. 23 (*Id.* at ¶ 53). LCPS notes that "[s]uch [acts] are usually associated with negative feelings and beliefs with respect to others [sic] race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability." J.A. 23 (*Id.*). LCPS documents define "[b]ias incidents" to include "microaggressions" such as saying that "I don't think that white privilege exists," and statements promoting the concept of "colorblindness." J.A. 23-24 (*Id.* at ¶¶ 50-56). Thus, if the Parents' children express their views on these issues, their speech may be reported as a "bias incident."

36

As a result, the Parents fear that the Bias Incident Reporting System will be used to discipline or shame their children for their views. J.A. 25 (*Id.* at ¶ 65). Indeed, the reports will be reviewed and logged by the equity supervisors and ambassadors. LCPS also invites students who submit incidents to the Bias Incident Reporting System to indicate whether they want the school to investigate. J.A. 22 (*Id.* at ¶¶ 48-49). Thus, LCPS is effectively censoring speech "on the basis that it communicates controversial or upsetting ideas," but as this Court recognized last month, such censorship is "incompatible with the very purpose of public education." *Starbuck v. Williamsburg James City Cty. Sch. Bd.*, No. 20-2334, 2022 U.S. App. LEXIS 6706, at *12 (4th Cir. Mar. 15, 2022).

### A. The district court erred when it held that the Parents had to allege instances where bias incident reports have led to investigation or discipline.

### 1. The existence of the Bias Incident Reporting System in and of itself chills speech.

Contrary to the district court's opinion, Plaintiffs were not required to allege "any disciplinary incidents initiated as a result of the reporting forms" to state a First Amendment overbreadth claim. J.A. 144. Plaintiffs have stated a viable claim despite the absence of such an

37

allegation because the bias incident response system's existence chills
student speech.

The Fifth and Sixth Circuits have recognized students' standing to
bring pre-enforcement challenges to similar bias response systems, as
has Judge Brennan of the Seventh Circuit. *Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020); *Speech First, Inc. v. Schlissel*, 939 F.3d
756, 770 (6th Cir. 2019); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 652
(7th Cir. 2020) (Brennan, J., dissenting).[4]

The Fifth Circuit in *Fenves* and Judge Brennan in *Killeen* recognized
that the bias reporting system's existence, *by itself*, chilled speech.
*Fenves*, 979 F.3d at 338 ("That the CCRT invites anonymous reports
carries particular overtones of intimidation to students whose views are
'outside the mainstream.'"); *Killeen*, 968 F.3d at 652 (Brennan, J.,
dissenting) ("[P]otential 'offenders' may not speak at all if they fear that
University officials are monitoring them for biased speech.").

---

[4] This Court is currently considering *Speech First v. Sands*, Case No.
21-2061. This Court could hold argument in this case until *Speech First*
is decided, because the issue is similar, although *Speech First* is not
determinative of Plaintiffs' claims because of the differences between K-
12 and higher education.

38

The Sixth Circuit considered a similar "bias response team" system in *Schlissel*, and found that it would chill the speech of an ordinary college student. 939 F.3d at 765. The Bias Response Team in *Schlissel* did not have "direct punitive authority" but could "make referrals to police, [the Office of Student Conflict Resolution], or other school resources such as counselling services." *Id.* at 763. The court reasoned that the Bias Response Team's "ability to make referrals—i.e., to inform OSCR or the police about reported conduct—is a real consequence that objectively chills speech." *Id.* at 765. It explained that "referral subject[ed] students to processes which could lead to" "criminal conviction or expulsion." *Id.* "The referral initiate[d] the formal investigative process, which itself is chilling even if it does not result in a finding of responsibility or criminality." *Id.* The court held that this objectively chilled speech, and the students thus had standing to sue. *Schlissel*, 939 F.3d at 765; *see also Abbott*, 900 F.3d at 171 (noting a student would be justified in being "alarmed" and "deterred" by a formal notice "raising the prospect of an investigation" for on-campus speech).

So too with LCPS' Bias Incident Reporting System. The ability of those running the system to refer a case to school administrators for possible discipline objectively chills speech.

The district court erred in concluding that the Parents could have no injury without allegations of investigations against them or others. A plaintiff need not "first expose himself to actual arrest or prosecution" to bring a pre-enforcement challenge. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Nor must individuals silently chill themselves for several months to see whether someone else gets arrested to establish a credible threat of enforcement. The "existence of a statute implies a threat to prosecute." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). *See ACLU v. Alvarez*, 679 F.3d 583, 593-94 (7th Cir. 2012). The existence of a check-box for investigation on an official school form further implies a threat to refer for investigation.

The Parents have alleged all they must at this stage: a form for reporting bias incidents to school authorities exists; it includes an option for referral to investigation; and a reasonable middle or high school student would fear speaking out on controversial topics facing a report on such a form.

40

## 2. The young ages of the children involved heightens the chilling effects the Bias Incident Reporting System has on their speech.

The Parents' claims are stronger than those of the students in any of the *Speech First* cases (or *Abbott*) because of their children's ages. In the other cases, courts considered whether objectively reasonable *young adults* would feel that their speech was chilled. This case concerns whether *children* in middle and high school would self-censor rather than risk reporting, investigation, and review by the Orwellian equity supervisors. "[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).[5] Thus, an ordinary sixth or seventh grader is more likely to be chilled by the potential reporting and investigation of their speech by school

---

[5] To be sure, *Myers v. Loudoun County Public Schools* said that *Lee's* indirect coercion analysis is "not relevant in cases . . . challenging non-religious activities." 418 F.3d 395, 408 (4th Cir. 2005). But that statement was made in the context of deciding whether *Lee* controlled the question of whether public school administrators reciting the pledge of allegiance in class violated the Establishment Clause, which is not the question here. Instead, the question is what a middle or high school student of ordinary firmness would find chilling to their speech and *Lee's* indirect coercion analysis answers that such students would find the Bias Incident Reporting System chilling.

41

officials than an adult college student, especially one whose student handbook includes some protections for academic freedom.

The district court further speculated that the Parents' children would self-censor out of fear of "peers and school administrators" regardless of the Bias Incident Reporting System. J.A. 145. Most fundamentally, this violates the rule against speculation on a motion to dismiss, which the court should not indulge, especially to the detriment of a plaintiff. *See Morgan v. Caliber Home Loans, Inc.*, No. 20-1745, 2022 U.S. App. LEXIS 4728, at *6 (4th Cir. Feb. 22, 2022) (noting that on a motion to dismiss the court "construe[s] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.").

Additionally, the district court overlooks LCPS' role in contributing to self-censorship. Indeed, by placing an additional burden on the school children's speech beyond what they may experience from peers, LCPS is chilling their speech with the Bias Incident Reporting System.

Indeed, the student in *Lee* no doubt faced peer pressure from her classmates to pursue religion, but what mattered was that the school there placed an additional official pressure on her by hosting a prayer at the graduation. *See* 505 U.S. at 580, 593. The Court reasoned that in

42

the "elementary and secondary public schools" context there are "heightened concerns with protecting freedom of conscience." *Id.* at 592. Here, the Bias Incident Reporting System is the heaviest thumb on the scale because it places official pressure on school children that leads to self-censorship.

Not only that, the Bias Incident Reporting System influences other factors that might lead a school child to self-censor, such as their peers' opinions. *Lee* recognized that hosting a prayer placed "peer pressure" on dissenting students. *Id.* at 593. So too here. By creating and maintaining the Bias Incident Reporting System, LCPS cultivates "cancel culture" in its student body and the broader community. Indeed, LCPS is effectively teaching children how to respond to ideas you disagree with: tell the authorities or shame them into silence. Whether school children self-censor out of fear of their peers or because of a threat of school discipline, the Bias Incident Reporting System is still the proximate cause because it incites their peers to be hostile to ideas with which they disagree.

This falls far short of the standard that Justice Breyer's majority opinion in *Mahanoy Area School District v. B.L.* set for public school

administrators last year. 141 S. Ct. 2038, 2046 (2021). There, the Court held that public schools have "an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.* The Court reasoned that "America's public schools are the nurseries of democracy," and democracy requires protecting the "'marketplace of ideas.'" *Id.* Accordingly, "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* Rather than fostering this type of environment, LCPS instead chills it by encouraging those in its community to practice: "I disapprove of what you say, so I will shame you and silence your dissent."

## CONCLUSION

The district court's decision should be reversed and the case remanded.

Dated: April 12, 2022          Respectfully Submitted,

                              /s/ Jeffrey D. Jennings
                              Jeffrey D. Jennings
                              Daniel R. Suhr
                              *Counsel of Record*
                              Liberty Justice Center
                              440 N. Wells St., Suite 200

44

Chicago, Illinois 60654
312-263-7668
dsuhr@libertyjusticecenter.org
jjennings@libertyjusticecenter.org

## STATEMENT REGARDING ORAL ARGUMENT

The Parents request oral argument on their appeal because this case presents novel and important constitutional questions about K-12 public schools' ability to implement race-conscious programs and the scope of free speech protections involving young school children. Indeed, this case requires this Court to take a position on an issue that has split other federal courts of appeal, i.e., the degree to which K-12 public schools can implement viewpoint restrictions in school sponsored fora. It also requires this Court to consider what types of pressure that K-12 schools can place on the speech of young school children without chilling it. Accordingly, oral argument will aid this Court in considering these important constitutional questions.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,689 words, excluding the parts that can be exempted by Rule 32(f), which is under the limit of 13,000 words for such a brief. I also certify that it complies with Rule 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font, size 14.

Dated: April 12, 2022                    /s/ Jeffrey D. Jennings

*Attorney for Plaintiffs-Appellants*

47