**No. 22-1168**

─────────────────────────────────────────────

## United States Court of Appeals
## for the Fourth Circuit

─────────────────────────────────────────────

PATTI MENDERS, SCOTT MINEO, AND JANE DOE # 3,

*Plaintiffs – Appellants,*

v.

LOUDOUN COUNTY SCHOOL BOARD;

*Defendant – Appellee.*

─────────────────────────────────────────────

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:21-cv-00669-AJT-TCB

─────────────────────────────────────────────

## JOINT APPENDIX

─────────────────────────────────────────────


Daniel R. Suhr, *Counsel of Record*
Jeffrey D. Jennings
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
312-263-7668
dsuhr@libertyjusticecenter.org
jjennings@libertyjusticecenter.org

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

District court docket entries ........................................................................1

First Amended Complaint (D. Ct. Dkt. No. 30) ......................................10

Exhibit A to First Amended Complaint (D. Ct. Dkt. No. 30-1) .............35

Exhibit B to First Amended Complaint (D. Ct. Dkt. No. 30-2) .............64

Exhibit C to First Amended Complaint (D. Ct. Dkt. No. 30-3) .............87

Exhibit D to First Amended Complaint (D. Ct. Dkt. No. 30-4) ...........108

Exhibit E to First Amended Complaint (D. Ct. Dkt. No. 30-5) ...........113

Exhibit F to First Amended Complaint (D. Ct. Dkt. No. 30-6) ...........118

Exhibit G to First Amended Complaint (D. Ct. Dkt. No. 30-7) ...........122

Exhibit H to First Amended Complaint (D. Ct. Dkt. No. 30-8)...........124

Memorandum Opinion and Order (D. Ct. Dkt. No. 52) ........................128

Judgment (D. Ct. Dkt. No. 55) .............................................................146

Notice of Appeal (D. Ct. Dkt. No. 56)..................................................147

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00669-AJT-TCB

| | |
|---|---|
| Menders et al v Loudoun County School Board | Date Filed: 06/02/2021 |
| Assigned to: District Judge Anthony J Trenga | Date Terminated: 01/19/2022 |
| Referred to: Magistrate Judge Theresa Carroll Buchanan | Jury Demand: None |
| Case in other court: 4th Circuit, 22-01168 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Fed Question-Violation of Constitutional Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Patti H Menders**
*on behalf of herself and her minor child RM*

represented by **Daniel Robert Suhr**
Liberty Justice Center (NA)
208 LaSalle St.
Suite 1690
Chicago, IL 60604
NA
312-367-2280
Fax: 312-263-7702
Email: dsuhr@libertyjusticecenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reilly Walsh Stephens**
Liberty Justice Center (NA)
208 LaSalle St.
Suite 1690
Chicago, IL 60604
*NA*
312-637-2280
Fax: 312-263-7702
Email: rstephens@libertyjusticecenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Jennings**
Liberty Justice Center
440 N Wells St
Ste. 200
Chicago, IL 60605
312-637-2280
Email: jjennings@libertyjusticecenter.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Mineo**
*on behalf of himself and his minor child AM*

represented by **Daniel Robert Suhr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

J.A. 1

                                             **Reilly Walsh Stephens**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Jennings**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe #1**
*on behalf of herself and her three minor children*
*TERMINATED: 01/14/2022*

represented by **Daniel Robert Suhr**
Liberty Justice Center (NA)
208 LaSalle St.
Suite 1690
Chicago, IL 60604
*NA*
312-367-2280
Fax: 312-263-7702
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reilly Walsh Stephens**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Jennings**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe #2**
*on behalf of herself and her minor child*

represented by **Daniel Robert Suhr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reilly Walsh Stephens**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Jennings**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jane Doe #3**
*on behalf of herself and her minor child*
*TERMINATED: 01/14/2022*

represented by **Daniel Robert Suhr**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reilly Walsh Stephens**

J.A. 2

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Jennings**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Loudoun County School Board**　　　　　represented by　**Stacy Leann Haney**
Haney Phinyowattanachip PLLC
11 S. 12th Street
Suite 100b
Richmond, VA 23219
804-500-0301
Fax: 804-500-0309
Email: shaney@haneyphinyo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Paul Selman**
Haney Phinyowattanachip PLLC
11 S. 12th Street
Suite 100b
23219
Richmond, VA 23219
804-500-0303
Fax: 804-500-0309
Email: aselman@haneyphinyo.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/02/2021 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC-7820816.), filed by Patti H Menders, Jane Doe #2, Jane Doe #1, Scott Mineo, Jane Doe #3. (Attachments: # 1 Civil Cover Sheet)(Jennings, Jeffrey) (Entered: 06/02/2021) |
| 06/03/2021 | | Initial Case Assignment to District Judge Anthony J Trenga and Magistrate Judge Theresa Carroll Buchanan. (ahas) (Entered: 06/03/2021) |
| 06/04/2021 | 2 | Motion to appear Pro Hac Vice by Daniel R. Suhr and Certification of Local Counsel Jeffrey D. Jennings Filing fee $ 75, receipt number AVAEDC-7825315. by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 06/04/2021) |
| 06/04/2021 | 3 | ORDER granting 2 Motion for Pro hac vice Appointed Daniel Robert Suhr for Jane Doe #1,Daniel Robert Suhr for Jane Doe #2,Daniel Robert Suhr for Jane Doe #3,Daniel Robert Suhr for Patti H Menders,Daniel Robert Suhr for Scott Mineo. Signed by District Judge Anthony J Trenga on 6/4/2021. (ahas) (Entered: 06/04/2021) |
| 06/04/2021 | 4 | Motion to appear Pro Hac Vice by Reilly Walsh Stephens and Certification of Local Counsel Jeffrey D. Jennings Filing fee $ 75, receipt number AVAEDC-7825889. by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 06/04/2021) |

| 06/04/2021 | 5 | ORDER granting 4 Motion for Pro hac vice Appointed Reilly Walsh Stephens for Jane Doe #1,Reilly Walsh Stephens for Jane Doe #2,Reilly Walsh Stephens for Jane Doe #3,Reilly Walsh Stephens for Patti H Menders,Reilly Walsh Stephens for Scott Mineo. Signed by District Judge Anthony J Trenga on 06/04/2021. (clar, ) (Entered: 06/07/2021) |
|---|---|---|
| 06/17/2021 | 6 | WAIVER OF SERVICE Returned Executed by Patti H Menders, Jane Doe #2, Jane Doe #1, Scott Mineo, Jane Doe #3. All Defendants. (Jennings, Jeffrey) (Entered: 06/17/2021) |
| 06/25/2021 | 7 | MOTION Proceed Anonymously by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Attachments: # 1 Brief, # 2 Appendix)(Jennings, Jeffrey) (Entered: 06/25/2021) |
| 06/25/2021 | 8 | MOTION Judicially Notice Certain Facts re 7 MOTION Proceed Anonymously by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 06/25/2021) |
| 06/25/2021 | 9 | MOTION for Preliminary Injunction by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Attachments: # 1 Brief, # 2 Appendix)(Jennings, Jeffrey) (Entered: 06/25/2021) |
| 06/25/2021 | 10 | MOTION Judicially Notice Certain Facts re 9 MOTION for Preliminary Injunction by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 06/25/2021) |
| 06/28/2021 | 11 | MOTION re 8 MOTION Judicially Notice Certain Facts re 7 MOTION Proceed Anonymously *CORRECTED* by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 06/28/2021) |
| 06/28/2021 | 12 | MOTION Briefing Schedule re 10 MOTION Judicially Notice Certain Facts re 9 MOTION for Preliminary Injunction , 9 MOTION for Preliminary Injunction , 7 MOTION Proceed Anonymously , 11 MOTION re 8 MOTION Judicially Notice Certain Facts re 7 MOTION Proceed Anonymously *CORRECTED* by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Attachments: # 1 Proposed Order)(Jennings, Jeffrey) (Entered: 06/28/2021) |
| 06/29/2021 | 13 | ORDERED that the Motion Doc. No. 12 be, and the same hereby is, GRANTED to the extent that the proposed briefing schedule on Motion for a Preliminary Injunction and the related Motion for the Court to Judicially Notice Certain Facts is hereby ADOPTED; and it is further ORDERED that a hearing on the Motion for a Preliminary Injunction Doc. No. 9 and the related Motion for the Court to Judicially Notice Certain Facts Doc. No. 10 be, and the same hereby is, specially SCHEDULED for Friday, July 30, 2021, at 10:00 a.m. in court. Signed by District Judge Anthony J Trenga on 6/29/2021. (ahas) (Entered: 06/29/2021) |
| 06/29/2021 | | Set Hearings as to 9 MOTION for Preliminary Injunction , 10 MOTION Judicially Notice Certain Facts: Motion Hearing set for 7/30/2021 at 10:00 AM in Courtroom 701 before District Judge Anthony J Trenga. (ahas) (Entered: 06/29/2021) |
| 06/30/2021 | 14 | ORDERED that the Court ADOPTS Plaintiffs proposed briefing schedule (See Dkt. 12); and it is further ORDERED that a hearing on the Motion to Proceed Anonymously Dkt. 7 and Corrected Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of Their Motion to Proceed Anonymously Dkt. 11 is SCHEDULED for Friday, July 30, 2021 at 9:30 a.m.. Signed by Magistrate Judge Theresa Carroll Buchanan on 6/28/2021. (ahas) (Entered: 06/30/2021) |
| 06/30/2021 | | Set Hearings as to 7 MOTION Proceed Anonymously, 11 MOTION Proceed Anonymously: Motion Hearing set for 7/30/2021 at 09:30 AM in Courtroom 500 before Magistrate Judge Theresa Carroll Buchanan..(ahas) (Entered: 06/30/2021) |

J.A. 4

| 07/16/2021 | 15 | Memorandum in Opposition re 7 MOTION Proceed Anonymously filed by Loudoun County School Board. (Haney, Stacy) (Entered: 07/16/2021) |
| 07/16/2021 | 16 | Memorandum in Opposition re 11 MOTION re 8 MOTION Judicially Notice Certain Facts re 7 MOTION Proceed Anonymously *CORRECTED* filed by Loudoun County School Board. (Haney, Stacy) (Entered: 07/16/2021) |
| 07/16/2021 | 17 | Memorandum in Opposition re 9 MOTION for Preliminary Injunction filed by Loudoun County School Board. (Attachments: # 1 Exhibit A)(Haney, Stacy) (Entered: 07/16/2021) |
| 07/23/2021 | 18 | REPLY to Response to Motion re 10 MOTION Judicially Notice Certain Facts re 9 MOTION for Preliminary Injunction , 11 MOTION re 8 MOTION Judicially Notice Certain Facts re 7 MOTION Proceed Anonymously *CORRECTED* filed by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 07/23/2021) |
| 07/23/2021 | 19 | REPLY to Response to Motion re 7 MOTION Proceed Anonymously filed by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 07/23/2021) |
| 07/23/2021 | 20 | REPLY to Response to Motion re 9 MOTION for Preliminary Injunction filed by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 07/23/2021) |
| 07/26/2021 | 21 | CERTIFICATE of Service *Amended* re 20 Reply to Response to Motion, 18 Reply to Response to Motion, 19 Reply to Response to Motion by Jeffrey Daniel Jennings on behalf of Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo (Jennings, Jeffrey) (Entered: 07/26/2021) |
| 07/28/2021 | 22 | ORDERED that Plaintiffs 7 Motion to Proceed Anonymously is GRANTED; it is further ORDERED that the 8 Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of their Motion to Proceed Anonymously is DENIED AS MOOT; it is further ORDERED that Plaintiffs 11 Corrected Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of their Motion to Proceed Anonymously is GRANTED; and it is further ORDERED that the hearing set for Friday, July 30, 2021 at 9:30 a.m. is CANCELLED. Signed by Magistrate Judge Theresa Carroll Buchanan on 07/28/2021. (jlan) Modified on 7/29/2021 (aott, ). (Entered: 07/28/2021) |
| 07/29/2021 |  | ***Motion Hearing terminated for July 30, 2021 at 9:30 am. (kgall) (Entered: 07/29/2021) |
| 07/29/2021 |  | Reset Deadlines as to 9 MOTION for Preliminary Injunction , and 10 MOTION Judicially Notice Certain Facts re 9 MOTION for Preliminary Injunction . Motion Hearing set for 7/30/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J. Trenga. (dzir) (Entered: 07/29/2021) |
| 07/30/2021 | 23 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 7/30/2021 re 10 MOTION Judicially Notice Certain Facts re 9 MOTION for Preliminary Injunction filed by Patti H Menders, Jane Doe #2, Scott Mineo, Jane Doe #1, Jane Doe #3, 9 MOTION for Preliminary Injunction filed by Patti H Menders, Jane Doe #2, Scott Mineo, Jane Doe #1, Jane Doe #3. Counsel appeared for Plaintiff and Defendant. Motion argued and taken under advisement. Order to follow. (Court Reporter A. Thomson)(dzir) (Entered: 07/30/2021) |
| 08/13/2021 | 24 | ORDERED that the Motion of Plaintiffs for the Court to Judicially Notice Certain Facts in Support of Their Motion for a Preliminary Injunction 10 be, and the same hereby is GRANTED; and it is further ORDERED that the Motion of Plaintiffs for a Preliminary Injunction 9 be, and the same hereby is, DENIED. Signed by District Judge Anthony J. Trenga on 8/13/2021. (dzir) (Entered: 08/13/2021) |

USCA4 Appeal: 22-1168     Doc: 14     Filed: 04/12/2022     Pg: 8 of 151

| | | |
|---|---|---|
| 08/16/2021 | 25 | MOTION to Dismiss for Failure to State a Claim by Loudoun County School Board. (Haney, Stacy) (Entered: 08/16/2021) |
| 08/16/2021 | 26 | Memorandum in Support re 25 MOTION to Dismiss for Failure to State a Claim filed by Loudoun County School Board. (Haney, Stacy) (Entered: 08/16/2021) |
| 08/16/2021 | 27 | ANSWER to Complaint by Loudoun County School Board.(Haney, Stacy) (Entered: 08/16/2021) |
| 08/16/2021 | 28 | SCHEDULING ORDER: Initial Pretrial Conference set for 9/8/2021 at 11:00 AM in Alexandria Courtroom 500 before Magistrate Judge Theresa Carroll Buchanan. Final Pretrial Conference set for 1/20/2022 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J. Trenga. Discovery due by 1/14/2021. Signed by District Judge Anthony J. Trenga on 8/16/2021. (Attachments: # 1 Magistrate Consent, # 2 Pretrial Notice)(dzir) (Entered: 08/16/2021) |
| 08/18/2021 | | Notice of Correction re 25 MOTION to Dismiss for Failure to State a Claim . The motion was filed without a Notice of Hearing or a Notice of Waiver of Oral Argument. The filing user has been notified that the Motion will not be ruled until a Notice of Hearing Date or a Notice of Waiver of Oral Argument have been filed. (dest) (Entered: 08/18/2021) |
| 08/25/2021 | 29 | Waiver of re 25 MOTION to Dismiss for Failure to State a Claim *Notice of Waiver of Oral Argument* by Loudoun County School Board (Selman, Andrew) (Entered: 08/25/2021) |
| 08/30/2021 | 30 | AMENDED COMPLAINT *First* against All Defendants, filed by Patti H Menders, Jane Doe #2, Jane Doe #1, Scott Mineo, Jane Doe #3. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H)(Jennings, Jeffrey) (Entered: 08/30/2021) |
| 08/30/2021 | 31 | Memorandum in Opposition re 25 MOTION to Dismiss for Failure to State a Claim filed by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 08/30/2021) |
| 08/31/2021 | 32 | ORDER denying 25 Motion to Dismiss for Failure to State a Claim. Signed by District Judge Anthony J Trenga on 8/32/2021. (see Order for further details). (swil) (c/s pursuant to Order) (Entered: 08/31/2021) |
| 09/01/2021 | 33 | MOTION Postpone Initial Pretrial Conference or Alternatively to Conduct it Virtually re 28 Scheduling Order, *Agreed Motion* by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Attachments: # 1 Proposed Order)(Jennings, Jeffrey) (Entered: 09/01/2021) |
| 09/01/2021 | 34 | *Joint* Discovery Plan by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo.(Jennings, Jeffrey) (Entered: 09/01/2021) |
| 09/02/2021 | 35 | Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that: Upon consideration of the representations made by the parties in the Joint Discovery Plan (Dkt. 34) and taking note of the Scheduling Order (Dkt. 28) entered in this case, the Court makes the following rulings: 1. All discover]' shall be concluded by Friday, January 14, 2022. 2. The Joint Discovery Plan filed by the parties is approved and shall control discovery to the extent of its application unless further modified by the Court. Regarding the parties' Agreed Motion to Postpone the Initial Pretrial Conference or Alternatively to Conduct it Virtually (Dkt. 33), this.Court does not stay discovery pending a motion to dismiss. That motion with be denied in a.separate, forthcoming order. The remainder of the Joint Discovery Plan is adopted. 3. The pretnal Cohferehcd'scheduled for Wednesday, September 8, 2021 at 11:00 a.m. is cancelled. 4. All Fed. R. Civ. P. 26(a)(i) disclosures were completed on Friday, August 27, 2021. 5. No "general objection" may be asserted in |

J.A. 6

| | | response to any discovery demand except to preserve the attorney-client privilege and work product protection. (see Order for complete details) Signed by Magistrate Judge Theresa Carroll Buchanan on 9/2/21. (tfitz, ) (Entered: 09/02/2021) |
|---|---|---|
| 09/02/2021 | 36 | ORDER denying 33 MOTION Postpone Initial Pretrial Conference or Alternatively to Conduct it Virtually re 28 Scheduling Order, *Agreed Motion*. Signed by Magistrate Judge Theresa Carroll Buchanan on 9/2/2021.(see Order for further details) (swil) (Entered: 09/02/2021) |
| 09/13/2021 | 37 | MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* by Loudoun County School Board. (Selman, Andrew) (Entered: 09/13/2021) |
| 09/13/2021 | 38 | Memorandum in Support re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* filed by Loudoun County School Board. (Selman, Andrew) (Entered: 09/13/2021) |
| 09/13/2021 | 39 | Notice of Hearing Date re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* (Selman, Andrew) (Entered: 09/13/2021) |
| 09/14/2021 | | Set Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction*. Motion Hearing set for 10/15/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. **(Deadlines Terminated)** (klau, ) (Entered: 09/14/2021) |
| 09/14/2021 | | Notice of Correction re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction*. The filing user has been notified that Judge Trenga do not hear motions on Friday and the attorney has been instructed to re-notice the motion to Wednesday. (klau, ) (Entered: 09/14/2021) |
| 09/20/2021 | 40 | Notice of Hearing Date re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* (Selman, Andrew) (Entered: 09/20/2021) |
| 09/21/2021 | | Reset Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction*. Motion Hearing set for 10/13/2021 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (klau, ) (Entered: 09/21/2021) |
| 09/27/2021 | 41 | Memorandum in Opposition re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* filed by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Jennings, Jeffrey) (Entered: 09/27/2021) |
| 09/30/2021 | 42 | Docketed in error and removed.(swil) (Main Document 42 replaced on 10/1/2021) (swil, ). Modified on 10/1/2021 (swil, ). (Entered: 09/30/2021) |
| 10/04/2021 | 43 | MOTION Appear at Motion to Dismiss Hearing Virtually re 40 Notice of Hearing Date *Unopposed* by Jane Doe #1, Jane Doe #2, Jane Doe #3, Patti H Menders, Scott Mineo. (Attachments: # 1 Proposed Order)(Jennings, Jeffrey) (Entered: 10/04/2021) |
| 10/04/2021 | 44 | REPLY to Response to Motion re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* filed by Loudoun County School Board. (Selman, Andrew) (Entered: 10/04/2021) |
| 10/05/2021 | 45 | ORDER denying 43 Motion Appear at Motion to Dismiss Hearing Virtually. Signed by District Judge Anthony J Trenga on 10/5/2021 (see Order for further details). (swil) (Entered: 10/05/2021) |
| 10/12/2021 | 46 | Notice of Hearing Date *(amended)* re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* (Selman, Andrew) (Entered: 10/12/2021) |
| 10/12/2021 | | Set/Reset Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction*. Motion Hearing reset for 11/10/2021 at 1:00 PM in |

J.A. 7

| | | |
|---|---|---|
| | | Alexandria Courtroom 701 before District Judge Anthony J. Trenga (per AJT Chambers). (dzir) Modified on 10/12/2021 (dzir). (Entered: 10/12/2021) |
| 11/10/2021 | 47 | Minute Entry for proceedings held before District Judge Anthony J. Trenga: Motion Hearing held on 11/10/2021 re 37 MOTION to Dismiss for Failure to State a Claim *and for Lack of Subject Matter Jurisdiction* filed by Loudoun County School Board. Counsel appeared for Plaintiff and Defendant. Motion argued and taken under advisement. Order to follow. (Court Reporter R. Montgomery)(dzir) (Entered: 11/10/2021) |
| 01/14/2022 | 48 | NOTICE of Voluntary Dismissal *Partial Dismissal* by Jane Doe #1, Jane Doe #3 (Jennings, Jeffrey) (Entered: 01/14/2022) |
| 01/14/2022 | 49 | So Ordered re 48 Notice of Voluntary Dismissal Partial Dismissal filed by Jane Doe #1, Jane Doe #3 (see Order for details). Signed by District Judge Anthony J Trenga on 1/14/2022. (swil) (Entered: 01/14/2022) |
| 01/14/2022 | 50 | ORDERED that the final pretrial conference in this matter, currently scheduled for Thursday, January 20, 2022, be, and the same hereby is, CONTINUED to be a date to be set, as necessary, following the Court's decision on the pending Motion to Dismiss First Amended Complaint [Doc. No. 37]. Signed by District Judge Anthony J Trenga on 1/14/2022. (swil) (Entered: 01/14/2022) |
| 01/19/2022 | 51 | Joint MOTION for Protective Order by Jane Doe #2, Patti H Menders, Scott Mineo. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order Proposed protective order)(Jennings, Jeffrey) (Entered: 01/19/2022) |
| 01/19/2022 | 52 | MEMORANDUM OPINION - ORDERED that the Motion to Dismiss First Amended Complaint 37 filed by Defendant Loudoun County School Board be, and the same hereby is, GRANTED and this action is DISMISSED. Signed by District Judge Anthony J. Trenga on 1/19/2022. (dzir) (Entered: 01/19/2022) |
| 02/14/2022 | 53 | MOTION Entry of Judgment re 52 Memorandum Opinion, *Unopposed* by Jane Doe #2, Patti H Menders, Scott Mineo. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Jennings, Jeffrey) (Entered: 02/14/2022) |
| 02/15/2022 | 54 | ORDER granting 53 Motion Entry of Judgment re 52 Memorandum Opinion, Unopposed (see Order for details). Signed by District Judge Anthony J Trenga on 2/15/2022. (swil) (Entered: 02/15/2022) |
| 02/15/2022 | 55 | CLERK'S JUDGMENT. Signed by Clerk on 2/15/2022. (swil) (Entered: 02/15/2022) |
| 02/17/2022 | 56 | NOTICE OF APPEAL as to 52 Memorandum Opinion, 55 Clerk's Judgment by Jane Doe #2, Patti H Menders, Scott Mineo. Filing fee $ 505, receipt number AVAEDC-8251514. (Jennings, Jeffrey) (Entered: 02/17/2022) |
| 02/22/2022 | 57 | Transmission of Notice of Appeal to US Court of Appeals re 56 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (swil) (Entered: 02/22/2022) |
| 02/23/2022 | 58 | USCA Case Number 22-1168 4th Circuit, Case Manager R. Sewell for 56 Notice of Appeal filed by Patti H Menders, Jane Doe #2, Scott Mineo. (jlan) (Entered: 02/26/2022) |
| 03/02/2022 | 59 | NOTICE by Jane Doe #2, Patti H Menders, Scott Mineo re 56 Notice of Appeal *Certificate: no transcript will be ordered* (Jennings, Jeffrey) (Entered: 03/02/2022) |

## PACER Service Center

### Transaction Receipt

J.A. 8

| 04/05/2022 17:50:04 | | | |
|---|---|---|---|
| **PACER Login:** | jeffjennings21 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00669-AJT-TCB |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| Patti Hidalgo Menders; Scott Mineo; and Jane Does #1, #2, and #3, on behalf of their minor children R.M.; A.M.; Jane Does #4, #5, and #6; and John Does #1 and #2.<br><br>Plaintiffs,<br><br>v.<br><br>Loudoun County School Board,<br><br>Defendant. | Case No. 1:21-cv-00669<br><br><br><br>**First Amended Complaint** |

1.      Writing on whether a school district could force high school students to show their support for a viewpoint they found objectionable, Justice Jackson penned some of the most memorable lines in constitutional law: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).[1]

2.      Yet basic principles like the First Amendment have not stopped the Loudoun County School Board from prescribing exactly what shall be orthodox for its students. LCPS is all-in on a curricular framework that expects students to speak,

---

[1] Plaintiffs file this First Amended Complaint "as a matter of course" according to Federal Rule of Civil Procedure 15(a)(1)(B).

J.A. 10

act, and think in line with a particular ideology. Any dissent from that ideology can be labeled as "bias" and anonymously reported to the speech police, a group of hand-picked students who share the LCPS administration's ideology, charged to pass judgment on those classmates that their peers turn in.

3.     In the name of "dismantling systemic racism," LCPS has implemented explicit racial distinctions between its students. The official LCPS "Action Plan to Combat Systemic Racism" creates a new position of "Student Equity Ambassador" ("SEA"), which is limited to certain students on account of their race, and discriminates against students on the basis of their viewpoint. The Board has also implemented a viewpoint discriminatory "bias reporting system" that chills students' speech on matters of important public concern. Each of these policies violates the Constitution's guarantees of free speech and equality before the law. Plaintiffs, parents in LCPS, sue on behalf of their minor children to put a stop to these constitutional violations. They therefore bring this action pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief, as well as nominal damages.

**PARTIES**

4.     Plaintiff Patti Hidalgo Menders is a resident of Loudoun County, Virginia, and the parent of a child, RM, who attends Briar Woods High School in the Loudoun County School District.

5.     Plaintiff Scott Mineo is a resident of Loudoun County, Virginia, and the parent of a child, AM, who attends Stone Bridge High School in the Loudoun County School District.

6.    Plaintiff Jane Doe #1 is a resident of Loudoun County, Virginia, and the parent of three children (Jane Doe #4 and John Does #1 and #2) who will attend a LCPS middle school.

7.    Plaintiff Jane Doe #2 is a resident of Loudoun County, Virginia, and the parent of a child (Jane Doe #5) who attends a LCPS middle school.

8.    Plaintiff Jane Doe #3 is a resident of Loudoun County, Virginia, and the parent of a child (Jane Doe #6) who attends a LCPS middle school.

9.    Defendant Loudoun County School Board is the official policy-making body of LCPS, which is headquartered at 21000 Education Court, Ashburn, VA 20148, in the Eastern District of Virginia.

## JURISDICTION AND VENUE

10.    This case raises claims under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11.    Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in the Eastern District of Virginia. The Alexandria Division is appropriate because all plaintiffs live in and the Defendant is headquartered in Loudoun County, which is in that division.

## FACTUAL ALLEGATIONS

12.    Plaintiffs Patti Hidalgo Menders, Scott Mineo, Jane #1, Jane Doe #2, and Jane Doe #3, are parents of children who attend LCPS.

13.    Plaintiff Patti Hidalgo Menders is the parent of a high school student,

RM, who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe his views as "social justice" as LCPS uses that term.

14.    Plaintiff Scott Mineo is the parent of a high school student, AM, who is subject to the Board policies challenged in this case. His child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

15.    Plaintiff Jane Doe #1 is the parent of three LCPS students who are subject to the Board policies challenged in this case. Her children would not meet the SEA criteria established by LCPS and would not describe their views as "social justice" as LCPS uses that term.

16.    Plaintiff Jane Doe #2 is the parent of a middle school student who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

17.    Plaintiff Jane Doe #3 is the parent of a middle school student who is subject to the Board policies challenged in this case. Her child would not meet the SEA criteria established by LCPS and would not describe her views as "social justice" as LCPS uses that term.

18.    All five families raise their children to be active, engaged citizens in their community and country. Their families frequently discuss current events and public affairs in a thoughtful, respectful way. The plaintiff parents encourage and teach their children to also share their views with their peers. They know that their

4

children discuss politics and public affairs with classmates and friends in person, via phone, text, or on social media. These views on politics, candidates, and public policy are often not shared by other residents or young people in Loudoun County. These views have prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

19.     The plaintiffs all currently enroll their children in LCPS.

20.     Defendant Board oversees LCPS, the public school system for Loudoun County, Virginia.

21.     LCPS operates 17 High Schools, 17 Middle Schools, and 51 Elementary Schools, serving approximately 84,000 children and employing approximately 5,700 teachers.

22.     Around June 6, 2019, LCPS commissioned a 2019 report by an outside consultant, The Equity Collaborative. That report is attached as **Exhibit A**.[2] One of the consultant's observations about the campus climate within LCPS was that "[t]here are limited opportunities for Black/African-American and Muslim students to convene in a network of social and cultural support." Based on that observation, the consultant recommended that LCPS "[e]stablish student affinity groups at all levels to support the social and cultural identities of students of color." The groups would serve as "a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social or cultural conflict." The need for a "formal structure" that

---

[2] Exhibit A is downloaded from LCPS's website:
https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/LCPS_Equity_Report_FINALReport12_2_19.pdf.

J.A. 14

"support[s] the social and cultural identities of students of color" became the Student Equity Ambassadors program that is one of the subjects of this lawsuit.

23.    "Affinity groups," as that term is used in the equity literature, refers to groups that are limited to people based on their shared race.

24.    On June 23, 2020, LCPS published its "Action Plan to Combat Systemic Racism," which outlines a complex set of initiatives to implement an ideological orthodoxy across public schools in Loudoun County. The action plan is attached as **Exhibit B**.[3]

25.    That LCPS is on an ideological mission with its Action Plan is seen in the corresponding "LCPS Comprehensive Equity Plan," where LCPS "calls for all students, staff, families, and other members of our community to engage in the disruption and dismantling of white supremacy, systemic racism, and hateful language and actions based on race, religion, country of origin, gender identity, sexual orientation, and/or ability. LCPS rejects racist and other hateful behavior and language, recognizing that it encourages discrimination, hatred, oppression, and violence." The "LCPS Comprehensive Equity Plan" is attached as **Exhibit C**.[4]

26.    The 29 slides in the Action Plan to Combat Systemic Racism (Exhibit B) include numerous proposals, including to "[p]rohibit the wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology,"

---

[3] This exhibit was downloaded directly from LCPS's website: https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/Detailed_Plan_to_Combat_Systemic_Racism_August_2020.pdf.
[4] This exhibit was downloaded directly from LCPS's website: https://www.lcps.org/cms/lib/VA01000195/Centricity/domain/60/equity_initiative_documents/Comprehensive_Equity_Plan-9_2020rev.pdf.

J.A. 15

"[f]inalize the Protocol for Responding to Racial Slurs and Hate Speech in Schools," and "consider the potential renaming of the Loudoun County High School mascot, the Raiders." Its fifteen "action items" include "developing racial literacy; raising racial consciousness," "build . . . racial consciousness," finalize a "protocol for responding to racial incidents when they occur in our schools," "reduce racial/ethnicity discipline disproportionality," setting quotas for "racially diverse interview panels" for hiring, and "meet[ing] biannually" with only "LCPS staff members of color" to "connect and offer a safe space to listen and learn." As the Action Plan says at its close, "the Action Plan to Combat Systemic Racism has a laser focus on systemic racism, oppression, and the need for the disruption and dismantling of ineffective systems."

27.    Additionally, Action Item 9 promises "LCPS will revise hiring protocols, practices, and resources for hiring managers to include but not limited to setting forth requirements for racially diverse interview panels." Action Item 11 promises that only "LCPS staff members of color" will be invited to exclusive, regular meetings with LCPS senior leadership to "connect and offer a safe space to listen and learn about their experiences in LCPS." It further explains, "As a vehicle for increasing racial consciousness; a welcoming and affirming school system for Staff of Color, during the school year LCPS Superintendent, Cabinet, and LCSB members who serve on the Equity Committee will host a minimum of two 'listen and learn' sessions for Staff of Color." The Action Item lists among its "Remaining Questions under Consideration" "What is the participation option for a non-Person of Color (who desires to serve as allies) to engage in these sessions?"

28.    The LCPS' Action Plan also developed the "Student Equity

Ambassador" program based on the 2019 Equity Collaborative report. Two to three students from each LCPS high school and middle school are selected by each school principal for the program.

29.    LCPS developed the Student Equity Ambassador Program to implement Action Item 15 in the Action Plan to Combat Systemic Racism. That action item says that "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and LCPS student leaders of Color during regularly occurring student *Share, Speak-up, Speak-out* meetings . . ." It further states: "These meetings "will be used to amplify the voice(s) of Students of Color." It also notes: that the "questions for consideration" ask "What will be the process for selecting Students of Color to serve in this way?" and "How can we create a Student Leaders of Color (i.e. student equity ambassador) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices?" *Id.* Four different times, in other words, Action Item 15 limits the Student Equity Ambassadors and "Share, Speak-up, Speak-out meetings" to only students of color.

30.    LCPS's Equity Ambassadors program is part of a larger national movement to emphasize "student voice" in education, one component of which is providing students a forum to discuss issues within the school community with administrators.

31.    Students are selected based on particular criteria, and they serve as a liaison collaborating with the district-wide Supervisor of Equity during regularly occurring student "*Share, Speak-up, Speak-out* meetings."

32.    LCPS' original "Student Equity Ambassador Information Packet"

included a section explaining the "Process for Selecting Student Equity Ambassadors." That packet is attached as **Exhibit D**.[5]

33.    The "Process for Selecting Student Equity Ambassadors" included as its first guideline for selection of SEAs that "[t]his opportunity is open to all Students of Color."

34.    Lest there be any ambiguity as to the meaning of that guideline, the LCPS' publication included a Frequently Asked Questions ("FAQ") section. The very first entry in that FAQ explained directly that the SEA program discriminated on the basis of race:

> [Question:] My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
>
> [Answer:] Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.

35.    Driving home the point, the second entry in another FAQ suggested alternatives for those who were racially barred from applying to be SEA:

> [Question:] Are there other opportunities for students to get involved?
>
> [Answer:] Students may reach out to their school's activity coordinator or the equity lead if they would like to be involved in other equity opportunities.

36.    The flyer accompanying the FAQ document from the district explains that equity ambassadors must "amplify the voices of students of color" and "represent

---

[5] App. Supp. Pls'. Mot. for Prelim. Inj. and to Proceed Anonymously 122, 124-28, ECF No. 9-2 (Decl. of Scott Mineo ¶ 16 & Ex. A).

J.A. 18

your peers of color."





**Share, Speak-up, Speak-out**

Do you want to be a **Voice** for **Social Justice**?

Are you interested in **Amplifying** the **Student Voice of Color**?

Do you want to **Represent** your **Peers of Color** by sharing their experiences in LCPS?

*You can do all of this by serving as one of our **Student Equity Ambassadors**. See XXXX for more information or visit this website for the information packet.*

37.     After LCPS posted this document online, the explicit racial discrimination in the SEA program was criticized.

38.     On or about October 28, 2020, LCPS removed the SEA program description from its website and replaced it with a revised version without any explanation for the revision. The revised version is attached as **Exhibit E**.[6]

39.     The revised version of the SEA program description was almost entirely identical to the prior version, except that it deleted the requirement that the SEA program was open only to people of color, and the two related FAQ entries quoted above.

40.     On November 5, 2020, emails were published between a concerned parent and an administrator at LCPS. The parent asked about the SEA program, and

---

[6] This exhibit is drawn from BoardDocs, which is a contractor website service that LCPS uses to organize and house documents for its School Board: https://go.boarddocs.com/vsba/loudoun/Board.nsf/files/BUSM2L5829AB/$file/Revised10_27_20%20SB%20-%20Student%20Equity%20Ambassador%20Packet.pdf.

J.A. 19

whether their child, who is not a student of color, was eligible to apply. Relevant portions of those emails are attached as **Exhibit F**.[7]

41.    The LCPS administrator responded "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings."

42.    Though students may report "bias incidents" about gender, gender identity, religion, or politics, LCPS is clear that the focus of the program, and the focus of the principals selecting the student ambassadors, is fixed on race: "We are focusing on race because it is important to recognize students who have been marginalized." *See* Ex. E, at 3. Apparently LCPS believes the marginalization of other students, whether because of their religious faith, political beliefs, gender, income, or other factors, is not worthy of such focus.

43.    The revised version retains other criteria upon which principals are supposed to select students, such as "[s]tudents who have a passion for social justice and are willing to serve." The flyer inviting students to engage in the program similarly solicits applicants who "want to be a voice for social justice." In a presentation, LCPS's equity director described the equity ambassadors as part of the district's work to "empower students to make meaningful contributions to their world through a social justice lens." Likewise, the Action Plan to Combat Systemic Racism says the Student Equity Ambassadors Program is a "Student Leaders of Color network division-wide" with the purpose of "build[ing] forward motion in using

---

[7] App. Supp. Pls'. Mot. for Prelim. Inj. and to Proceed Anonymously 122, 129-32, ECF No. 9-2 (Decl. of Scott Mineo ¶ 17 & Ex. B).

J.A. 20

student voice" to use a "Social-Justice lens to develop greater awareness and build student empathy, leadership and advocacy skills." One LCPS school's "equity lead" teacher has said: "Student Equity Ambassadors "are promoting cultural awareness and growth by . . . be[ing] a voice for social justice." In a letter to parents from an LCPS high school announcing the SEA program, the high school's equity team lists having "a passion for social justice" as the first quality students "serving in th[e] role" of Student Equity Ambassador must possess. That letter is attached as **Exhibit G.**[8] In other words, to qualify for this program, a student must be on board with LCPS's vision for social justice.

44.    The Student Equity Ambassador program is not simply another extracurricular student club or activity, like the Debate Team, or 4H, or the French Club. Rather, it is a formal office the school endows with particular authority to speak on behalf of the student body, and as with any student leadership position, it is a valuable credential for students looking to improve their resumes.

45.    LCPS implemented the Student Equity Ambassador Program during the waning months of the 2020-2021 school year. Yet of the students that LCPS chose to serve as student equity ambassadors during that time only seventeen percent identified as "white only," despite "white only" students making up forty-seven percent of LCPS enrollment.

46.    The "*Share, Speak-up, Speak-out*" meetings in which Student Equity Ambassadors are entitled to take part are not an everyday opportunity for student-

---

[8] *Id.* at 123, 134 (Decl. of Scott Mineo ¶ 18 & Ex. C).

faculty engagement. Rather they are part of an explicit initiative to stifle speech under the guise of eliminating "bias."

47.    To this end, the LCPS Office of Equity distributed to parents and students a "Share, Speak Up, Speak Out form" to "capture incidents of bias in an anonymous manner." That form is attached as **Exhibit H.**[9] The incidents reported on this form are then used in the "*Share, Speak-up, Speak-out*" meetings with the Student Equity Ambassadors. LCPS developed the bias incident reporting form to implement Action Item 15 in the Action Plan to Combat Systemic Racism.

48.    LCPS will investigate "bias incidents" if the person submitting the form provides his or her name and indicates on the form that they would like school administrators to investigate the "particular incident" they are reporting. The slide deck on the Action Plan to Combat Racism says the "electronic form will be used to anonymously collect student stories and to ascertain whether or not the student would like their account of the issue investigated."

49.    The form includes check boxes for the "Type of Bias Incident" being reported, including "Harassment or Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression," "Ability Status," "Religious Practices," and "Sexual Orientation."

50.    One LCPS "equity lead" described the equity ambassadors' role to a student newspaper as to "work to identify microaggressions" within their school.

---

[9] Defs.' Mem. Opp'n to the Mot. of Pls.' for Prelim. Inj., Ex. A, ECF No. 17-1 (Decl. of Lottie Spurlock ¶ 13, Ex. 3).

51.    On May 11, 2021, three student equity ambassadors from Lightridge High School presented to the LCPS Board. In their slideshow, they said, "Microaggressions are defined as the everyday, subtle, intentional — and often unintentional — interactions or behaviors that communicate some sort of bias toward historically marginalized groups."

52.    The presentation continues by citing examples of microaggressions that are "denial[s] of racial reality" like "I don't think that white privilege exists." Another slide says that to assert a framework of "colorblindness" which sees people as individuals rather than members of a race is a microaggression.

53.    In a webinar for the Virginia Department of Education, the LCPS equity director presented a slide that stated, "A bias incident is an act of discrimination, harassment, [or] intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias. Such are usually associated with negative feelings and beliefs with respect to others [*sic*] race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability."

54.    Nothing about the bias reporting system limits the covered speech to on-campus activities. Speech on social media or via text message or even in-person or telephone conversations outside school but involving students could constitute a "bias incident."

55.    Nothing about the bias reporting system guarantees that those accused of bias will enjoy any due process rights, a presumption of innocence, a right to counsel, or any privacy or confidentiality protections.

J.A. 23

56.    LCPS already has in place a robust policy against bullying and cyber-bullying, LCPS Policy 8250. As part of its Action Plan, LCPS has also adopted a "LCPS Protocol for Responding to Racial Slurs and Hate Speech in Schools." LCPS's equity office emphasizes in its messages about the bias response system, "Students should still report discipline incidents to a trusted adult or members of the administrative team." Thus, the bias reporting system functions alongside and in conjunction with the disciplinary system.

57.    In the Virginia Department of Education presentation, the director described the SEA as "students coming together in this forum."

58.    In a letter to parents from an LCPS high school announcing the SEA program, the high school's equity team says "[t]he goal is to provide a forum to amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination."

59.    The Plaintiffs' children would not have qualified for the SEA program as originally conceived or practically implemented.

60.    The Plaintiffs' children hold views about important public issues that they believe conflict with LCPS's definition of social justice.

61.    The Plaintiffs' and their children are opposed to the ideology known as Critical Race Theory ("CRT"), which teaches that white people are evil or oppressors and that our nation's institutions are inherently racist. Instead, they believe that everyone is equal and that we should strive for a color blind society. Indeed, the Plaintiffs' have taught their children to treat everyone with respect and dignity regardless of their race. They have also taught them that each individual is unique

J.A. 24

and special, and that we should consider others not based on the color of their skin but the content of their character.

62.    The Plaintiffs' children wish to speak out on CRT, race, and gender identity, and other controversial political issues within the LCPS community. The Plaintiffs encourage and teach their children to share their views on these subjects with their peers.

63.    But the views of the Plaintiffs and their children on these subjects are often not shared by other residents or young people in Loudoun County. Indeed, when others have shared views similar to the Plaintiffs and their children on CRT, race, gender identify, and other controversial political issues, that speech has prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

64.    Plaintiffs are aware that in other school settings nationwide, "bias incident" response or disciplinary systems have been invoked against students based on similarly worded standards for wearing clothing supporting President Trump, saying "Make America Great Again," or celebrating the Second Amendment.

65.    Plaintiffs are concerned that if their students share their views about political or social issues, including those touching on CRT, religion, race, human sexuality, and other controversial political issues, they will be reported and investigated for "bias incidents." They fear such a report, investigation, public disclosure, could negatively impact their students' standing in the school community and ruin their college or career prospects.

66.    An LCPS school district spokesperson told a newspaper, "The specific

reason behind this action step is to utilize it as a means to amplify and elevate student voice." Yet it will have the opposite effect: rather than amplifying or elevating student voices, it will chill them by creating a process for anonymously ratting out classmates for anything anyone finds offensive, with no burdens of proof or due process protections.  It is a heckler's veto in a kangaroo court.

## COUNT I

**Defendant's Student Equity Ambassador Program violates the Fourteenth Amendment's guarantee of equal protection because it discriminates on the basis of race.**

67.    The allegations in the preceding paragraphs are incorporated herein by reference.

68.    "When the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *see also Adarand Constructors v. Pena*, 515 U.S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny").

69.    Even where a policy is formally race-neutral, it can still be shown to be discriminatory where its historical context, legislative history, and implementation show it was adopted with a race-discriminatory motive. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

70.    "[D]iscrimination in favor of one race is necessarily discrimination against members of another race." *La. Associated Gen. Contractors v. State ex rel.*

J.A. 26

*Div. of Admin., Office of State Purchasing*, 669 So. 2d 1185, 1204 (La. 1996).

71.    Creating new forms of discrimination to remedy old ones is not a solution to past racism. Rather, the U.S. Supreme Court has said "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved,* 551 U.S. at 748.

72.    The Board, in making policy for LCPS, is acting under color of state law.

73.    Plaintiffs' children are being unlawfully discriminated against on account of their race.

74.    Plaintiffs' children are similarly situated in all relevant aspects to other parents and children attending LCPS.

75.    LCPS' Student Equity Ambassador program is an invidious racial classification that discriminates against students on the basis of race.

76.    LCPS has a policy and practice of apportioning the benefits of the Student Equity Ambassadors program among students on account of their race.

77.    There is no compelling government interest in LCPS discriminating among students on account of their race.

78.    The Student Equity Ambassador program is not narrowly tailored to serve any government interest, especially when the SEA program is tied to race, but its bias-investigation mandate includes bias based on gender, gender identity, sexuality, and political beliefs.

79.    There is no important government interest in defining the Student Equity Ambassadors program based on race.

80.    The Student Equity Ambassadors program is not substantially related

J.A. 27

to any government interest.

81.    Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

## COUNT II

**Defendant's Student Equity Ambassador Program violates the First Amendment's guarantee of freedom of speech because it discriminates on the basis of viewpoint.**

82.    The allegations in the preceding paragraphs are incorporated herein by reference.

83.    "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting)). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

84.    The Board, in making policy for LCPS, is acting under color of state law.

85.    The Student Equity Ambassadors Program and its "Share, Speak Up, Speak Out" are a nonpublic forum. LCPS officials have described it as a forum.

86.    LCPS requires that Student Equity Ambassadors express a government-approved orthodox viewpoint in order to participate in the program.

87.    There is no compelling government interest in LCPS discriminating among students on account of their viewpoint.

88.    The Student Equity Ambassador program's viewpoint requirement is

J.A. 28

not narrowly tailored to serve any government interest.

89.    There is no important government interest in the Student Equity Ambassadors program.

90.    The Student Equity Ambassadors program is not substantially related to any government interest.

91.    Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## COUNT III

**Defendant's Student Equity Ambassador Program violates the Equal Protection Clause because it discriminates on the basis of viewpoint.**

92.    The allegations in the preceding paragraphs are incorporated herein by reference.

93.    The Fourteenth Amendment's Equal Protection Clause protects individuals from "arbitrary government decisionmaking, and against 'invidious discrimination' . . . ." *Buxton v. Kurtinitis*, 862 F.3d 423, 430 (4th Cir. 2017) (quotation omitted). A government violates the Equal Protection Clause when it discriminates on the basis of viewpoint. *Id.*

94.    The Board, in making policy for LCPS, is acting under color of state law.

95.    LCPS' requirement that Student Equity Ambassadors express a government-approved orthodox viewpoint in order to participate in the program violates the Equal Protection Clause.

96.    Plaintiffs are therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

J.A. 29

## COUNT IV

**Defendant's bias reporting system violates the First and Fourteenth Amendments because it chills speech through content based speech restrictions.**

97.    The allegations in the preceding paragraphs are incorporated herein by reference.

98.    "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. 819 at 829.

99.    Bias response systems chill speech even where there is no formal sanction against individual students. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (holding that bias reporting systems create "an objective chill based on the functions of the Response Team").

100.    Though the government may legitimately regulate speech that crosses the line into bullying, especially in the school setting*, Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 650 (1999), the government does not have permission to grant a heckler's veto to any student who files a report based on a single incident of speech that the hearer found offensive.

101.    The Board, in making policy for LCPS, is acting under color of state law.

102.    LCPS, in defining the scope of "bias incidents," has created content-based regulations of speech subject to strict scrutiny, because only speech about certain matters can possibly be reported as "bias incidents."

103.    There is no compelling government interest in LCPS' bias reporting system.

J.A. 30

104. The bias reporting system is not narrowly tailored to serve any government interest.

105. There is no important government interest in the bias reporting system.

106. The bias reporting system is not substantially related to any government interest.

107. Plaintiff is therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## COUNT V

**Defendant's bias reporting system violates the First and Fourteenth Amendments because it chills speech through viewpoint discrimination.**

108. The allegations in the preceding paragraphs are incorporated herein by reference.

109. "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 470 (2015) (Scalia, J., dissenting)). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).

110. The Board, in making policy for LCPS, is acting under color of state law.

111. In defining what constitutes a "bias incident" for the bias incident reporting system, Defendant discriminates on the basis of viewpoint. The "bias incident" reporting system chills speech based on viewpoint given that the equity ambassadors who will judge their peers' speech must hold certain viewpoints in order to secure their positions. Defendant's viewpoint discrimination on these matters

J.A. 31

violates the Fourteenth Amendment.

112.   Plaintiff is therefore entitled to declaratory and injunctive relief and nominal damages under 24 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare that Loudoun County Public School's Student Equity Ambassador program impermissibly discriminates on the basis of race.

b.    Declare that Loudoun County Public School's Student Equity Ambassador program impermissibly discriminates on the basis of viewpoint in violation of the First Amendment and Equal Protection Clause.

c.    Declare that Loudoun County Public School's bias reporting system impermissibly discriminates on the basis of speech content and viewpoint.

d.    Enjoin the Loudoun County School Board from operating the Student Equity Ambassador program.

e.    Enjoin the Loudoun County School Board from operating the bias reporting system.

f.    Award Plaintiffs Nominal Damages.

g.    Award Plaintiffs their costs and attorney's fees under 42 U.S.C. § 1988.

h.    Award Plaintiffs any other relief to which they may be entitled.

Dated: August 30, 2021                    Respectfully submitted,

                                          /s/ Jeffrey D. Jennings

J.A. 32

Jeffrey D. Jennings (VSB No. 87667)
Daniel R. Suhr (Admitted *pro hac vice*)
Reilly Stephens (Admitted *pro hac vice*)
141 W. Jackson St., Ste. 1065
Chicago, Illinois 60604
Telephone (312) 637-2280
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org

*Attorneys for Plaintiffs*

J.A. 33

### CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2021, a copy of the foregoing was sent to the

following persons through the Court's ECF system:

> Stacy Haney
> Haney Phinyowattanachip PLLC
> Shaney@haneyphinyo.com
>
> *Counsel for Defendant Loudoun County School Board*

DATED: August 30, 2021                    /s/ Jeffrey D. Jennings
                                          Jeffrey D. Jennings (VSB No. 87667)
                                          Liberty Justice Center
                                          141 W. Jackson Blvd., Suite 1065
                                          Chicago, Illinois 60604
                                          Telephone (312) 263-7668
                                          Facsimile (312) 263-7702
                                          jjennings@libertyjusticecenter.org

                                          *Attorneys for Plaintiffs*

J.A. 34

# EXHIBIT A



# INITIAL REPORT

## Systemic Equity Assessment:
## A Picture of Racial Equity
## Challenges and Opportunities in
## Loudoun County Public School District

**PRESENTED TO:**
**Eric Williams**
**Superintendent of Schools**
**Loudoun County Public Schools**

## Submitted June 6, 2019

REPORT CONTACT:
Jamie Almanzán
The Equity Collaborative, LLC
P.O. Box 14, Hillsborough, NC 27278

J.A. 36

## FRAMING THE ISSUE: A FOCUS ON DIVERSITY, EQUITY, AND INCLUSION

The Loudoun County Public Schools (LCPS) is committed to providing a world-class education to every student and mobilizing resources in the face of any barrier that challenges this commitment. Additionally, similar to many school systems across the country, LCPS recognizes that an important component of providing a world-class education involves addressing issues of diversity, equity, and inclusion.

While LCPS has a long history of providing educators with high quality professional development and support on instructional matters, few LCPS educators have had formal training or support on appropriately weaving social and cultural differences into the fabric of schools and classrooms. Hence, issues such as poverty, race, gender identity, and sexual orientation are perceived as not only difficult to traverse or poorly traversed, but better left untouched or ignored. Attempts by parents to discuss or by staff to conduct meaningful work in these areas usually evoke feelings of anxiety, apprehension and disbelief.

Because the struggle to address issues of diversity, equity, and inclusion is so tall, many educators tend to sidestep differences in the students and families they serve and resolve to treat all people "the same." This is indeed a noble effort, except for the fact that how students and families experience school varies widely based on social, cultural, and racial factors. Schools' attempts at fairness and equality within school walls are rarely noticed among student, family and community groups that perceive they have been historically and traditionally marginalized because that is not their experience on a day-to-day basis. In many ways this dilemma frames the reason that Loudoun County Public Schools initiated a partnership with The Equity Collaborative: to find and elevate the voices and stories of those whose experiences are not widely known or accepted and make recommendations for a path forward.

J.A. 37

## EXECUTIVE SUMMARY: Preliminary Findings & Recommendations

In the spring of 2019, as part of a larger move toward addressing racial inequity, Loudoun County Public School's Superintendent Eric Williams engaged in conversation with The Equity Collaborative to gather additional data and perspectives from LCPS students, parents, and educators around issues of racial equity, to further understanding the student and family experiences based on their social, cultural, and racial factors. Superintendent Williams expressed the need to use an Equity Assessment process to begin to identify and address inequities within the division at the School Board meeting on February 12, 2019.

*"In addition to the strategic plan, more work needs to be done. The Department of Instruction has been collaborating with The Equity Collaborative, an organization with expertise in equity in education, to develop a plan for a systemic equity assessment to be conducted this spring. The equity assessment will utilize our existing quantitative district data and will involve a series of qualitative interviews and focus groups. This assessment will include in-person interviews of division leaders, teachers, students, parents, and community members. The team conducting the assessment will compile an assessment report that will inform the work of the ad hoc committee. It is important that this type of assessment is done by experts in the field rather than internal staff. It is also important that this assessment utilize our current LCPS data and collect qualitative feedback from stakeholders as well. This assessment is an essential step in developing a comprehensive equity plan that will include a clear vision and specific strategies for systemic change."*

From mid-April through the end of May, The Equity Collaborative staff conducted a series of focus group sessions and interviews at 24 schools across the division. The focus group participants provided descriptions of their experiences in classrooms, within the school as a whole, and their interactions with school leadership. They expressed their frustrations on how some racially motivated acts of intimidation have been handled, provided hopeful recommendations for improvements, and declared their commitment to fostering productive partnership with the division for county-wide success. Five salient themes emerged, informed by insights shared by focus group participants. Four primary recommendations are identified to further support LCPS in addressing pervasive inequities division-wide.

### Five Emergent Themes

1. Despite efforts from the division, school site staff, specifically principals and teachers, indicate a low level of racial consciousness and racial literacy. People are unclear and fearful on how to participate in conversations about race, let alone respond to racially charged incidents.

2. Educator focus groups indicated a desire to recruit and hire diverse school staff that reflect student racial and language backgrounds.

3. Economic diversity across the county/division complicates the discussions about race, leading many people to steer the conversation away from race to focus on poverty.

J.A. 38

4. Discipline policies and practices disproportionately negatively impact students of color, particularly Black/African-American students.

5. Many English Learners, Black/African-American, Latinx, and Muslim students have experienced the sting of racial insults/slurs or racially motivated violent actions.

**Four Primary Recommendations**

1. Produce and publish on the "Superintendent's Message" page a new division-authored statement defining and condemning White supremacy, hate speech, hate crimes, and other racially motivated acts of violence. Require individual schools sites include this message on their webpage and in communications to parents twice a year (not only in response to an incident).

2. Review the current/establish a clear policy with built-in accountability for addressing racially motivated acts and create proactive leadership measures to address the student use of racial insults. Name that the N-word is not tolerated by anyone in LCPS.

3. Design additional opportunities for LCPS educators to engage in professional learning about color consciousness and implicit bias. Further establish a culturally-responsive framework to inform curricular and instructional efforts across the division.

4. Revise the current/establish a short- and long-range action plan to address challenges related to hiring for diversity, equity, and inclusion.

J.A. 39

## INTERVIEW AND FOCUS GROUP STRUCTURES

During the spring of 2019, from mid-April through the end of May, The Equity Collaborative staff conducted a series of focus group sessions and interviews at 24 schools across the division to review division culture related to diversity, equity, inclusion, and race.  Elementary, middle and high school students, staff, parents and administrators were interviewed for at least an hour each.  Questions asked were used as prompts for deeper discussion.  The Equity Collaborative staff gathered all of the qualitative data, removed all names and other identifiers, sorted the comments by themes, and share the resulting analysis in this report.  Below is a list of roles and groups that participated in interviews or focus groups sessions.

- Minority Student Achievement Advisory Committee
- Principal & Assistant Principal/Administrative Team Interviews
- Teacher/Staff (credentialed and certificated) Focus Groups
- African-American and Latinx Parents Focus Groups
- African-American and Latinx Teacher/Staff Focus Group
- Student Focus Groups (newcomers, Special Ed, mostly but not exclusively students of color)

The report highlights peoples' experiences across the system.  It is meant to serve as a means of listening to multiple constituencies and validating those experiences.  Using these qualitative assessment processes is helpful to understand the LCPS community issues and needs.  The data gathered expresses motives, opinions, feelings, and relationships, in addition to the small actions, or pieces of community history or context that affect the current situation.  We acknowledge the fact that experience is subjective – that it is filtered through the perceptions and world views of the people going through it.  It is important to understand those perceptions and world views.

## EQUITY ASSESSMENT

Loudoun County Public Schools carry a well-deserved reputation for academic excellence.  Nearly every educator interviewed was able to speak to the division's academic achievement and stature in the greater Washington DC area.  The division has made significant financial and human capital investments in instructional supports, such as implementing Project Based Learning and Personalized Learning Initiative programs, and effective communications about inclusion in Special Education services and practices.  The division's top performers can compete with students from any schools in the country and attend prestigious colleges and universities.

Yet division data and anecdotal reports show that there are academic performance and opportunity gaps between student groups as well as groups of students who feel disconnected from the school environment.  Virginia's Standards of Learning (SOL) performance measures show that division and school site academic interventions are not yet effective in sufficiently supporting the success of economically disadvantaged students, students with special needs, students of color and students with developing English.

### Poverty

LCPS staff frequently speak about the number of students living in poverty and the broad economic spectrum of families in the division.  Indeed, the division does have significant achievement gaps between students who are economically disadvantaged and those who are not.

|  | Non-ED Students | Economically Disadvantaged |
|---|---|---|
| HS Graduation | 96% | 88% |
| **Advanced Diploma** | **72%** | **42%** |
| **Standard Diploma** | **23%** | **46%** |
| ELA Reading | 86% | 65% |
| ELA Writing | 89% | 72% |
| Math Proficiency | 83% | 62% |

Staff address the economic differences with sincere care for the impact of living in poverty and with questions about the cultural gaps between families across the economic divide.  Especially at the Elementary School level, staff are very aware of the living conditions of students from the rural parts of the division whose families struggle with poverty.  There is a general awareness that living in poverty can have an impact on student learning, but not much deep understanding about the impact of trauma, hunger, and other poverty-associated conditions have on the brain.

Staff, students and parents also talk quite openly about the cultural gaps between affluent and poor families.  Sometimes this dialogue also acknowledges urban-rural differences.  When probed about

J.A. 41

USCA4 Appeal: 22-1168      Doc: 14        Filed: 04/12/2022      Pg: 44 of 151

these differences, most respondents had no sense of how to possibly bridge these cultural differences better than what the schools are already doing, such as Backpack Buddies.

**Learning Disabilities**

When LCPS staff are asked about equity issues, they most frequently speak about the number of students with disabilities and current inclusion practices.  The data on student achievement shows that significant achievement disparities in LCPS are between general education students and students with disabilities.

|  | All Students | Students with Disabilities |
|---|---|---|
| HS Graduation | 96% | 94% |
| **Advanced  Diploma** | **72%** | **28%** |
| **Standard Diploma** | **23%** | **67%** |
| ELA Reading | 86% | 59% |
| ELA Writing | 89% | 57% |
| Math Proficiency | 83% | 55% |

It is clear that LCPS has invested significant financial and human resources in trying to address opportunity gaps and thus the achievement disparities for students with disabilities.  And while it is not a major focus of this report, there are elements of equity work that could have additional impact on this specific achievement disparity.

An emphasis on understanding how the brain works can help improve academic conditions for all students with learning differences, whether those be cultural or biological.  Additionally, equity work helps to shift school culture to increase expectations for all students, and students with disabilities can gain from a belief system that expects all students to perform at high levels.

**English Learners**

In continuing the conversations about equity issues, LCPS staff also frequently speak about the number of students who are English Language Learners.  The data on student achievement shows that the most significant achievement disparities are in earning diplomas.

|  | All Students | English Learners |
|---|---|---|
| HS Graduation | 96% | 73% |
| **Advanced Diploma** | **72%** | **21%** |
| **Standard Diploma** | **23%** | **52%** |

J.A. 42

| | | |
|---|---|---|
| ELA Reading | 86% | 62% |
| ELA Writing | 89% | 57% |
| Math Proficiency | 83% | 62% |
| | | |

**Race**

Like many school divisions in the country, LCPS has significant racial opportunity gaps and thus achievement disparities. While graduation rates are close, Black/African-American and Latinx students complete Advanced Diplomas at a significantly lower rate than white students.

| | White | Latinx | Black |
|---|---|---|---|
| HS Graduation | 98% | 84% | 97% |
| **Advanced Diploma** | **80%** | **45%** | **57%** |
| **Standard Diploma** | **19%** | **39%** | **40%** |
| ELA Reading | 90% | 69% | 77% |
| ELA Writing | 92% | 75% | 80% |
| Math Proficiency | 87% | 65% | 69% |

In focus group interviews, Black/African-American students, parents and community members shared that their experience in school does not match students' academic record.  As will be explored later in this report, Black/African-American students feel marginalized within the school division and do not feel that they are supported in developing a sense of cultural or academic identity, while at the same time are often performing well academically in spite of those experiences.  In interviews with LCPS staff, most professionals also identified that the division does not have very many specific methods for supporting Black/African-American students.

There are, of course, other students of color in LCPS with some regions of the county having higher numbers of Latinx or East Indian (included in "Asian") students.  Staff report that the division's English Language Learners are mostly newcomers, also from economically disadvantaged backgrounds.

## Summary: Student Focus Groups

**Emergent Themes: Student Focus Groups**

1. Discipline policies and practices disproportionately negatively impact students of color, particularly African-American students.

J.A. 43

> 2. Most English Learners, Black/African-American, Latinx, and Muslim students have experienced the sting of racial insults/slurs.
> 3. There are limited opportunities for Black/African-American and Muslim students to convene in a network of social and cultural support.
> 4. Students rarely speak with their parents about routine racial incidents experienced at school.
> 5. There are few school-based personnel that students trust to help navigate the complexities of race.
> 6. Students indicate a desire to continue and increase opportunities for interesting academic work and different approaches to learning.

The Equity Collaborative staff engaged groups of students at each of the elementary, middle and high schools visited.  The groups were mostly, but not exclusively, comprised of students of color.  Each group participated in structured dialogue to express their perceptions and experiences of how race unfolds in LCPS.  In general, the feedback from students added a more intrinsic layer to the needs identified by MSAAC, other community members and parents of Black/African-American students.  Whereas community members and parents of Black/African-American students expressed concern about the limitations to educational opportunities their students encounter, student focus group members shared how the weight of race shapes how they feel about themselves, their peers, and their school community.

Some Black/African-American students shared openly about their experiences with race in LCPS.  In fact, many students were relieved that other adults were interested in what they had to say.  The atmosphere in the groups could be described as having an aura of validation and affirmation - the recognition that their experiences, both positive and negative, were indeed real and authentic.  Summarized below are vignettes that capture the essence of what students encounter in the racial landscape of LCPS.

### Racial Slurs, Insults, and Hostile Learning Environment

We live in a world where race matters.  It is a social construct that shapes our identities – how we think of ourselves and how others perceive us.  To some degree, we may be able to control how we view ourselves as individuals.  It is exponentially more difficult to influence what others project on us because of our race.  Focus group students explored the frustrations in their everyday experiences being targets of racist comments and acts of violence from both their peers and teachers.  Most disturbing was a growing sense of despair among those interviewed that such racist events, large and small, are ignored and school leaders do not believe their reports of mistreatment.  *"Nothing happens"* or *"It gets swept under the rug"* were common comments across the county.

J.A. 44

Focus group participants highlighted the pervasive use of racial slurs and insults directed at students of color.  Most focus group members have been on the receiving end of racial insults personally or have witnessed incidents in school or through social media platforms.  Students also shared that those who hurl the insults frequently hide under the cover of humor or mockery, discounting how harshly they affect the targeted student.  One example offered was *"People will ask me do you like watermelon or grapes...do you like chicken? And then laugh."*  Students continued to share that White students will deny having said the insult to avoid repercussions and to make Black/African-American students look as if they are needlessly complaining, pulling "the race card."  While insults have taken on many forms, it is shocking the extent to which students report the use of the N-word as the prevailing concern and consistently discussed among students in the school environment.  Focus group participants were also very specific to say that the vast majority of the racial insults come from White students, White teachers, and White parents.

> *A group of White kids [at my school] used the N-word and then denied it.*

> *White kids will use it as a joke or because they think they can say it because you're friends. They treat the word like a joke and they think its funny.  I have heard teachers say things, too.*

> *A kid who said something dumb – said it was OK because he had "the N-pass."*

> *The N-word gets used ALL the time here.*

> *Kids are always getting on me about my skin color and my hair.  They call me out my name and call me the N-word and my teacher just turns the other cheek – because they are uncomfortable – but if I say the B-word or any other word – I'm in trouble.*

> *You can't say it is disturbing you – then they'll laugh in your face.  Or they will stop and all their friends will start and make up a song of it.  I have to hold myself back.*

> *Maybe they should pay attention to how kids' parents behaved.  I've had racist remarks made to me by another kid's parents.*

> *I don't take it as a joke, I take it personally.*

> *No – that's not OK. I don't like it from anyone.*

Focus group students seem to understand the complexities surrounding the N-word.  In some spaces it can be used as a term of endearment among students from various social and cultural backgrounds, and in other spaces, the word is used to demean and humiliate.  Nonetheless, focus group students acknowledged the historical significance of the term and its problematic nature whatever space its use.  As quoted above, several students expressed that they'd rather never hear it at all.

J.A. 45

Although confronting racial insults and slurs is a part of the Black/African-American student experience in LCPS, English Learners, Latinx and Muslim students also experience insults and slurs because of their race, religion, language and culture.  These students also reported the instances of being subjected to racial insults came from teachers as often as White students.  And similar to the experience of Black/African-American students, they too cited the use of jokes and humor as cover for the slurs.  When asked if anyone had experienced racial slurs, one student replied, *"Yes.  They think it's funny, but it's not funny."*  Other students shared:

> *One of my teachers told me to go back to my country. I was in shock. I was born here.*

> *In middle school and there was something in a book about Arabs and the teacher said – All Arabs are terrorists.  I raised my hand and said "I am Arab and I am not a terrorist."  She just stared at me.*

> *The other day we had a teacher mention police – not in a mean way – to a student.  Hispanic kids are dealing with immigration and deportation and for that girl, hearing "the police" means a lot to her.*

> *The White kids came up with a word for Hispanic kids.*

Core Value 3 in the LCPS Vision 2020 Strategic Framework put forth from the LCPS Board of Education states that the division values "An inclusive, safe, caring, and challenging learning environment serves as the foundation for student growth."  With students hearing racial slurs and insults everyday in hallways, at recess, at lunch and in the classroom, coupled with their experience and perception of little to no repercussions for those who use such hurtful language, students are forced into a hostile learning environment that not conducive to academic success.


### Academic Expectations

Students were just as descriptive about how teachers respond to them in academic settings when students self-advocate for support.  Students indicated that they all had at least one teacher recently who was unsupportive.

> *"When we go for help, they just give you more worksheets."*

> *"If you say 'I don't understand that' some of the teachers are mean and don't want to go back over it."*

> *"We weren't this mean to each other at my other school [in another state]."*

> *"They treat us like we are super dumb - we get help on the things that we don't need help on and don't get help on the things that we do need help on."*

J.A. 46

When instruction and educational experiences were positive, however, students' faces lit up indicating they enjoyed this type of instruction and that the teacher believes in their academic ability -- *"In math she tells me – you can do it – you're smart."* Students were eager to share about other innovative approaches that hooked them.

> *Wiggle room Wednesday – we started a few weeks ago in 5th grade – we had a playlist of worksheets and things to do on your Chromebook and you had a couple of weeks to do. On wiggle room Wednesday there were no mini lessons – we just do everything on our Chromebook. We can do our work in any order, and can work with our friends, we just need to get it done by the end of the day.*

> *I like the way the teachers teach this year – they are a lot more fun and do a lot of activities. Say a teacher stands there and tells you a bunch of things over and over again. Or say you do a really fun activity – like learning about acids and bases and using vinegar. Which one do you think you'll remember better for the test? The activity because it was more fun and engaging.*

## Uneven/"Unfair" Discipline Practices

Almost all student participants acknowledged that their school has a discipline policy, but that is often experienced as discriminatory and particularly "unfair" for Black/African-American and Latinx students. Students are very tuned in to the tone and phrasing that teachers and administrators use in the disciplinary process. They see and hear about who received which "type" of punishment, who gets suspended and who does not, and for how long.

> *No, it's not fair. Skipping class, my White friend got a less punishment.*

> *Some teachers don't know the difference between discipline and disrespect.*

> *But some kids will get off really easy. Yesterday two White boys got in a full on fight and only got 2 – 3 day suspension. Last year 2 Hispanic girls got in a fight and the one that threw the punch got kicked out [of school].*

> *Why is it that when a kid who is misbehaving and is Black – why do you hear "that kid's going to end up in jail someday" – but you don't hear that about the White kids who mess up.*

## Recommendations

The following recommendations were informed by information gathered from the student focus groups. The recommendations were also shaped by conversations with parents, members, and school site personnel. However, these recommendations should not be viewed as the only solutions needed to

address the challenges identified by students.  It will also be important to leverage and possibly rethink existing structures and practices in LCPS to move this work forward.

---

### Recommendations: Student Focus Groups

1. School administrators establish proactive measures that intervene and mitigate the impact of racial incidents experienced by students of color in order to build an inclusive culture that doesn't tolerate harassment.
2. Create a clear discipline policy that works to address necessary changes in discipline practices across the division with input from school-based student groups to include student voice.
3. Establish student affinity groups at all levels to support the social and cultural identities of students of color.  This recommendation is important because it:
   a. Creates a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social or cultural conflict.
   b. Provides a vehicle for outside community or business partners to disseminate important information about educational opportunities or to provide mentoring and encouragement to students of color.

---

## Summary: Parent & Community Stakeholder Focus Groups

### Emergent Themes: Parent & Community Stakeholder Focus Groups

1. Racial incidents occur often in and around LCPS schools, making regional and national news, and set the tone for the larger systems of racism within the division.
2. Parents fear for their children's safety and well-being at school and do not trust the division to support them.
3. Economic diversity across the County/Division complicate the discussions about race by steering the conversation away from race to focus on poverty.
4. Response to racially motivated incidents from schools and the division is slow and ineffective.
5. There is the continued need to hire racially diverse school site staff, particularly teachers, counselors, and front office staff.

---

As The Equity Collaborative staff interviewed parents from across all levels and areas of LCPS and members of the Minority Student Achievement Advisory Committee (MSAAC).  The general feeling was distrust of the Division and the inability of Division representatives to adhere to the mission of LCPS with

J.A. 48

its responsibility of "Empowering all students to make meaningful contributions to the world." Theoretically, the mission situates students at the center of all the Division's efforts. LCPS is a proud division that describes itself as having a culture/"tradition" of support, togetherness, and family. Critical to realizing this mission is an increased understanding and validation of the experience of race that is described by students or their families.

The excerpts below are from our discussion with parents and other stakeholders in May 2019. The stories that parents shared in focus groups were full of raw emotion. Although every parent did not have the same personal experience, they largely and widely agreed about a theme of significant distrust between families of color and the division. This report shares several anecdotes from parents to help readers understand the parents' perspective. The Equity Collaborative cannot validate the specific claims of parents. The focus of this report is to elevate the voices of marginalized individuals throughout LCPS.

> "Early in the year, [there was an] incident with a student of color and with a White student who is known for getting into issues of race. They had an issue and we were involved because there was a video. The White student jumped the Black student. The Black student spoke up for themselves and was brought to the ground and hit. Kids with the video were told to delete the video and to not share it. Both students were taken to the administrator's office. The Black parent was informed later that the Black student had a concussion that was not addressed. It was determined that both students were at fault and both were suspended. The student who did not engage in violence received the same punishment. The administration intimidated students to delete the video. The White student who initiated the fight had been previously found yelling "Make America Great Again." He has been known to target and antagonize students of color. This White student hit a Muslim student for the Muslim student not standing for the pledge. The White student brought a knife to school. He has hit a student in the head so much his own hand broke. One student who took the video sent it to a parent before it was asked to be deleted. The Black student who was attacked did not do anything to fight back. It is the inconsistency. The administration handled the situation poorly. The White student's parent was called in one hour. The Black student who has a concussion order, his parents were not called in 4 hours. This impacts the other students of color where they do not trust their safety with the administration. The administration did not call the SRO. The past experience with a video has administrators so afraid. There is an administrator who I don't believe has the best interest of students of color. That student who was beat up by a White student was followed by administration. He was scared to push back. Other students of color were afraid. We are walking the line in the system in hopes that there will be change. When you have a student with a racist history, and another student of color who is an A student, you now have a distrust that we're still trying to recuperate."

Another parent shared the following experience.

*"My daughter experienced a racial incident a few weeks ago.  Serious enough that we contemplated contacting the NAACP.  My husband was so fearful of her safety, so I followed protocol.  I spoke to the teacher, got the run around for a week.  Put me off, went around us, didn't speak to us for a week.  I had to call the administrator.  Her group of friends have been saying hurtful things about her hair, that her eyes are so black that she looks evil.  Then the kids created a sign language at school and there are videos of her friends using the sign language, the first video is about the N word.  My daughter didn't know what was going on. I waited a few days after, one administrator never spoke to me, only another administrator. "I have been very busy with other matters, not that you're not important. I haven't spoken to anyone outside of the school."  I had to call the parent resource center to get information about who to call.  The parent resource center gave me a person to call.  They already spoke to someone in central office who then spoke to the administrator.  The way they were going to handle the situation, not addressing my daughter.  They were going to have the students go to the counselor to create a poster of inclusion and computer safety.  The new symbol is about White supremacy.  They don't take it seriously.  It is extremely frustrating.  Where does a parent go with this?  How can I trust them?"*

Another parent shared the following experience.

*"There are guidelines on how to deal with the trauma of racism, where the child is first.  Let the child be first.  You're not bad, you're ok.  When a child was called the N-word, the principal called the child a liar without the parent there."*

Another parent shared the following experience.

*"I have personally submitted data, phone calls, meetings, about so many issues. They 'listen' to me just fine.  Here we are again.  We're all frustrated, we all feel ignored."*

---

**Recommendations: Parent & Community Stakeholder Focus Groups**

1. Define Diversity, Equity & Inclusion and include as LCPS Core Beliefs.
2. Establish parent affinity groups at all school levels in support of stronger partnerships and open communication between parents, students, and school administrators.
3. Utilize the Equity Ad Hoc Committee once a month meetings and/or establish a parent led group to provide equity leadership and guidance and feedback concerning division plans for advancing diversity, equity, and inclusion in its programming.
4. Provide specific social emotional support for students and families dealing with the traumatic impact of racism and discrimination.

---

J.A. 50

## Summary: Educator Focus Groups & Interviews

### Emergent Themes: Educator Focus Groups & Interviews

1. School site staff, specifically principals and teachers, indicate a low level of racial consciousness and literacy. People are unclear and fearful on how to participate in conversations about race, let alone respond to racially charged incidents.
2. Teachers of color see and experience the LCPS hiring process as biased.
3. White teachers are resistant, resentful, or otherwise uncomfortable with conversations about race.
4. Teachers have some experiences with data, but do not fully understand how and why to analyze data to inform instruction.
5. Principals and Assistant Principals could not consistently accurately name or describe the ethnic breakdown of their school.

The Equity Collaborative staff interviewed educators from across LCSP elementary, middle and high schools, including school site administrators, custodial and office staff, parent volunteers, counselors, and teachers. The mission of LCPS situates that its responsibility is "Empowering all students to make meaningful contributions to the world," theoretically making students at the center of all the division's efforts. Critical to realizing this mission is ensuring that the division and its staff are responsive to and affirming of all students and their families. LCPS is a proud division that describes a culture of and a desire to provide world-class academic and extracurricular programs for students. However, in our conversations with LCPS educators, the sense of pride did not seem to extend to the understandings of how the diversity of the Loudoun community, the equity of opportunity for students, and the inclusion of concerned stakeholders can be girders for such academic excellence.

### Race, Diversity, Equity, and Inclusion

Diversity, equity, and inclusion are concepts that shape current education discourse. These ideas drive education programming throughout the country in areas such as school funding, research, teacher practice, and policymaking. Unpacking the meaning of diversity, equity, and inclusion in LCPS revealed a range of viewpoints that were influenced by a number of factors including job responsibility, grade span, and prior professional and personal experiences.

Teachers, counselors and principals frequently grounded these concepts in the context of Special Education. For instance, when asking teachers what comes to mind when they hear the terms diversity, equity, and inclusion, the most common answers focused on the concept of inclusion and the division's Special Education services. Some teachers included English Learner programs and poverty, and then, after additional prompting included classroom lessons, and school functions that celebrate cultural diversity.

J.A. 51

As shared by several teachers, "*Inclusion is primarily addressed through our Special Education program. We work hard to meet the needs of our kids no matter where they come from.  We try to mainstream kids whenever possible.  Everyone is trying to push for more inclusion.*"

The term "diversity" was most often used in describing the general demographics of the students at school sites.  And with this, at all of the 24 schools we visited, the school site staff, from the principal to teachers, could not provide accurate demographic breakdown data.  In general, school staff knew the racial/ethnic and language groups at their sites, but not the numbers of each in the population.  Participants across the county, educators referred to the rapid pace at which the non-White populations are growing and the anxiety that produces as educators are finding it challenging to adjust pedagogically, programmatically, and linguistically to both student need and parent engagement.

Some staff vocalized that they are not ready or do not feel the need to engage in conversations about race:

> "*I don't see a problem.  All the kids get along.*"

> "*I don't see color.*"

> "*I really don't have a lot time to do that work and I also teach high level classes, so I don't have those kids.*"

Other staff do identify there is a problem with race relations in LCPS and are ready to embrace the diverse shift in population of students and families with statements such as "*Why are we always reactionary?  Let's get in front of this by planning.  This shouldn't be a surprise.*"  Another teacher implored the division to be more observant of the community and plan professional development based on the trends and influx of those new to Loudoun County:

> "*You know [Loudoun] is growing, but the system is not prepared.  They are very reactive.  They are not projecting what needs to be done to prepare the division.  Do you now know the diversity of the community for specific schools?  Go to Walmart, Wegmans, and listen and hear the different languages to see the diversity.*"

> "*It would be great if there were an incentive for teachers to become bilingual.  I'd like to be able to call home and talk to families myself.*"

> "*At least do these kids the service of saying their name properly.*"

Even with these more positive attitudes toward diversity and inclusion, the vast majority of educators interviewed expressed trepidation in how to appropriately respond to racially motivated incidents.  Some are afraid to lose their jobs while others would rather not engage by saying "*I don't see color.*"  It was not uncommon to hear LCPS educators describe the invisibility of race and the inconsequentiality of

J.A. 52

race to their practice as school leaders and teachers, and therefore unnecessary to address specifically. Many focus group participants wanted to avoid the race topic altogether, ignoring race as the "socio" component of "socio economic status" by declaring, *"I think we should be talking about poverty not race" and "Why are we even doing this?"* One LCPS educator summed up the challenge with *"It is sometimes difficult to have conversations about race and it causes [White staff] discomfort."*

What was also resounding, however, was that educators and school leaders did not fully understand what division (or school site) policies are in place, what lines of communications they should follow, or the kind of documentation they need to acquire to carry the school community through. Some participants in school communities shared experiences of extreme racially motivated acts of intimidation, including nooses hanging from trees at the entrance to the school, swastikas and the N-word carved into the snow outside of the school, and school sites being visited by members of the KKK. Educators are also unclear on what kinds of whistleblower protections are in place for students, parents and other educators who report or express concerns about such incidents. Participants indicated that it is also unclear the kind of care the victimized students and their families can expect. Messages back out to the school community that such racist behavior is not tolerated are seen as weak or intentionally delayed.

> *"Be clear about policies - I was speaking to one of the students in Spanish and the teacher said, Oh – I don't know if you can do that."*

> *"The division has not made any sort of declaration – 'we don't believe in White supremacy.' Nothing like that."*

> *"I have been the victim of racism in this very building. There was a noose hanging out in a tree outside our building. It was jarring. I called safety and security and there wasn't a quick response…."*

> *"Account for the sincerity of the student [experiencing discrimination]."*

> *"We do not talk to kids or teachers about use of racial slurs."*

> *"For teachers of color, there is a sense of fear of retaliation if they 'report' an incident or express concern about how a situation is being handled."*

> *"How isolating your job is feeling like you need to protect the students of color because no one else in the building is advocating for students of color?"*

> *"There is a line – as a teacher – where I want to go up to this line and … I don't want to go there or I'll get a pink slip."*

J.A. 53

*"When I asked for help [in supporting Black students] I was just told that's not in our job description."*

The seriousness about which school leaders take this issue is not clear at all levels of the organization.  It is fair to say based on the interviews that some school leaders are responsive to this matter, but consequences are unpredictable and inconsistent.  The Equity Collaborative staff did not observe any proactive measures used to address this serious issue in schools.  Contrary to what students shared, the prevailing view among school administrators was that incidents involving the N-word, and other racial slurs, are in general isolated events that do not represent school-wide cultural norms around race.

Several staff also shared that there has been some work across the division and that it has lost momentum, meaning many educators have not had the opportunity for such professional learning. There was also conjecture that the division has an incomplete or not fully informed plan around racial equity.  Aligned with LCPS' Core Belief 1 "A culture of continuous improvement drives the fulfillment of our mission," the division's work with school and division leaders, does indeed have a strong framework for advocating on behalf of their students and families of color.

## Recruitment & Hiring Practices

LCPS educators and parents described several recent incidents of hate crimes and other racially motivated acts meant to intimidate people of color throughout Loudoun County in general that have made local and national news.  In our interviews, at least 5 incidents were referenced having occurred in the past 12 months in the county alone.  Also shared in conversations was data from the Virginia State Police that hate crimes have increased by 50% from 2016 to 2017.  One news story opened with "A Virginia community is making headlines again for the wrong reasons.  Racism, threats and threatening symbols… How is this still a problem in Loudoun County?"

Participants spoke to and connected the frequency of these incidents in the broader Loudoun community, coupled with the pervasive use of the N-word in schools and the many racially motivated incidents targeting Black/African-American, Latinx, and Muslim students, create an extremely negatively challenging work and learning environment for students and staff of color.  Focus group participants acknowledged that this current state of Loudoun County, while not appealing for educators of color, is exactly the reason why more intentional and fruitful recruitment and hiring is necessary to the growth and success of LCPS students and staff.

Among school administrators, striving for diversity, equity, and inclusion in LCPS centered on structural challenges in hiring and the capacity to lead for diversity, equity, and inclusion.  School leaders openly acknowledged that the demographic makeup of staff, particularly teaching staff, was not reflective of the student population.  Further, educators at all levels underscored the struggle of recruiting people of color to the region.  Participants in the parent and other community stakeholders focus group also recognized this dilemma.  As outlined by one group member, *"Teachers and administrators will not*

J.A. 54

come [to this community], and why would they?  They would not see themselves reflected in any of our schools.  [Prospective educators] need to be able to visualize themselves in our community - identify where they fit in and how they can contribute."

While recruiting Black/African-American educators specifically and other educators of color to LCPS may be a challenge, The Equity Collaborative staff did not come across any school leader that was not open to confronting this difficult challenge.  Some offered very concrete ways to diversify their staff:

> "Diversify the interview panels.  Include as many non-whites as you can."

> "If you look at people's resumes – they have masters and doctorates.  Hire them if they are Black!"

> "Hire bilingual TA's for the front office.  Easy."

### Recommendations

The following recommendations were informed by insights shared by school and division leaders who participated in focus group sessions and interviews with The Equity Collaborative staff.  As previously stated, these recommendations should not be viewed as all-encompassing, but representative of the type action needed to address the challenges identified by LCPS leaders.  It will be important to lean on the wisdom and experience of LCPS staff should the division decide to move this work forward.

---

**Recommendations: Educator Focus Groups & Interviews**

1. Produce and publish on the "Superintendent's Message" page a division-authored statement defining and condemning White supremacy, hate speech, hate crimes, and other racially motivated acts of violence.
2. Review current and/or establish clear policies with built-in accountability for addressing racially motivated acts and speech.
3. Create, repeat and further emphasize proactive leadership measures that the N-word is not tolerated to address the student use of racial insults.  Name that the N-word is not tolerated by anyone in LCPS.
4. Develop and socialize a shared understanding of the meaning of diversity, equity, and inclusion among educators.
5. Establish a cultural responsiveness framework to inform curricular and instructional efforts across the division.
6. Review current efforts and further establish short- and long-range action plans to address challenges related to hiring for diversity, equity, and inclusion.
7. Review current and further design opportunities for LCPS educators to engage in professional learning about color consciousness and implicit bias.

---

## LCPS Division-Wide Efforts to Address Inequities

The following actions and programs are described below to highlight examples of how LCPS has worked to address pervasive inequities in the division. Most of the items listed here have been informed by insights shared by school and division leaders who participated in group sessions and interviews with The Equity Collaborative staff. Though not every item listed here was directly referenced in the focus groups, the actions and programs below connect to recommendations made throughout the report. It is understood that actions and programs listed may not completely achieve the equitable outcomes desired and may need to be supplemented or altered as our collective learning journey toward equity continues.

- Since 2006, LCPS has been implementing Positive Behavioral Interventions and Support (PBIS) for all students across all schools to prevent discipline issues.
- From 2007 to 2018: Designed and delivered professional learning experiences for teachers on *Teaching Cultural Awareness in Social Science*; *Teaching Sensitive Subjects in Social Science.*
- In summer 2016, HRTD began the implementation of *Mitigating Unconscious Bias with Equity in Hiring* training for hiring managers.
- In fall 2016, Pupil Services, HRTD, and DOI personnel created an Equity Committee whose members researched equity organizations and consultants—as well as school divisions--that have developed equity programs.
- During the 2017-2018 school year, HRTD created a Diversity Champions Network to expand recruitment and onboarding efforts to be more inclusive.
- In 2018, the Department of Pupil Services created and began providing professional learning in *Equitable Practices: Implicit Bias, Vulnerable Decision Points, and Neutralizing Routines*.
- In early 2019, Superintendent Eric Williams made public comments to denounce racism and hate language. One written statement sent to the community included the following: *"Hateful, threatening language such as this can never be tolerated in LCPS because of its harmful effect on individuals, groups, and communities. We reject this painful, racist language that encourages discrimination, hatred, and violence."*
- In early 2019, the Department of Instruction developed a three-module *Equity in the Center* cultural competence training for all schools to participate in before or during the 2019-2020 school year. As of the date of this report, all principals, assistant principals, deans, and DOI staff have participated.
- In spring 2019, the Department of Instruction created a position and hired an Equity and Cultural Competence Specialist.
- In spring 2019, the Superintendent created a position and hired a Director of Equity in the Office of the Superintendent to lead cross-departmental efforts to promote and sustain equity.
- The LCPS School Board voted to create an ad hoc committee on equity. The ad hoc committee was created in April 2019 and is scheduled to review the draft report of the systemic equity assessment at their June 2019 meeting.

J.A. 56

- In the 2019-2020 school year, LCPS is expanding the community school initiative from one to six schools, including making part-time parent liaisons full-time positions and hiring an additional social worker.
- Since the 2016-2017 school year, HRTD has been implementing unconscious bias training for hiring managers, including but not limited to the following:
  - FY17: Unconscious Bias Training for 522 participants
  - FY18: Hiring with Equity Training for 243 participants, Mitigating Unconscious Bias with Equity in Hiring for an additional 277 participants
  - FY19: Continuing training with a train-the-trainer model
- The HRTD department participated in the Inspire-Connect-Educate Conference-conference is focused on targeting young Black and Hispanic males in the DC metro area, in order to conduct mock interviews and make presentations on careers in LCPS.
- LCPS communicates information about recruitment and hiring events to diverse serving organizations to seek their assistance in promoting the event. The organizations include Loudoun NAACP, Asian American Chamber of Commerce, Northern Virginia Black Chamber of Commerce, Virginia Hispanic Chamber of Commerce, Loudoun County Indian Community.
- LCPS has been encouraging diverse participation in our high school Teacher Cadet course and Educators Rising club. This includes outreach intended to target diverse populations through HBCU Showcase, AVID, and CAMPUS.
- During spring 2019, the Department of Instruction formed a formal partnership with the Loudoun Freedom Center to provide professional development opportunities, field trips, and curriculum reviews to remove instances of potential bias or insensitivity.

J.A. 57

## THE PATH FORWARD, TOGETHER

Educator Horace Mann recognized that education, beyond all other devices, is the great equalizer in society.  To this day, Mann's wisdom still rings true.  The work of The Equity Collaborative staff uncovered a number of community divisions that if remain unattended, limits Loudoun County Public Schools' capacity to realize Mann's wisdom for the greater Loudoun County, VA area and its stakeholders.  In many ways the divisions in LCPS follow similar fault lines reflected in our current society: diversity, equity, inclusion, social class, economics, and race.

The Superintendent's remarks at the School Board Meeting on February 12, 2019 express the need for addressing inequities to promote diversity, equity, and inclusion in LCPS.

*"Closing equity gaps has been a central part of the Loudoun County Strategic Plan since soon after I arrived in Loudoun as Superintendent.  Like the families and communities documented in the Edwin Washington project report, who relentlessly strove to educate their children, we, as a community working together, must never give in or give up until no inequities exist.  The Strategic Plan has been the core of that effort for LCPS.*

*As Superintendent of LCPS, I am committed to dedicating the resources necessary to address issues of equity by further developing strategic actions, engaging outside expertise, and working with our families and the community.  Together, we can have a lasting impact on the lives of ALL our students and truly honor and cherish the diversity that defines us."*

While the synopsis of experiences in the above report are reflective of stakeholder concerns and insights, the most important question at the center of this review is, can those on all sides of these critical issues move forward together in a community of collective action?  For Loudoun County educators, this work would require leadership and an openness to hearing and affirming the stories and schooling experiences of marginalized students and their families.  And a willingness to practice from a place of *action* - not only good intentions.  For LCPS students, their families, and community members, this work would require a commitment to productive partnerships and a readiness to support educators to bring the LCPS community together.  With the support of The Equity Collaborative staff, and other support providers, there is clearly a path forward in Loudoun County.

J.A. 58

## APPENDIX

**Participation List**

Invited participants in each school participating in the equity assessment engaged in focus group discussions facilitated by the *Equity Collaborative*. Respective groups represented in each school included following:

- 1 hour Student session (Invited Elementary: Grade 5; Middle School; Grade 8; High School: Grades 9-12)
- 1 hour Staff session (Invited Licensed and Classified staff)
- 1 hour Administrative Team session (Assistant Principals, Deans, Lead/Director of School Counseling)
- 1 hour Principal only session

The following schools participated in the Focus Group discussions:

| Elementary Schools | Middle Schools | High Schools |
|---|---|---|
| Ashburn ES | Belmont Ridge | Park View |
| Belmont Station | Brambleton | Loudoun County HS |
| Catoctin | J Lupton Simpson | Freedom HS |
| Countryside | Sterling | Woodgrove HS |
| Dominion Trail ES | River Bend MS | Broad Run HS |
| Emerick ES | | Douglass School |
| Frederick Douglass ES | | |
| Goshen Post ES | | |
| Guilford ES | | |
| Legacy ES | | |
| Meadowland ES | | |
| Sugarland ES | | |
| Sully ES | | |

Parents with children attending 1 of the 24 schools above had opportunities to participate in and contribute to the discussion about equity.  There were 3 opportunities for this to occur on **May 11, 2019:**

| Time | Location | Participating Schools |
|---|---|---|
| 9:00 am- 11:00 am | Sterling MS | Countryside ES, Guilford, ES, Meadowland ES, Sugarland ES, Sully ES, River Bend MS, Sterling MS, Park View HS |
| 12:00 pm- 2:00 pm | Frederick Douglass ES | Belmont Station ES, Catoctin ES, Emerick ES, Frederick Douglass ES, Belmont Ridge MS, Simpson MS, Loudoun County HS, Woodgrove HS |
| 3:00 pm- 5:00 pm | Goshen Post ES | Ashburn ES, Goshen Post ES, Dominion Trail ES, Legacy ES, Brambleton MS, Broad Run HS, Freedom HS |

The Equity Collaborative will also engage additional stakeholder groups in discussions related to equity.

| Date | Time | Stakeholder Group | Location |
|---|---|---|---|
| May 13, 2019 | 6:30 PM-8:30 PM | MSAAC | 100B Administration Building |
| May 14, 2019 | 5:30PM - 7:30PM | Minority Teacher Focus Group: Black, African American | Leesburg Junction |
| May 16, 2019 | 5:30PM - 7:30PM | Minority Teacher Focus Group: Hispanic, Latinx | Embassy Suites Dulles North |
| | | NAACP and the Loudoun Freedom Center | 507 Administration Building |

J.A. 60

**APPENDIX**

**Equity Assessment Questions: LCPS Staff**

**1. I want to hear a bit about you and your role in the School District. What is it like to do what you do? What's your motivation for doing it? Why here?**

**2. What do you feel is most important to know about this community and the Loudoun County school district?**

**3. How would you describe community relations in your school and the school district?**

**4. When you hear the terms diversity, racial equity, and inclusion, what comes to mind regarding your school and district? What has been your experience talking about and working on those issues?**

**5. What do you know about the data on student performance in your school and district?**

**6. How would you describe the history of race relations in the broader community and in the school and district?**

**7. Can you speak to any incidents (small or large) that could give me insight to how race is experienced in the community? In the school district?**

**8. Who are the people doing the best work to support students of color in your school and district? In the community?**

**9. Who are the major players with respect to race relations and advocacy in the community and district?**

**10. What would be your advice about starting racial equity work in the school district?**

**11. What makes you most proud about working in Loudoun County and at your school?**

**12. Is there anything else you would like to share that I didn't ask about?**

J.A. 61

**Equity Assessment Questions: Students**

**1. What should we know about your school coming in from another place?  About Loudoun County?**

**2. What is it like to go to school here for you?**

**3. What is this school known for?**

**4. Talk to me about the teachers here.  Who is your favorite teacher?  Why?  What do you think makes them a good teacher?**

**5. What do you know about student performance at the school?  Who tends to do well in school?**

**6. What are race relations like here?  Do students hang out with different kids?  How often do adults at school talk about race?**

**7. What more could be done to help you academically?  What do you wish teachers would do differently?**

**8. How is discipline in the school?  Is it fair?  Why or why not?**

**9. Anything else you want to tell us?**

J.A. 62

**Equity Assessment Questions: Parents**

**1. What is it like to be a parent of a child at your school and in the district?**

**2. What do you feel is most important to know about this community and the Loudoun County school district?**

**3. How would you describe community relations in your school and the school district?**

**4. When you hear the terms diversity, racial equity, and inclusion, what comes to mind regarding your school and district?  What has been your experience talking about and working on those issues?**

**5. What do you know about the data on student performance in your school and district?  Have the performance gaps been shared with you?**

**6. How would you describe the history of race relations in the broader community and in the school and district?**

**7. Can you speak to any incidents (small or large) that could give me insight to how race is experienced in the community? In the school district?**

**8. Who are the people doing the best work to support students of color in your school and district? In the community?**

**9. Who are the major players with respect to race relations and advocacy in the community and district?**

**10. What would be your advice about starting racial equity work in the school district?**

**11. What makes you most proud about being a parent in Loudoun County and at your school?**

**12. Is there anything else you would like to share that I didn't ask about?**

# EXHIBIT B



# Action Plans to Combat Systemic Racism

**Present State of the Plan:** This detailed plan is designed to identify action steps and associated governance and operational opportunities that the Loudoun County School Board (LCSB) and Loudoun County Public Schools (LCPS) Administration can take to combat systemic racism. Actions that were in progress prior to the school closure in March of 2020 due to the COVID-19 pandemic are identified with an asterisk. This plan identifies detailed steps associated with each action. The purpose of the plan is to ensure transparency in progress monitoring and accountability; therefore, it will be posted on the Equity webpage for the public to access. The plan is organized by action steps that include both governance and operational opportunities, goals, resources needed to accomplish each goal, and questions that are under consideration.

This document is a fluid document in which LCPS reserves the right to add or revise action steps based on progress monitoring data, current events, and climate survey data.

**Action Steps:** General actions that the LCSB and LCPS Administration will take toward combating systemic racism.

**Focus Area(s):** Each action step is categorized by a minimum of one of four areas of focus - Academic Progress, Access & Opportunity, Relationships & Culture, and Closing Gaps. These graphic symbols are provided to assist with various forms of presenting digestible information for public consumption.

**Opportunities:** A set of potential circumstances that make it possible for the LCSB and the LCPS Administration to act on the action steps set forth.

1

**SMART Goals and Objective(s):** Goals (the what) and objectives (the how) for each action step are part of this plan to provide a sense of directional clarity, accountability, a clear focus, and to clarify the importance of each action step. Each SMART goal and its potential associated objective(s) incorporate the criteria - SMART acronym that stands for **Specific, Measurable, Achievable, Realistic,** and **Timely**. Each SMART goal incorporates all of these criteria to help focus efforts and increase the chances of achieving the goal.

**Resources Needed to Accomplish Each Goal:** Some action steps may have a list of resources needed in order to accomplish the associated goals set forth.

**Remaining Questions under Consideration:** Each action step lists questions that are currently under consideration further supporting the notion that the document is fluid, that anti-racism work is ongoing, and that LCPS is not approaching the work from an initiative or checklist perspective.

Each action step is categorized by a minimum of one of four areas of focus.



Academic Progress    Access & Opportunity    Relationships & Culture    Closing Gaps

**The slidedeck presented to the LCSB in June 23, 2020 can be found [HERE](HERE)**

2

| Action | Focus Area(s) | Opportunities |
|--------|---------------|---------------|
| Finalize the comprehensive equity plan to guide our work in this important area.* |  | **Governance:** The three members of the LCSB who serve on the Committee provided input into the development of the comprehensive equity plan at the July 16, 2020 Equity Committee meeting. The LCSB will review and approve the final plan presented by the Equity Committee in the fall of 2020. The LCSB can ensure that the Equity Plan is aligned with strategic actions set forth in the next iteration of the Strategic Plan.<br><br>**Operations:** LCPS is finalizing a comprehensive equity plan to guide our work in this important area. The document, currently in draft form, was presented in the February 2020 *Equity Community Conversation* and underwent additional community review and feedback as well as input from the Equity Committee of the Loudoun County School Board. |

**SMART Goal and Objective:** LCPS will finalize the comprehensive equity plan under the leadership of the Director of Equity by presenting the plan aligned to the current strategic actions to the Equity Committee on July 16, 2020, incorporating the committee's input by August 3, 2020 and presenting the final draft of the plan to the LCSB on or before its August 11, 2020 School Board meeting as an information item seeking School Board approval at its September 8, 2020 meeting. The *Comprehensive Equity Plan* is not to be confused with this plan to combat systemic racism, although both plans will complement each other.

**Needed Resources to Accomplish the Goal:**
- Designated time on the August 11 and September 8 School Board agendas for School Board review and approval;
- Resource allocation through the FY22 and beyond budget process that supports the implementation of each Equity Emphasis identified in the *Comprehensive Equity Plan*; and
- Clear communication strategies led by the Public Information Office to provide clear messaging regarding all inclusive equity efforts on an ongoing basis.

**Remaining Questions under Consideration** (see Q&A at the bottom of this document)**:**
- What is the difference between the Equity Plan and the LCPS Action Plan to Combat Systemic Racism?
- Will both plans exist as separate documents?

3

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS staff will complete mandatory professional learning (PL) set forth by the division and will either self-prescribe or collaborate with their immediate supervisor to participate in optional PL specific to developing racial literacy, raising racial consciousness, and/or delivering culturally relevant and responsive instruction.* |  | **Governance:** The LCSB will support professional learning plans set forth by the LCPS Administration.<br><br>**Operations:** In the winter of 2020, LCPS Administration began designing a professional learning series by employee group which outlines both required and optional professional learning sessions. LCPS Administration will further develop, publish and implement a comprehensive professional development plan in the 2020-2021 school year. The plan will be recommended by a cross-departmental team, specific to racial equity for employees. |

**SMART Goal and Objective:** By August 7, 2020 complete the development of a cross departmental plan of mandatory Diversity, Equity, and Inclusion (DEI) professional learning opportunities for school and division staff, including efforts related to addressing opportunity and achievement gaps, systemic oppression, and implicit bias. Mandatory training will be connected to and promote sustained supports such as:
- Regular curation and sharing of resources related to DEI
- Opportunities for ongoing conversations amongst school leaders and teachers on issues related to DEI
- Support and development of the capacity of individual offices to support the building of capacity related to DEI

LCPS staff will have access to optional DEI professional learning and be expected to participate in mandatory DEI professional learning beginning in the 2020-2021 school year.

**Needed Resources to Accomplish the Goal:**
- Cross-departmental team to curate and design professional learning opportunities

- Professional development resources, including funds, texts and materials, to support mandatory professional learning across the division

**Remaining Questions under Consideration:** N/A
- What professional development will be considered mandatory, and what optional, personalized professional development will be provided?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| The Superintendent's Cabinet and LCSB will participate in their personal continued professional learning to build equity literacy and racial consciousness. |  | **Governance:** The LCSB will participate in professional learning with the Superintendent and the Superintendent's Cabinet.<br><br>**Operations:** The LCPS Superintendent and Cabinet will develop and fully participate in a mutually agreed upon professional learning plan focused on racial consciousness and equity literacy. |

**SMART Goal and Objective:** Annually in the month of August, the LCSB and LCPS Administration will develop and participate in a mutually agreed upon professional learning plan for the upcoming school year to be facilitated by an external expert. The annual plans will be completed by May of each year and will build upon each other in order for the LCSB and LCPS Administration to build equity literacy and racial consciousness. LCPS Administration and the LCSB will also have access to a menu of professional learning sessions and resources that individuals may opt into.

**Needed Resources to Accomplish the Goal:**
- Funds to pay an external consultant to deliver the service.

**Remaining Questions under Consideration:**
- How will the LCSB and LCPS Administration develop a plan that is mutually agreed upon?
- Will there be pre and post tests to determine individual School Board members' and cabinet members' racial literacy and consciousness?
- Will there be an expectation for School Board members and Cabinet members from an accountability standpoint to exhibit equity literacy and racial consciousness through evaluations of Cabinet or a survey of the public?
- Should the professional learning plans of individual members of the School Board, the Superintendent, and the Superintendent's Cabinet be posted on the Equity webpage?

5

| Action | Focus Area(s) | Opportunities |
|--------|---------------|---------------|
| Prohibiting the wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology, such as Confederate flags, swastikas, etc., which may cause a disruption to positive school/workplace cultures. |  | **Governance:** The LCSB will consider a proposed revision to Policy 8270 Student Dress Code prohibiting the wearing/flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology, such as Confederate flags, swastikas, etc., which may cause a disruption to positive school/workplace cultures.<br><br>**Operations:** LCPS will propose revisions to Policy 8270 Student Dress Code for the School Board's consideration, revise the Student Code of Conduct, Employee Handbook, and associated regulations. Staff will solicit feedback from the Equity Committee to prepare to present Policy 8270 to the Discipline Committee of the School Board. |

**SMART Goal and Objective:** By August 2020, LCPS Administration will refine Policy 8270 Dress Code to reflect prohibition of wearing or flying of flags, images, or symbols on LCPS property that represent racist or hateful ideology.

**Needed Resources to Accomplish the Goal:**
- Time to refine policy 8270
- Review draft and seek feedback at Discipline Committee meeting on August 19, 2020
- Schedule meeting for Equity Committee to review the draft and provide feedback in the months of August and/or September, 2020

**Remaining Questions under Consideration:**
- Students' first amendment right.
- Determine what disciplinary measure will be extended if a student violates the policy.

| Action | Focus Area(s) | Opportunities |
|--------|---------------|---------------|
| Finalize revisions to the Memorandum of Understanding (MOU) between LCPS and law |  | **Governance:** Members of the LCSB may choose to participate in the *Equity Community Conversation* regarding the MOU, provide feedback through the Equity Committee, and support the final version of the MOU by discussing its importance at a School Board meeting. |

6

| enforcement.* | | **Operations:** LCPS will partner with the Loudoun County Sheriff's Office (LCSO) and Leesburg Police Department (LPD) to resume the *LCPS Pathway to Equity Community Conversation* Series and further engage the community in the finalization of the MOU proposed revisions with a strong racial equity perspective. Stakeholders include representatives from MSAAC, SEAC, and the Equity Committee, etc. |
|---|---|---|

**SMART Goal and Objective:** LCPS will partner with the Loudoun County Sheriff's Office (LCSO) and Leesburg Police Department (LPD) to resume staff review and finalization of edits based upon the conversations to date.  Staff level work will include planning for the  Equity Community Conversation Series (to be held virtually in early September 2020) and further engage the community in efforts to fully understand contemporary issues that affect the school community.  LCPS will revisit the extensive written and verbal feedback provided by MSAAC and SEAC (during a review period of November 6, 2019 through January 29, 2020) and the Equity Committee (reviewed February 3 - February 6, 2020) prior to finalizing the document.  The revised version of the MOU will consider stronger language from a racial equity perspective. LCPS Administration will present the MOU to the School Board as an information item in September 2020 with anticipated approval by October 2020.

**Needed Resources to Accomplish the Goal:**
- N/A

**Remaining Questions under Consideration:**
- Does the MOU legally require Board approval and Chair signature?
- Should we consider a separate action step regarding training of SSOs and SROs or emphasize the plan and timeline within this action step?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| Finalize the Protocol for Responding to Racial Slurs and Hate Speech in Schools and Revise Policy 7560 |  | **Governance:** Individual members of the LCSB will express conceptual support for the staff actions described below related to the Student Code of Conduct. LCSB will consider proposed revisions to Policy 7560 Professional Conduct.<br><br>**Operations:** LCPS is finalizing the next iteration of a protocol for responding to |

7

| Professional Conduct.* | | racial incidents when they occur in our schools. The document, currently in draft form, was presented in the February 2020 *Pathway to Equity Community Conversation* and has undergone additional revision for input from the Equity Committee of the Loudoun County School Board on July 16, 2020. Some members of the Equity Committee offered additional feedback at the July 16 meeting which will be considered prior to finalization of the protocol.  LCPS has developed revisions to the Student Rights and Responsibilities Handbook that includes disciplinary sanctions related to the use of racial slurs and hate speech. The Employee Handbook, and associated regulations will be aligned with any policy revisions approved by the LCSB to address expectations for employee conduct and response to the use of racial slurs and hate speech. LCPS Administration will be ready to present the proposed changes to Policy 7560 Professional Conduct to the Human Resources & Talent Development Committee in August. |
|---|---|---|

**SMART Goal and Objective:** LCPS presented the draft *Protocol for Responding to Racial Slurs and Hate Speech in Schools* to the Equity Committee on July 16, 2020, and is in the process of considering the feedback received from the Equity Committee prior to finalizing the *Protocol*.  LCPS will present the revised *Protocol* and revised associated Code of Conduct violations  to school administrators at the Administrative Leadership Conference in August 2020 and post the finalized document on the LCPS Equity Overview webpage with full implementation expected to begin in the Fall of 2020.

HRTD will present a revised draft  of Policy 7560 Professional Conduct to the HRTD committee of the LCSB by August 19, 2020.  The committee will consider changes and forward the policy to the full School Board consideration and adoption.

**Needed Resources to Accomplish the Goal:**
- Designated time for presentation as the August 2020 Administrative Leadership Conference.

**Remaining Questions under Consideration:**
- What training should be provided to students and staff related to bias, racial and cultural insensitivity, and racial and cultural literacy?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will implement measures to reduce racial/ethnicity discipline disproportionality. |  | **Governance:** Individual members of the LCSB will express conceptual support for the staff actions described below related to the Student Code of Conduct.<br><br>**Operations**: LCPS Administration has drafted changes to the Student Code of Conduct to include mandatory alternatives to out-of-school suspension for subjective discipline infractions, such as disrespect, defiance, and classroom/campus disruption, etc. LCPS Administration will solicit feedback from school leaders and the Equity Committee prior to finalizing. |

**Baseline Data for 2018-19** *(Replace with alternative?)*

| Student Group | Enrollment | Suspension-In School | Suspension-Out of School |
|---|---|---|---|
| Asian | 22.2% | 10.2% | 9.5% |
| Black | 6.8% | 11.9% | 15.8% |
| Hispanic | 17.7% | 31.5% | 29.7% |
| Other | 0.7% | 1.0% | 1.5% |
| Two or More | 5.5% | 4.9% | 5.6% |
| White | 47.3% | 40.4% | 37.7% |

**Out of School Suspensions**
- Disproportionality difference for Black Students: 15.8%  - 6.8% = 9 points
- Disproportionality difference for Hispanic Students: 29.7% / 17.7% = 12 points

**SMART Goals for 2020-21**
- Disproportionality difference for Black Students: 13.8%  / 6.8% = 7 points
- Disproportionality difference for Hispanic Students: 26.7% / 17.7% = 9 points

J.A. 73

**Alternative (***This option includes the suspension rates and risk ratios as suggested by best practices for presenting discipline data***)**
**Baseline Data for 2018-19**

| Student Group | Suspension Rate | Difference Compared to White Students | Risk Ratio to White Students |
|---|---|---|---|
| American Indian/Pacific Islander | 3.09% | 2.21 | 3.51 |
| Asian | 0.46% | -0.42 | -0.52 |
| Black | 2.57% | 1.69 | 2.92 |
| Hispanic | 1.82% | 0.94 | 2.07 |
| Two or More | 1.16% | 0.28 | 1.32 |
| White | 0.88% | 0.00 | 0.00 |

**SMART Goals for 2020-21**
- Reduce suspension rate for American-Indian/Pacific Islander students while closing the difference or disproportionality to white students by 25% (risk ratio decreases from 3.51 to 2.63)
- Reduce suspension rate for Black students while closing the difference or disproportionality to white students by 25% (risk ratio decreases from 2.92 to 2.19)
- Reduce suspension rate for Hispanic students while closing the difference or disproportionality to white students by 25% (risk ratio decreases from 2.07 to 1.55)

**Needed Resources to Accomplish the Goal:**
- Continued training and use of Reflective Considerations for Discipline for school staff to address implicit bias in discipline decisions, particularly disorderly conduct
- Ongoing use of MTSS Data Analytics Tool and Discipline Violation Reports in QLIK for monitoring and action steps throughout the school year

- Development and provision of ongoing interventions for Black and Hispanic students who are engaging in behaviors that might lead to suspensions
- Removing disorderly conduct as a violation category for suspensions, which disproportionately impacts Blacks and Hispanic students

**Remaining Questions under Consideration:**
- To what extent are we addressing the root causes for discipline disproportionality (bias, cultural insensitivity,culturally responsive and engaging instruction, etc.)?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| Implement measures to increase the diversity of the applicant pool and the population of admitted students at the Academies of Loudoun.* |  | **Governance:**  The LCSB will review draft plans as shared by LCPS Administration and, as individual members, will express conceptual support for revisions.<br><br>**Operations:** LCPS Administration will continue to revise the outreach, recruitment, application, and admissions processes for the Academies of Loudoun. Some steps have been taken in the 2019-2020 school year. Additional actions steps are planned based on current data and recommendations from outside Counsel. |

**SMART Goal and Objective:** By the start of the Fall 2020 admissions window, revise the Academies of Loudoun admissions process to minimize disparate impact of admissions criteria.  Implement measures to increase the diversity of the applicant pool and the population of admitted students to the Academies of Loudoun for the fall and winter 2020 Admissions window.  Add a belief statement by September 1, 2020 to the Academies of Loudoun Mission, Vision, and Belief statements reflecting the commitment to equitable access for all students. Additionally, the staff members responsible for the development, implementation, and monitoring of the recruitment and admission process would become Department of Instruction staff members, rather than Academies staff members, and would report to the Director of High School Education.

**Needed Resources to Accomplish the Goal:**
- Training for admissions panel

**Remaining Questions under Consideration:**
- How do we continue to monitor admissions criteria and impact on applicant pool and admitted students, adjusting as needed?
- Should the CogAT be implemented for the Fall 2021 admissions window in lieu of the STEM Thinking test? Is there another more appropriate assessment to measure STEM thinking skills?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will revise hiring protocols, practices, and resources for hiring managers to include but not limited to setting forth requirements for racially diverse interview panels.* |  | **Governance:** The LCSB will support the LCPS Administration's revisions to said protocols, practices, and resources for hiring managers.<br><br>**Operations:** HRTD will work with hiring managers and principals to develop and implement racially diverse interview panels. In addition to continuing to promote this practice, HRTD will collect data regarding the implementation of this practice. HRTD will also use staff demographic data and hiring data to identify schools that need additional assistance and supervision in utilizing practices that are proven to increase the diversity of staff. HRTD will publish staff demographic and hiring data on a school-by-school basis. |

**SMART Goal and Objective:**
- By November, 2020 HRTD will analyze interview and hiring data for the summer 2020 hiring season and report results on the diversity of applicants, the diversity of candidates interviewed, the diversity of staff hired, and the diversity of interview panels.
- By January, 2021, HRTD and principals will review hiring data for each school and assist principals in developing an action plan to increase diversity in hiring.
- By January, 2021, HRTD will identify schools that need additional assistance and supervision and develop and implement remediation plans.
- By February 2021, HRTD will train all principals and assistant principals in the hiring protocols, processes, and requirements.
- Beginning in November 2020, HRTD will actively monitor and remediate schools that are not compliant with the interview and hiring processes.

**Needed Resources to Accomplish the Goal:**
- Funds and personnel to support schools in need of remediation.
- Additional personnel at local hiring events.  Required attendance for all school-based administrators.

- Programming data management and applicant tracking systems to correlate reports.

**Remaining Questions under Consideration:**
- How do we seat interview panels to insure diverse representation?
- How do we diversify contacts at all steps of the hiring process?
- How diverse are our current interview panels?
- How are we going to create diverse interview panels at small schools?
- How do we extrapolate and track demographic data for candidates and interview panels?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will collaborate with the Black community in Loudoun to establish an interpretive display or exhibit such as a statue honoring Black individuals who made significant contributions related to education during segregation. Locations for consideration include the Douglass School and LCPS Administration campuses. |  | **Governance:** The LCSB will endorse the concept of the interpretative display or exhibit and, if necessary, will take action to appropriate funds.<br><br>**Operations:** LCPS Administration will meet with the Equity Committee, MSAAC, and the leaders of several groups (the Loudoun Branch of the NAACP, the Douglass School Alumni Association, Loudoun County Black History Committee and the Edwin Washington Project), and others to develop a plan. |

13

**SMART Goal and Objective:** As a part of design development for the renovation of the Douglass High School, the interpretive display exhibit will be considered as complementary to the efforts of preserving the history of the school and the community.  The design team will engage the community and stakeholders in the development of concepts for the interpretive display that will address the type, location, materials and message to be conveyed through the articles of the work.  Goals for the display will  address the preservation of memories of black community history and hopes for the future.  Additionally, the work will serve as a memorial to african american ancestors who worked tirelessly and sacrificed so that members of the community might have better opportunities in the future.  Concepts from the design team will be shared with the community and school board for consensus in the September 2020 to October 2020 time frame .

**Needed Resources to Accomplish the Goal:**
- Supplemental funding may be required depending upon the scope and costs

**Questions under Consideration:**
- Will other locations be considered for similar displays?
- Who will be included in the final approval for the effort?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS Superintendent, the Superintendent's Cabinet and members of the LCSB who are on the Equity Committee will meet biannually with LCPS staff members of color to connect and offer a safe space to listen and learn about their experiences in LCPS. |  | **Governance:** The LCSB will commit to revising policies and allocating resources to combat systemic racism and discrimination of staff based on what they learn and hear in the "listen and learn" sessions with staff. Members of the LCSB who are not on the Equity Committee may wish to participate in these meetings as well. Depending on the number of Board members who participate, the meetings may be public.<br><br>**Operations:** LCPS Administration will set forth recommendations to the LCSB to revise policies and allocate resources to combat systemic racism and discrimination of staff based on what they learn and hear in the "listen and learn" sessions with staff. LCPS Administration will also work with their department leaders to establish affinity groups and safe spaces to inform decision making. |

14

**SMART Goal and Objective:** As a vehicle for increasing racial consciousness; a welcoming and affirming school system for Staff of Color,  during the school year LCPS Superintendent, Cabinet, and LCSB members who serve on the Equity Committee will host a minimum of two "listen and learn" sessions for Staff of Color.

**Needed Resources to Accomplish the Goal:**
- Some shared foundational knowledge (for LCSB and Cabinet) on (safe and brave spaces, centering, etc.) will need to be established in order for true "listening" to occur in these sessions. This could link to the Professional Learning goal/action step for LCSB and Cabinet
  - Me and White Supremacy by Layla Saad
  - The Listening Leader: Creating the Conditions for Equitable School Transformation by Shane Safir
  - How to be an AntiRacist by Ibram X. Kendi
- The Racial Healing Handbook by Anneliese Singh - Resource with some discussion prompts for "listen and learn" sessions
- Will need to develop some norms of collaboration and working agreements for creating space to share

**Remaining Questions under Consideration:**
- Who will facilitate these sessions?
- What is the participation option for a non-Person of Color (who desires to serve as allies) to engage in these sessions?
- Should LCPS consider an external facilitator?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will develop and implement a culturally responsive instructional framework and explore the possibility of a legislative action item regarding culturally responsive instruction |  | **Governance:** The LCSB will support the development and implementation of a culturally responsive instructional framework and professional learning plans needed to implement the framework set forth by the LCPS Administration.<br><br>**Operations**: LCPS Administration will collaboratively develop and implement a culturally responsive instructional framework based on three principles: welcoming, inclusive & affirming environment, inclusive curriculum & assessment, and engagement and challenge through deeper learning. LCPS Administration will |

| as part of the 2020 legislative program.* | | include multiple stakeholders, including secondary students representing MSAAC Ambassadors and high school student affinity groups, in the development of the framework to assist with creating an inclusive and affirming environment. LCPS Administration will also explore the possibility of a legislative action item regarding culturally responsive instruction as part of the 2020 legislative program. |
|---|---|---|

**SMART Goal and Objective:** The Culturally Responsive Instructional Framework will be completed by October 2020 following feedback and input from internal and external stakeholders.

**Needed Resources to Accomplish the Goal:**
- Access to agenda for Equity Committee, MSAAC, and other meeting structures
- ALT input session for Principals
- Student Voice
- Staff from cross departmental team including ECR office in DOI

**Remaining Questions under Consideration:**
- How will mandatory DEI professional learning connect to the framework?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCSB will consider the potential renaming of the Loudoun County High School mascot, the Raiders. |  | **Governance:** At the request of an individual School Board member, the LCSB will begin a discussion involving the potential renaming of the Loudoun County High School mascot. Should the School Board decide to consider taking action in the future, the LCSB may wish to engage in a public input process through a Special Meeting of the School Board. The LCSB may also choose to establish a "re-naming committee" including but not limited to current students and staff, LCHS alumni, representatives of the Loudoun Branch of the NAACP, etc. **Operations**: LCPS Administration will collaborate with school administration, the LCHS community, and others to be responsive to any action taken by the Board. LCPS Administration will also conduct a school by school name review beginning the summer of 2020 In alignment with Board action to change the name of the LCHS |

|  |  | mascot, the school principal with support from division administration will implement a process to engage the LCHS community in selecting a new mascot for the high school.LCPS Administration will work with school administration to review needs in order to set forth budget recommendations for the School Board's support. |

**SMART Goal and Objective:** During the summer of 2020, the Loudoun County High School leadership, with support from LCPS Senior Leadership, will engage the LCHS community in a collaborative and public process to select a new mascot to replace the Loudoun County Raiders. During the 2020-2021 school year and once a mascot is selected, LCPS Departments of Support Services, Business & Finance, and Instruction will work with LCHS leadership to identify and replace all references to the LCHS Raiders with the new mascot.

**Needed Resources to Accomplish the Goal:**
- Funds to support the removal and replacement of the Raiders word and emblem from physical LCHS property, spirit wear, uniforms, etc.

**Remaining Questions under Consideration:**
- Timing for removal of Raiders mascot throughout building and on campus?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will maintain a list of resources for the consumption of the broader LCPS community on the [LCPS Equity webpage](). | 🤝 | **Governance:** The LCSB will support the concept of offering resources regarding racial literacy and consciousness with the LCPS community.<br><br>**Operations:** LCPS Administration will review and revise the list of resources for the LCPS community based on goals set forth in the comprehensive equity plan, relevant LCPS topics, and local, state, and national current events. LCPS will access external resources, like [Racial Equity Tools](), and internal resources to maintain the list. |

**SMART Goal and Objective:** Beginning summer of 2020, LCPS Directors of Equity and Communication and Community Engagement will collaborate to review, publish, and maintain resources to be posted to the LCPS Equity webpage. Resources will be reviewed and posted at least quarterly for public consumption.

**Needed Resources to Accomplish the Goal:**
- **N/A**

**Remaining Questions under Consideration:**
- Do we want to consider a process to allow internal and external partners to submit resources for review and posting?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will collect qualitative data regarding racial incidents to amplify student voices. |  | **Governance:** The LCSB will support the concept of LCPS staff amplifying student voices regarding racial incidents they have experienced in school.<br><br>**Operations:** LCPS Administration will create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity. The intent will be to amplify student voice as the Equity Assessment indicated, "...many English Learners, Black/African-American, Latinx, and Muslim students have experienced the sting of racial insults/slurs or racially motivated violent actions." The information will also be used to collect qualitative data regarding racial incidents; however, the tools used to highlight student voice may inform, not supersede, LCPS policies or protocols for addressing racial incidents, including but not limited to the Student Code of Conduct, Policy 7560 Professional Conduct, and the Protocol for Responding to Racial Slurs and Hate Speech in Schools. LCPS Administration will also collaborate with school leaders and partners such as MSAAC, who have student affinity groups, to ensure that students are encouraged to share their stories, speak up, and to ensure that they are supported by LCPS. |

J.A. 82

**SMART Goal and Objective:** Beginning Fall of 2020, LCPS will create opportunities to listen to student stories and collect anonymous student stories/experiences regarding issues of racism, injustice and inequity.  Stories and experiences will be reviewed and shared by the Supervisor of Equity and LCPS student leaders of Color during regularly occurring student *Share, Speak-up, Speak-out* meetings via virtual platform or in-person. These opportunities will be used to amplify the voice(s) of Students of Color.  An electronic form will be used to anonymously collect student stories and to ascertain whether or not the student would like their account of the issue investigated and/or if they would like to speak with a member of a LCPS United Mental Health Team for support.

**Needed Resources to Accomplish the Goal:**
- Leverage support of Equity Leads to support this affinity space for Students of Color
- Professional learning, resources and protocols (for staff) to facilitate sharing and creating safe and brave spaces for students

**Remaining Questions under Consideration:**
- What will be the process for selecting Students of Color to serve in this way?
    - How often will the student group meet with the Supervisor of Equity and other division leaders?
    - Should LCPS Administration use Restorative Practices to repair harm and amplify student voices during the Share, Speak-up, Speak-out meetings?
- How can we create a Student Leaders of Color (i.e. student equity ambassador) network division-wide with student representatives at schools and bring those students together as a means to amplify student voices?  This allows for an opportunity to build forward motion in using student voice in the following ways:
    - PBL experiences & Deeper Learning focus - solving an authentic problem
    - Social-Justice lens to develop greater awareness and build student empathy, leadership and advocacy skills
- How can LCPS use strengths-based Social Emotional Learning (SEL) and mental health approaches to support individuals and school communities??
- In what ways can school teams use the CASEL resources through an equity lens as part of a systemic division wide effort to promote SEL and equity to further support the development of communal values and positive ethnic-racial identity; particularly for students whose cultures and racial-ethnic groups are historically marginalized?
- What other actions can be implemented to help minimize the negative impacts of internalized, interpersonal, and institutional oppression and provide ways for students and staff to constructively and collectively respond to injustices?
- What can LCPS do to promote the timely reporting of concerns so that school administrators may apply the existing protocol and involve  qualified members of UMHT or other mental health professionals?

| Action | Focus Area(s) | Opportunities |
|---|---|---|
| LCPS will formally apologize for the history of operating segregated schools. |  | **Governance:** The LCSB and the LCPS Administration will jointly extend a formal apology for the history of operating segregated schools. The LCSB will direct the Superintendent to reach out to the County Administrator to invite the Board of Supervisors to join the school division in issuing the apology.<br><br>**Operations:** LCPS Administration will develop a formal statement of apology for the history of operating segregated schools. |

**SMART Goal and Objective:** On Friday, August 28, 2020, the 57th anniversary of the March on Washington and Dr. Martin Luther King, Jr.'s "I Have a Dream Speech", the LCPS Public Information Office will issue a media release announcing the intent of the LCSB and Superintendent to extend a formal written statement of apology for the history of operating segregated schools. The letter will acknowledge and apologize for the fact that Loudoun was one of the last school systems in the nation to desegregate its schools, three years after Dr. King's speech and 14 years after the U.S. Supreme Court's Brown vs. Board of Education ruling that declared separate public schools based on race to be unconstitutional. The letter will also be inclusive of an apology for the LCSB's agreement to build a new high school for Students of Color that met standards of accreditation and provide school bus transportation throughout the County in exchange for the eight acres of land (the Black community purchased in 1939 for $4,000), which the Black community sold to the LCSB for $1 to build the high school. LCPS will seek input from MSAAC, NAACP, Friends of Thomas Balch Library, Edwin Washington Project, Black History Committee - Friends of Thomas Balch Library, and Loudoun Douglass School Alumni Association on additional topics to be addressed in the apology letter. The apology letter and a video that displays the purpose of the apology with snippets of interviews of members of the Black community of LCPS expressing what it means for LCPS to be apologizing and what some of the action steps to combat systemic racism mean from their point of view will be released in mid-September.

**Needed Resources to Accomplish the Goal:**
● Support from the LCSB of the concept of a written apology at the August 11, 2020 School Board meeting.

**Remaining Questions under Consideration:**
● N/A

# Q&A

**Q:** What is the difference between the Comprehensive Equity Plan and the LCPS Action Plan to Combat Systemic Racism?

**A:** The Comprehensive Equity Plan will have goals to denote specific work underway and future work as it relates to Diversity, Equity, and Inclusion for the division. It is a multi-year outlook with goals and action steps to show our deliberate intentionality toward eradicating inequities across the division. The Equity Framework at the outset of the Comprehensive Equity Plan's goals display the various components to be addressed in the plan. Focus areas from three different departments (HRTD, DOI, and DPS) are outlined in the plan in alignment with Strategic Goals from the Vision 20/20 Strategic Action Plan along with the pairing of an Equity Emphasis area. Recent quantitative data (discipline disproportionality, course enrollment, etc.) as well as qualitative data from the LCPS Systemic Equity Assessment served as a foundation for the types of goals and areas of focus to be outlined by the Comprehensive Equity Plan. The five emergent themes from the LCPS Systemic Equity Assessment revealed foundational information related to unconscious bias and the discomfort of staff on conversations about race and racism. The themes and recommendations included in the assessment suggested the need for a well-organized professional learning series to deepen equity literacy and racial consciousness to better support traditionally underserved students in having a positive school experience, with equitable outcomes.

J.A. 85

Although the Comprehensive Equity Plan is intended to address inequities by taking a preventative as well as a responsive approach, the Action Plan to Combat Systemic Racism has a laser focus on systemic racism, oppression, and the need for the disruption and dismantling of ineffective systems (referenced in the Superintendent's Division-wide Equity Statement issued August 19, 2019) in particular, which fail to serve every student. The reiteration here is that even with a forward-facing multi-year strategy for improving equitable outcomes through a Comprehensive Equity Plan, none of the goals or actions outlined in the plan can fully come to fruition without recognizing where true interruptions in our current practices and even policies need to occur as foundational work to truly move the needle in combating systemic racism.

**Q:** Will both exist as separate documents?

**A:**  At this point, these documents are in stand-alone format to give them both the individualized attention needed to address equity comprehensively and systemic racism specifically. In this work, which is more adaptive and less technical in nature, it is important that we place these documents at the center of our work to allow for the necessary and sometimes uncomfortable conversations; and bold action steps that foster transparency and accountability.  Internal and external stakeholders may need time to review and process the nature of both plans and the implications for the LCPS and the broader community. In the future, the Action Plan to Combat Systemic Racism *may* be embedded (linked) into the Comprehensive Equity Plan, as part of the action steps listed beneath specific goals throughout the Comprehensive Equity Plan.

# EXHIBIT C

# LCPS Comprehensive Equity Plan

**Revised September 2020**



J.A. 88

# LCPS Profile of a Graduate



## LCPS Core Beliefs

- A culture of continuous improvement drives the fulfillment of our mission
- Strong partnerships with families and our community enhance our excellence
- An inclusive, safe, caring, and challenging learning environment serves as the foundation for student growth
- Transparency and good stewardship of resources strengthen public trust and support

## Why a Comprehensive Equity Plan?

In addition to the LCPS Core Beliefs, developing and implementing an equity plan will communicate the following commitments about LCPS as a division serious about ensuring the following:

- we collaborate and engage families and community stakeholders to ensure student growth and success for every child
- a culturally-responsive, supportive environment for welcoming, identity-affirming, inclusive, and safe teaching and learning space for every student and adult
- we are utilizing strategies to eliminate opportunity gaps
- there is improvement in programming to leverage greater access, opportunity, and outcome data for students
- our teachers and staff engage in continuous professional learning and coaching on Diversity, Equity, Inclusion and Justice work

J.A. 90

# LCPS Equity Impact Statement:

In addition to ensuring a racially-conscious, identity-affirming, and culturally responsive learning space for every student and employee, Loudoun County Public Schools is committed to decreasing disparities, increasing opportunities and participation outcomes for rigorous learning, dismantling barriers and interrupting the status quo for the development of stronger equitable practices.  A diverse, inclusive, equitable, and socially-just teaching and learning community is a priority in LCPS.

# LCPS Systemic Equity Assessment by the Equity Collaborative

**Systemic Equity Assessment Recommendations** : A division-wide equity assessment was commissioned by the Superintendent in the spring of 2019.  The purpose of the assessment was to identify key areas of strength and areas for improvement and further development regarding equitable practices in LCPS.

During the spring of 2019, from mid-April through the end of May, The Equity Collaborative staff conducted a **series of focus group sessions** and interviews at 24 schools across the division to review division culture related to **diversity, equity, inclusion, and race**. Elementary, middle and high school students, staff, parents and administrators at least an hour each.  Questions asked were used as prompts for deeper discussion.  The Equity Collaborative staff gathered all of the qualitative data, removed all names and other identifiers, sorted the comments by themes, and share the resulting analysis in the report entitled the LCPS Systemic Equity Assessment. Below is a list of the five emergent themes and four primary recommendations of the systemic equity assessment.

J.A. 92

# Five Emergent Themes of the Systemic Equity Assessment

- Despite efforts from the division, school site staff, specifically principals and teachers, indicate a low level of racial consciousness and racial literacy.  People are unclear and fearful on how to participate in conversations about race, let alone respond to racially charged incidents.

- Educator focus groups indicated a desire to recruit and hire diverse school staff that reflect student racial and language backgrounds.

- Economic diversity across the county/division complicates the discussions about race, leading many people to steer the conversation away from race to focus on poverty.

- Discipline policies and practices disproportionately negatively impact students of color, particularly Black/African-American students.

- Many English Learners, Black/African-American, Latinx, and Muslim students have experienced the sting of racial insults/slurs or racially motivated violent actions.

# Four Primary Recommendations

- Produce and publish on the **"Superintendent's Message"** page a new division-authored statement defining and condemning White supremacy, hate speech, hate crimes, and other racially motivated acts of violence.  Require individual schools sites include this message on their webpage and in communications to parents twice a year (not only in response to an incident).

- Review the current/establish a clear policy **with built-in accountability for addressing racially motivated acts** and create proactive leadership measures to address the student use of racial insults.  Name that the N-word is not tolerated by anyone in LCPS.

- Design additional opportunities for LCPS educators to engage in **professional learning about color consciousness and implicit bias.**  Further establish a culturally-responsive framework to inform curricular and instructional efforts across the division.

- Revise the current/establish a short- and long-range action plan to address challenges related to **hiring for diversity, equity, and inclusion.**

J.A. 94

## Division-wide Equity Statement

*LCPS is committed to* providing a safe, empathetic, respectful and supportive learning environment in order to empower every student to make meaningful contributions to the world. When students and staff experience racial insults, slurs, and/or other hate speech, we lack the positive culture and climate that supports students' growth.

*LCPS calls for* all students, staff, families, and other members of our community to engage in the disruption and dismantling of white supremacy, systemic racism, and hateful language and actions based on race, religion, country of origin, gender identity, sexual orientation, and/or ability. LCPS rejects racist and other hateful behavior and language, recognizing that it encourages discrimination, hatred, oppression, and violence.

*Every individual is valued in Loudoun County Public Schools*. Let's celebrate the diversity that helps define us as a school division.

J.A. 95



## COMMON LANGUAGE

## What is it?

## What does it look like ?

### Diversity

A system that has a good understanding of what diversity of representation really means, diverse = differences

- Diversity of thought, diversity of religion, racial diversity, gender diversity, diversity of experience, etc.
- Diversity of workforce – rate, offerings, positions.
- A diverse staff that reflects the county demographics
- Diversity of participation in parent connection opportunities that reflect the county demographics

### Equity

Shared power communicates the division's intent to fundamentally change the manner it practices by amplifying marginalized voices and perspectives.  An equity-centered division would create spaces and environments where marginalized voices and perspectives who have not been historically valued, are now given the consideration it deserves. In addition, equity is purposefully ensuring power is diversely distributed.

- Equitable resources throughout the county
- Eliminating discipline disparities
- EDGE in every school
- AOS enrollment reflects the community demographic

### Inclusion

Increasing participation and connectedness, creating a sense of belonging

- An increase in diversity of parental engagement
- Opportunities for every student
- After-school programming/clubs, scholarships
- Special needs programming
- Outreach strategy and program to reach EL students
- Increased/easier access to resources (SPED, MD, etc. )

Representation

Shared Power

Participation

J.A. 96

# Comprehensive Equity Plan Development

- **Initial development of the Comprehensive Equity Plan** came from a combination of qualitative data from the Systemic Equity Assessment and corresponding recommendations, recommendations from the Equity Committee submitted to the LCSB in December 2019, quantitative data, climate survey, and a root cause analysis revealing opportunity gaps, disproportionality and disparities among  racially marginalized, underserved, and underrepresented group.

- **The Equity Committee**, initially named the Ad Hoc Committee on Equity, was formed in April 2019, with an original task of submitting recommendations for equity-focused solutions to the School Board by December 2019.  The committee was extended in December 2019 and is still actively working to address inequities in LCPS.  The committee's charge is creating a Culturally Responsive School System.  Some of themes and areas identified by the commitee for growth, improvement or further development were also used as data for goal development for the Comprehensive Equity Plan.

- **Input and feedback have been provided throughout this iterative process** including the following opportunities: February 20, 2020 - Pathway to Equity Community Conversation; internal leadership stakeholder cross-departmental group meetings; and during two summer meetings of the Equity Committee held in June and July 2020

# Desired Outcomes

Build upon existing LCPS Strategic Goals and infuse stronger equitable practices into our work across the school system to:

- Create a culturally-responsive school division, meeting the needs of every learner

- Design an emotionally-safe, identify-affirming learning space for every child and adult

- Build a diverse employee workforce that is focused on ensuring every student meets with success

- Develop and utilize an Equity Lead Network for the professional learning and support of Equity Leads in leveraging equitable outcomes across the school division

J.A. 98

# EQUITY–CENTERED LEADERSHIP ACROSS DEPARTMENTS THROUGHOUT LCPS

- A **cross-departmental leadership** approach is used to ensure equity is at the core of decision-making and strategic planning for successful student outcomes

- **Intentionality in equity** requires a high level of collaborative leadership, which means  responsibility for the work spans beyond those with equity found exclusively in their job title.

- The list below shows examples of **leaders who collaborate across departments** to ensure opportunities and access are afforded to every student.

Equity Specialist
EDGE Coordinator
Level & Departmental Directors
Professional Learning Supervisors
Content Supervisors & Specialists
Recruitment Supervisor
Supervisor of Equity, Compliance and Respectful Workplace
Family and Community Engagement Coordinator

**Supervisor of Research**
**Supervisor of Multi-tiered Systems of Support**

**Supervisor of Counseling**
**Student Support Services Supervisor**

**OFFICE OF SUPERINTENDENT**
***DIRECTOR OF EQUITY***

**SUPERVISOR OF EQUITY**

**COLLABORATING WITH STAKEHOLDERS**

**GUIDANCE FOR PRINCIPALS & EQUITY LEADS**

**COLLABORATES WITH SUPERVISOR OF EQUITY AND CULTURALLY RESPONSIVE INSTRUCTION**

DEPARTMENT OF INSTRUCTION
***DIRECTOR***
***OF***
***TEACHING & LEARNING***

**SUPERVISOR**
**OF EQUITY AND**
**CULTURALLY RESPONSIVE**
**INSTRUCTION**

COLLABORATES WITH

PROFESSIONAL LEARNING AND
CONTENT SUPERVISORS

EQUITY SPECIALIST

COLLABORATES WITH
SUPERVISOR OF EQUITY

# Frequently Referenced Educational Terms

**CRF: Culturally Responsive Framework:** creates and guides support of student-centered learning environments with a critical focus on culturally and linguistically diverse students that have been marginalized.  Three areas of the framework: 1.Welcoming, Inclusive and Affirming Environment, 2. Inclusive Curriculum and Assessment, and 3. Engagement and Challenges through Deeper Learning.

**Deeper Learning**: the process through which the learner becomes capable of applying what is learned in one situation to new situations (National Research Council 2012). The heart of this process is engaging students in solving authentic challenging problems.

**MTSS**: **Multi-Tiered System of Supports**: An evidence-based instructional framework comprised of practices and interventions to support the needs of all students. This holistic approach addresses academic, behavioral, and social emotional needs. The MTSS framework addresses student needs at three tiers, including an emphasis on prevention, strategies, and interventions.

**Equity Team**: ensures school is a welcoming, identity-affirming learning space; designed to continuously review instructional practices to reduce disparities among marginalized students; provide input and feedback on the implementation of school-wide culturally responsive practices.

**Equity Lead:** A teacher leader or mental health leader who works collaboratively with the Principal to build a solid equity-focused culture throughout the school. The Equity Lead will ensure stronger equitable practices are implemented school-wide.

**Equity Literacy:**  The skills and dispositions that allow us to create and sustain equitable and just learning environments for all families and students.

**Racial Consciousness:** The awareness of race and how it can influence our actions, thinking, and beliefs.

J.A. 102

# Frequently Referenced Educational Terms

**Standards of Learning (SOL):** SOL tests in reading, writing, mathematics, science and history/social science measure the success of students in meeting the Board of Education's expectations for learning and achievement

**PLC: Professional Learning Community**: a network which provides a focus on the following to drive schoolwide teaching and learning: 1. a focus on collaboration, 2. focus on learning and strategies and 3. a focus on results.

**CLT: Collaborative Learning Team** is a separate departmental, grade level, subject matter teams which are the smaller groups which make up the school-wide PLC.  The team is comprised of licensed staff and school administrators who meet regularly to review data, design assessment and/or learning outcomes, and review data to inform instructional and social-emotional practices.

LCPS is committed to closing opportunity gaps by increasing access to high-quality after-school STEM enrichment programs. Funding for the PROPEL and LEVEL UP programs has been increased so that more students are prepared for academically rigorous coursework in middle and high school.

***PROPEL*** (Providing Rich Opportunities Plus Enrichment Learning) focuses on 4th and 5th grade students in Title I or Title I eligible elementary schools.

***Level Up*** for middle school students was added in 2018 with programming for 6th graders. The curriculum includes engaging tasks that are designed to build computational and analytical thinking skills within the context of intensive, long-term STEM investigations.

***EDGE***: Empowering Diversity in Gifted Education The EDGE program is designed to nurture and challenge students with gifted potential from historically underrepresented populations.

# LCPS Strategic Goal 1

Develop knowledgeable, critical thinkers, communicators, collaborators, creators, and contributors

**EQUITY EMPHASIS:**

*Create access pathways of rigorous learning opportunities for students of color and underserved populations.*

| =EQUITY GOAL (PER YEAR) |

## 2020-2021

- Implement a Culturally Responsive Framework (CRF) to inform all instructional practices in every LCPS school.

- By Winter 2020, design CRF professional learning opportunities for teachers focused on 3 areas of implementation: 1. Welcoming, Affirming Environment, Inclusive Curriculum and Assessment, and 3. Engaging in Deeper Learning.

- By Spring 2021 increase the enrollment in EDGE, Propel and Level-Up programs by 10% and expand access to schools with the highest enrollment of groups that are underrepresented in the LCPS Gifted Program.

### ACTION STEPS

- As part of their professional learning series, equip and empower school-based Equity Leads to provide support related to the implementation of CRF and culturally responsive instruction.
- Establish look-fors that reflect the CRF
- Utilize CLT, data dialogue, and teacher professional learning sessions to create access to opportunities for underrepresented student populations, in gifted programming.

## 2021-2022

- By 2022 school CLT structures will demonstrate shift in Deeper Learning and CRF through increase use of feedback loop structures and student learning partnerships.

- LCPS will close the gap in SOL pass rates between Black and Latino/a/x students and White students by 10% (ex: passing rates of 90% and 70% is a 20% difference which will close the gap by 2%).

- Increase the enrollment in EDGE, Propel and Level-Up programs by 10% and expand access to schools with the highest enrollment of groups that are underrepresented in the LCPS Gifted Program.

### ACTION STEPS

- Division-wide use of Hammond's book , *Culturally Responsive Teaching and the Brain,* to create feedback and learning partnership structures.

- Utilize CLT, data dialogue, and teacher professional learning sessions to create access to opportunities for underrepresented student populations.

## 2022-2023

- By 2022, schools will have adopted the use of student learning portfolios and increased use of performance-based assessment as culturally-responsive indicators of student strengths.

- Increase the enrollment in EDGE, Propel and Level-Up programs by 10% and expand access to schools with the highest enrollment of groups that are underrepresented in the LCPS Gifted Program.

### ACTION STEPS

- Use Collaborative Learning Team (CLT) and data to create performance assessment and learning portfolio assessment options for students.

- Develop look-fors and implement structures for the underserved , non-traditional gifted students.

J.A. 104

Case 1:21-cv-00669-AJT-TCB   Document 30-3   Filed 08/30/21   Page 19 of 21 PageID# 619

## LCPS Strategic Goal 2:
Recruitment and retention of a high performing, diverse workforce.

*Identify, attract, and retain diverse faculty and staff*

**EQUITY EMPHASIS**

⬛ =EQUITY GOAL (PER YEAR)

### 2020-2021

- Develop and refine systems to recruit staff representing a broad range of diverse identities.

- By October 2020, 100% of new teachers will engage in on-boarding training sessions on equity, history of racism; mitigating bias, and the need for creating a safe, inclusive, and affirming learning space for every student.

- By Spring 2021, increase participation for Students of Color in the LCPS Teacher Cadet program to build a more racially diverse "Grow your Own" teacher program.

### 2021-2022

- Develop networks with teacher preparation programs at colleges and universities. By Spring 2022, build a network of junior college students Teachers of Color as prospective teachers for the following year.

- Increase intentionality in the recruitment of a diverse workforce, including robust outreach to, and partnerships with, Historically Black Colleges and Universities (HBCUs) and other Minority Serving Institutions (MSIs), and messaging that will appeal to a diverse audience.

### 2022-2023

- Embed student voice in recruitment efforts for teachers and Staff of Color.

- Leverage the Diversity Champions Recruitment Network (DCRN) and other groups to amplify the need for increased diversity to be reflected in all licensed staff positions. The Human Resources and Talent Development (HRTD) Department created a Diversity Champions Recruitment Network to expand recruitment and onboarding efforts to be more inclusive.

---

**ACTION STEPS**

- Utilize a needs assessment for school specific needs and embed a focus on diverse hiring in school improvement goals and plan.

- Develop onboarding action steps (including mid-year surveys) to support the development of racial literacy and awareness.

- Engage Students of Color in interest meetings about Teacher Cadet programming.

**ACTION STEPS**

- Establish partnerships with HBCUs and MSIs to create a college to career pipeline for aspiring Teachers of Color.

- Utilize teachers in the DCRN for recruitment efforts.

- Maximize social media outlets for marketing and recruitment efforts.

**ACTION STEPS**

- Utilize student voice in marketing and messaging (virtually and in-person) the need for more Teachers of Color.

- Evaluate effectiveness (three year period) of recruitment and retention through surveys and focus groups. Use that data to change practices and recruitment actions for Staff of Color.

J.A. 105

## LCPS Strategic Goal 2:
Recruitment and retention of a high performing, diverse workforce.

**EQUITY EMPHASIS**

*Retention of Diverse Workforce: Cultivate Equity Literacy Through Professional Learning and Coaching*

= EQUITY GOAL (PER YEAR)

### 2020-2021

- Fall 2020, licensed staff will continue to build equity literacy and racial consciousness through Equity in the Center virtual professional learning modules.

- By May 2021, train classified staff on training sessions on equity, history of racism; mitigating bias, and the need for creating a safe, inclusive, and affirming learning space for every student.

- Winter 2020, begin to identify and differentiate professional learning opportunities to further equity literacy development for staff across the division. (ie. Equity Lead and Equity Team development, coaching for culturally responsive teacher development, student driven culturally responsive teaching strategies, etc.)

#### ACTION STEPS

- Continue Equity in the Center and other DEI modules to develop equity literacy.

- Review and research differentiated opportunities for professional learning for all employees.

- Create and use a standardized LCPS survey to assess equity literacy development as a result of professional learning.

### 2021-2022

- Fall 2021, Equity Lead and the Equity Team in schools across the division have created a productive, cohesive Equity Leads Team with designated leader(s), explicit norms of behavior and communication to the greater school community. Level of progress determined by a rubric on equity development.

- Winter 2021, Equity Leads and Principals are able to articulate plans and purposes for culturally responsive classroom observations, including the process and frequency for providing teachers with feedback on instructional practice.

- Spring 2022, 100% of principals across the division will have experienced 2 coaching sessions to develop an equity-lens in order to inform their leadership.

#### ACTION STEPS

- Develop and utilize an Equity Lead "Team" curriculum and program map to support equity literacy development through Equity Leads on sites.

- Identify and utilize an equity centered coaching model and network (internal to LCPS or external to LCPS) to provide ongoing support for Equity Leads and principal development.

- Develop a Positive Racial Identity survey measure racialized experience of students in schools.

### 2022-2023

- By use of climate survey, measure students' perceptions of cumulative impact on of DEI actions on culture change in their schools.

- Fall 2022, principals across the division utilizing Equity Centered Coaching are able to review data with individual teachers to monitor student learning and effectiveness of instruction, build capacity of teachers to access and use student data, as measured by teachers; begin sharing student achievement data with students.

#### ACTION STEPS

- Utilize regular student focus groups to gather qualitative data about the experience of students across the system and their perceptions of the development of equity literacy.

- Identify and utilize an equity centered coaching model and network (internal to LCPS or external to LCPS) to provide ongoing support for equity leads and principal development.

- Utilize the CRF to inform Equity Leads and Principals action steps for building classroom observation and instructional feedback process.

J.A. 106

**LCPS Strategic Goal 3:**
Deliver effective and efficient support for student success.

**EQUITY EMPHASIS**

*Develop and maintain welcoming, inclusive, and identity-affirming teaching and learning spaces*

=EQUITY GOAL (PER YEAR)

## 2020-2021

- Infuse the CRF with social emotional learning supports for equitable practices related to discipline. By June 2021, decrease suspension and office referral rates for Black and Latino/a/x students by X% by implementing anti-discriminatory practices.

- .By Spring 2021, increase student affinity group opportunities in schools. Measure students' perceptions of positive change in their learning environment based on student self-reporting through climate survey data.

- Incorporate trauma-informed practices into existing MTSS Framework. By February 2021, provide parent engagement and learning session on MTSS and trauma supports.

### ACTION STEPS

- LCPS to educate community on issues regarding racism, xenophobia, homophobia, transphobia, and other forms of discrimination; as well as trauma and MTSS. Utilize "Justice Anchor Standards" - Tolerance.org

- Adopt a model to engage students and create student agency in conversations about race, as well as provide "instruction" to their teachers on CRF via student lens.

- Create a climate survey to specifically measure the racialized experience of students in schools.

## 2021-2022

- By June 2022, increase use of restorative and equitable practices to decrease discipline (i.e., suspension and expulsion) and office referral rates for Black and Latino/a/x students by X%.

- Increase student affinity group opportunities in schools. Measure students' perceptions of positive change in their learning environment based on student self-reporting through climate survey data.

- By Spring 2021, develop student mentoring programs and create spaces for community conversations about race and establishing a positive racial identity

- Increase students' positive perceptions in Diversity, Equity, and Inclusion (DEI) level of intentionality toward creating an inclusive and identity-affirming space in school.

### ACTION STEPS

- Conduct suspension referral rates reviews twice a quarter during PLC and PBIS collaborative meetings. Use practices in CRF to mitigate bias.

- Develop network of mentors via Minority Student Achievement Advisory Committee (MSAAC)

- Utilize specific student climate surveys for feedback on the affinity groups and mentoring group structures.

## 2022-2023

- Utilize student structures to partner with local community businesses and agencies for mentoring programs.

- Increase students' positive perceptions in Diversity, Equity, and Inclusion (DEI) level of intentionality toward creating an inclusive and identity-affirming space in school.

### ACTION STEPS

- Partner with Loudoun Chamber, Loudoun Government. and Loudoun Racial Ethnic Disparity Group for mentors.

- Utilize specific student climate surveys to measure student perceptions.

J.A. 107

# EXHIBIT D

# LOUDOUN COUNTY PUBLIC SCHOOLS



**SAMPLE CONTENTS FROM THE STUDENT EQUITY AMBASSADOR
INFORMATION PACKET**

I.  LCPS Action Plan to Combat Systemic Racism - description and purpose
II.  Action #15 from the Action Plan to Combat Systemic Racism - description and purpose
III.  Process for Selecting Student Equity Ambassadors
IV.  Frequently Asked Questions
V.  Information Flyer

## I.   LCPS Action Plan to Combat Systemic Racism

1.  This detailed plan is designed to identify action steps and associated governance and operational opportunities that the Loudoun County School Board (LCSB) and Loudoun County Public Schools (LCPS) Administration can take to combat systemic racism.
2.  The purpose of the plan is to ensure transparency in progress monitoring and accountability and is posted on the Equity webpage for public access.
3.  The plan is organized by action steps that include both governance and operational opportunities, goals, resources needed to accomplish each goal, and questions that are under consideration.
4.  The plan is fluid and LCPS reserves the right to add or revise action steps based on progress monitoring data, current events, and climate survey data.

1

J.A. 109

## II. Action #15 from the Action Plan to Combat Systemic Racism
### *LCPS will collect qualitative data regarding racial incidents to amplify student voices.*

1. LCPS Administration will create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity.
2. Stories and experiences will be reviewed and shared by the Supervisor of Equity and **Student Equity Ambassadors** during regularly occurring student *Share, Speak-up, Speak-out* meetings.
3. These opportunities will be used to amplify the voice(s) of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination.

## III. Process for Selecting Student Equity Ambassadors

### Student Equity Ambassador Selection

### Recommended Process for Selecting MS and HS Student Ambassadors

1. Ask the principal, assistant principals, counselors, and equity leads to facilitate the selection process.
   a. They may recommend students themselves.
   b. Share the opportunity with teachers and ask them for recommendations.
   c. Post on school announcements/Blackboard Connect for students to learn about the opportunity.
   d. Post the flyer on the school's digital bulletin board or principal's newsletter, if applicable.
   e. Students may self-select or recommend others.

2. Ensure that the nominators and students know the guidelines:
   a. This opportunity is open to all Students of Color.
   b. These student leaders will serve as equity ambassadors for their school.
   c. Each school will select 2-3 student leaders to meet 4-5X/year with the Equity Supervisor and LCPS Leaders.
   d. The student leaders will be responsible for amplifying the student voice by engaging in discussions about student stories/experiences regarding issues of racism, injustice and inequity.

2

3. Student attributes to consider when recommending students:
   a. Students who are honest and able to speak the truth, while also listening.
   b. Students who have a passion for social justice and are willing to serve.
   c. Students who are sympathetic and sensitive.
   d. Students who have the respect and credibility of their peers.
   e. Students who will be empowered by this opportunity and have the potential for leadership.

4. If more than three students show interest, the administrator, counselor, and equity lead will use the recommended student attributes to determine which students will best serve their peers in this capacity.

5. Parents will be contacted to approve student participation. The message will be created by the Equity Office so that each school sends a consistent message.

6. The school representative/Equity Lead will provide names to the Supervisor of Equity.


# IV.   Frequently Asked Questions

1. My child would like to participate as a Student Equity Ambassador and is not a student of color. Can they participate?
   > Thank you for your interest but this opportunity is specifically for students of Color. However, students at each school have an option of creating an affinity group for students of Color who all share a similar racial identity and they may also include allies.

2. Are there other opportunities for students to get involved?
   > Students may reach out to their school's activity coordinator or the equity lead if they would like to be involved in other equity opportunities.

3. Why are we focusing on race and why this group of ambassadors?
   > We are focusing on race because it is important to recognize students who have been marginalized. Also, our systemic equity assessment indicated that there is a low level of racial consciousness and racial literacy in our division; discipline policies and practices disproportionately negatively impact students of color, particularly Black/African American students; many English Learners, Black/African American, Latinx, and

3

Case 1:21-cv-00669-AJT-TCB   Document 30-4   Filed 08/30/21   Page 5 of 5 PageID# 656

Muslim students have experienced the sting of racial insults/slurs or racially motivated violent actions.

4. Who are the adult contacts in each school for the Student Equity Ambassadors?
   The ambassadors may reach out to their equity lead, assistant principal, or their counselor if they have questions or want to follow up on information discussed at their ambassador meetings.

5. How will the information from this group be used?
   Information from this group will be used to amplify student voices and inform LCPS about the experiences of our students.  This qualitative data will also be useful to determine steps to take to ensure a welcoming, inclusive, and affirmative environment for each student.


## V.    Flyer

*Each school will adjust the last sentence on the bottom of the flyer with the contact's name and the link for the recommendation form.*



# *Share, Speak-up, Speak-out*

Do you want to be a **Voice** for **Social Justice**?

Are you interested in **Amplifying** the **Student Voice of Color**?

Do you want to **Represent** your **Peers of Color** by sharing their experiences in LCPS?



*You can do all of this by serving as one of our **Student Equity Ambassadors**.  See XXXX for more information or visit this website for the information packet.*

4

# EXHIBIT E

# LOUDOUN COUNTY PUBLIC SCHOOLS



**SAMPLE CONTENTS FROM THE STUDENT EQUITY AMBASSADOR INFORMATION PACKET**

   I.   LCPS Action Plan to Combat Systemic Racism - description and purpose
  II.   Action #15 from the Action Plan to Combat Systemic Racism - description and purpose
 III.   Process for Selecting Student Equity Ambassadors
 IV.   Frequently Asked Questions
  V.   Information Flyer

## I.   LCPS Action Plan to Combat Systemic Racism

1. This detailed plan is designed to identify action steps and associated governance and operational opportunities that the Loudoun County School Board (LCSB) and Loudoun County Public Schools (LCPS) Administration can take to combat systemic racism.
2. The purpose of the plan is to ensure transparency in progress monitoring and accountability and is posted on the Equity webpage for public access.
3. The plan is organized by action steps that include both governance and operational opportunities, goals, resources needed to accomplish each goal, and questions that are under consideration.
4. The plan is fluid and LCPS reserves the right to add or revise action steps based on progress monitoring data, current events, and climate survey data.

1

## II. Action #15 from the Action Plan to Combat Systemic Racism

### *LCPS will collect qualitative data regarding racial incidents to amplify student voices.*

1. LCPS Administration will create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity.
2. Stories and experiences will be reviewed and shared by the Supervisor of Equity and **Student Equity Ambassadors** during regularly occurring student *Share, Speak-up, Speak-out* meetings.
3. These opportunities will be used to amplify the voice(s) of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination.


## III. Process for Selecting Student Equity Ambassadors

### Student Equity Ambassador Selection

### Recommended Process for Selecting MS and HS Student Ambassadors

1. Ask the principal, assistant principals, counselors, and equity leads to facilitate the selection process.
    a. They may recommend students themselves.
    b. Share the opportunity with teachers and ask them for recommendations.
    c. Post on school announcements/Blackboard Connect for students to learn about the opportunity.
    d. Post the flyer on the school's digital bulletin board or principal's newsletter, if applicable.
    e. Students may self-select or recommend others.

2. Ensure that the nominators and students know the guidelines:
    a. The student leaders will be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice and inequity.
    b. These student leaders will serve as equity ambassadors for their school.
    c. Each school will select 2-3 student leaders to meet 4-5X/year with the Equity Supervisor and LCPS Leaders.

2

3. Student attributes to consider when recommending students:
   a. Students who are honest and able to speak the truth, while also listening.
   b. Students who have a passion for social justice and are willing to serve.
   c. Students who are sympathetic and sensitive.
   d. Students who have the respect and credibility of their peers.
   e. Students who will be empowered by this opportunity and have the potential for leadership.

4. If more than three students show interest, the administrator, counselor, and equity lead will use the recommended student attributes to determine which students will best serve their peers in this capacity.

5. Parents will be contacted to approve student participation. The message will be created by the Equity Office so that each school sends a consistent message.

6. The school representative/Equity Lead will provide names to the Supervisor of Equity.


# IV.   Frequently Asked Questions

1. Why are we focusing on race and why this group of ambassadors?
   We are focusing on race because it is important to recognize students who have been marginalized. Also, our systemic equity assessment indicated that there is a low level of racial consciousness and racial literacy in our division; discipline policies and practices disproportionately negatively impact students of color, particularly Black/African American students; many English Learners, Black/African American, Latinx, and Muslim students have experienced the sting of racial insults/slurs or racially motivated violent actions.

2. Who are the adult contacts in each school for the Student Equity Ambassadors?
   The ambassadors may reach out to their equity lead, assistant principal, or their counselor if they have questions or want to follow up on information discussed at their ambassador meetings.

3. How will the information from this group be used?
   Information from this group will be used to amplify student voices and inform LCPS about the experiences of our students. This qualitative data will also be useful to determine steps to take to ensure a welcoming, inclusive, and affirmative environment for each student.

3

## V.    Flyer

*Each school will adjust the last sentence on the bottom of the flyer with the contact's name and the link for the recommendation form.*



## *Share, Speak-up, Speak-out*

Do you want to be a **Voice** for **Social Justice**?

Are you interested in **Amplifying** the **Student Voice of Color**?

Do you want to **Represent** your **Peers of Color** by sharing their experiences in LCPS?



*You can do all of this by serving as one of our **Student Equity Ambassadors**.  See XXXX for more information or visit this website for the information packet.*

4

# EXHIBIT F

On Nov 4, 2020, at 1:17 PM, Skyla Ausel <Skyla.Ausel@lcps.org> wrote:

Mr. Mineo,

This LCPS endeavor is specific to amplifying the voice of Students of Color by engaging in discussions about their experiences regarding issues of racism, injustice, and inequity. Though all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus would be to raise the voice of their classmates of color during these meetings. I have CCed Mr. Flynn to this email in the case that you have additional questions or concerns.

Sincerely,

*Skyla Ausel*

9th Grade Administrator
Stone Bridge High School
SCA Advisor - Girls Basketball Varsity Assistant
@SBHS_MrsA

CONFIDENTIALITY / PRIVACY NOTICE - The documents included in this transmission may contain information that is confidential and legally privileged. If you are not the intended recipient, or the employee or agent responsible for delivering the information to the intended recipient, you are at this moment notified that any disclosure, copying distribution or action in reliance on the contents of these documents is strictly prohibited. If you have received this document in error, please notify the sender immediately to arrange for return or destruction of these documents.

**From:** Minmaui2002 <minmaui2002@icloud.com>
**Sent:** Wednesday, November 4, 2020 1:00 PM
**To:** Skyla Ausel <Skyla.Ausel@lcps.org>
**Subject:** Re: [EXTERNAL] Equity Ambassador Info

Thank you for the follow up. You said: "These student leaders will be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice, and inequity. and they will serve as equity ambassadors for their school." Is "amplifying the voice of Students of Color" limited only to/for Students of Color or will/can this also include stories/experiences of white students as well?

Regards,

Scott

On Nov 4, 2020, at 12:45 PM, Skyla Ausel <Skyla.Ausel@lcps.org> wrote:

Good morning Mr. Mineo,

Thank you for reaching out about the Student Equity Ambassador opportunity. I've attached the letter that will be sent to the guardian(s) of students who express interest and/or are nominated. These student leaders will be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice, and inequity. and they will serve as equity ambassadors for their school. Each school will select 2-3 student leaders to meet 4-5 times throughout the year with the Equity Supervisor and LCPS Leaders. Stone Bridge's Equity Team will work together with the administration to look over all the recommendations and students who reached out expressing interest to determine which of the candidates will be chosen to represent our student body.

Student attributes that will be considered when recommending students:
- Students who have a passion for social justice and are willing to serve.
- Students who are honest and able to speak the truth, while also listening.
- Students who are sympathetic and sensitive.
- Students who have the respect and credibility of their peers.
- Students who will be empowered by this opportunity and have the potential for leadership.

If this is something either ▮▮▮▮▮▮▮▮ would like to pursue, please have them email me and I will send them the quick questionnaire.

J.A. 120

Thank you,

*Skyla Ausel*

9th Grade Administrator
Stone Bridge High School
SCA Advisor - Girls Basketball Varsity Assistant
@SBHS_MrsA

CONFIDENTIALITY / PRIVACY NOTICE - The documents included in this transmission may contain information that is confidential and legally privileged. If you are not the intended recipient, or the employee or agent responsible for delivering the information to the intended recipient, you are at this moment notified that any disclosure, copying distribution or action in reliance on the contents of these documents is strictly prohibited. If you have received this document in error, please notify the sender immediately to arrange for return or destruction of these documents.

**From:** Minmaui2002 <minmaui2002@icloud.com>
**Sent:** Wednesday, November 4, 2020 10:54 AM
**To:** Skyla Ausel <Skyla.Ausel@lcps.org>
**Subject:** [EXTERNAL] Equity Ambassador Info

Hi Skyla,

We have (2) kids at Stone Bridge that may have some interest in becoming a Student Equity Ambassador ( both of our kids are white, not that it matters). Do you have any more information on the Ambassador program you can share and how our kids can become Student Equity Ambassadors? Thanks for your time.

Scott Mineo

<SBHS Student Equity Ambassador Parent Letter.pdf>

J.A. 121

# EXHIBIT G



# Stone Bridge High School
43100 Hay Road
Ashburn, Virginia   20147
(571) 252-2200



Dear Parents and Guardians,

As a part of our ongoing equity work across LCPS and at Stone Bridge High School, we will be selecting students to represent our school to serve in the role of Student Equity Ambassadors. This opportunity for students stems from an action found in the LCPS Action Plan to Combat Systemic Racism, which can be found on the LCPS webpage at https://www.lcps.org/EquityOverview.  The goal is to provide a forum to amplify the voice of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination.

Each middle and high school in LCPS will select up to three Student Equity Ambassadors to meet regularly with the Supervisor of Equity and other LCPS leaders during the Share, Speak-up, Speak-out meetings.  These sessions will occur five times during the school year.  Amongst other attributes, students serving in this role will have a passion for social justice, be willing to engage in conversations, listen to learn, and represent the voice of their peers. School staff will recommend students to serve as Student Equity Ambassadors or students may self-recommend. Be advised that the principal or designee will make the final decision regarding student participation.

Ensuring that our school is a welcoming, inclusive, and affirming environment for each student is important.  Providing this opportunity for students to meet in a safe space where their voices are heard is one way of supporting this effort.  We are looking forward to selecting our Student Equity Ambassadors and their future participation in the Share, Speak-up, Speak-out meetings.

Thank you for your continued support of our commitment to provide a safe and caring learning environment for our students.

Sincerely,

Stone Bridge High School's Equity Team

# EXHIBIT H

# Share, Speak Up, Speak Out: Bias Reporting Form

Stories of bias shared through this platform will be used in an anonymous manner for the Share, Speak Up, Speak Out sessions with Student Equity Ambassadors.

A bias incident is an act of discrimination, harassment, and intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias. Such incidents are usually associated with negative feelings and beliefs about another's race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or disability.

This process provides information to LCPS leadership (specifically the Equity Office) that will be used for the Share, Speak Up, Speak Out sessions, as well as inform next steps for professional learning and support for school staff.

LCPS is committed to providing and ensuring a respectful, safe, supportive, culturally-responsive learning space for every LCPS student.

* Required

1. School Name *

   _____

2. Date of Incident

   _____

3. Location of Incident

   _____

EXHIBIT
3

4.  Type of Bias Incident: Check all that apply. *

    *Check all that apply.*

    ☐ Harassment or Intimidation
    ☐ Racial Slur
    ☐ Offensive Language,Teasing or Taunting Language/Verbal Exchange
    ☐ Exclusion or victim of lack of inclusivity
    ☐ Gender Identity and Expression
    ☐ Ability Status
    ☐ Religious Practices
    ☐ Sexual Orientation

5.  Describe what happened: Sharing details in this space will contribute to topics used to address biases during the Share, Speak Up, Speak Out sessions with the Student Equity Ambassadors from every middle and high school. *

    _____

    _____

    _____

    _____

    _____

6.  Official Incident Reporting: The primary use of this form is for the Office of Equity to capture stories and incidents of bias in an anonymous manner. Would you like this particular incident investigated by the administrators at your school? *

    *Mark only one oval.*

    ◯ No, I do not want to report this to my school.

    ◯ No, I have already reported this to my school.

    ◯ Yes. If yes, please provide your name below.

J.A. 126

7. Providing your name here will allow the Office of Equity to submit your name to your school for investigation.

_____

This content is neither created nor endorsed by Google.

Google Forms

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| PATTI H. MENDERS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-669 (AJT/TCB) |
| | ) | |
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Loudoun County School Board has moved to dismiss Plaintiffs' First Amended Complaint. [Doc. No. 37] (the "Motion"). Upon consideration of the Motion, the memoranda submitted in support thereof and in opposition thereto, the arguments of counsel at the hearing held on November 10, 2021, and for the reasons that follow, the Motion is GRANTED and this action is DISMISSED.

## I.    BACKGROUND

Unless otherwise noted, the following facts are taken from the Amended Complaint, [Doc. No. 30] ("Am. Compl."), and the documents referenced therein integral to the Amended Complaint. *See Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x. 395, 396 (4th Cir. 2006) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint without converting the motion to dismiss into one for summary judgment so long as the authenticity of these documents is not disputed.") (alterations omitted).

In June 2019 the Loudoun County Public Schools ("LCPS") commissioned an outside consultant, The Equity Collaborative, which issued a Report titled Systemic Equity Assessment:

A Picture of Racial Equity Challenges and Opportunities in the Loudon County School System, attached to the Amended Complaint as Exhibit A.

On June 23, 2020, LCPS published its "Action Plan to Combat Systemic Racism" ("the Action Plan"), attached to the Amended Complaint as Exhibit B. *Id.* ¶ 24. The Action Plan consists of sixteen "action items," the fifteenth of which, the only one at issue in this case, is that "LCPS will collect qualitative data regarding racial incidents to amplify student voices." *Id.*, Ex. B at 18. Toward that end, the "LCPS administration will support the concept of LCPS staff amplifying student voices regarding racial incidents they have experienced in school" and "create an electronic form for LCPS students to anonymously share their stories regarding issues of racism, injustice and inequity." *Id.* In addition, "Student Equity Ambassadors" ("SEAs") will be selected and "[s]tories and experiences will be reviewed and shared by the Supervisor of Equity and the Student Equity Ambassadors during regularly occurring student Share, Speak-up, Speak-out meetings." Am. Compl. ¶ 29. As explained by the LCSB in court, these Share, Speak-up, Speak-out meetings are intended to occur multiple times during the year and are open only to students who are SEAs.

### A. The Bias Reporting Form

The online electronic form used to report bias incidents is titled the Bias Reporting Form. Am. Compl., Ex. H. The Form states that "[s]tories of bias shared through this platform will be used in an anonymous manner for the Share, Speak Up, Speakout sessions with Student Equity Ambassadors." *Id.* A "bias incident," as stated in the Form, is "an act of discrimination, harassment, and intimidation directed against any person or group that appears to be intentional and motivated by prejudice or bias." *Id.* As stated in the Form, "[s]uch incidents are usually associated with negative feelings and beliefs about another's race, ethnicity, national origin, religion, gender, gender identity, sexual orientation, age, social class, political affiliation, or

J.A. 129

disability." *Id.*  The Form further states that "[t]his process provides information to LCPS

leadership (specifically the Equity Office) that will be used for the Share, Speak-up, Speak-out

sessions, as well as inform next steps for professional learning and support for school staff." *Id.*

Finally, the Form declares that "LCPS is committed to providing and ensuring a respectful, safe,

supportive, culturally-responsive learning space for every LCPS student." *Id.*

The Form requests the name of the school, the date of the incident and the location of the

incident.  *Id.*  Under "Type of Bias Incident," the form requires that the reporting student check

the box of all the listed categories of bias that apply.  Listed categories are "Harassment or

Intimidation," "Racial Slur," "Offensive Language, Teasing or Taunting Language/Verbal

Exchange," "Exclusion or victim of lack of inclusivity," "Gender Identity and Expression,"

"Ability Status," "Religious Practices," and "Sexual Orientation."  *Id.*   It then asks for a

description of "what happened," explaining that "[s]haring details in the space will contribute to

topics used to address biases during the Share, Speak Up, Speak-out sessions with the Student

Equity Ambassadors from every middle and high school." *Id.*

The Form ends with the section "Official Incident Reporting," which is the focus of

Plaintiffs' constitutional challenge to the use of the Form.  *Id.*  That section states that "[t]he

primary use of this Form is for the Office of Equity to capture stories and incidents of bias in an

anonymous manner.  Would you like this particular incident investigated by the administrators at

your school?" *Id.*  The following responses are listed: (a) "No, I do not want to report this to my

school."; (b) "No, I have already reported this to my school."; and (c) "Yes, if yes, please

provide your name below." *Id.*

A submitted Form goes directly to the Equity Office and the information on the Form is

used by the Equity Office to generate discussion points for the "Share, Speak-up, Speak-out"

meetings held with the SEAs.  Am. Compl. ¶ 47.  LCPS will only investigate reported "bias

incidents" if the person who submits the Form provides his or her name and indicates on the Form that he or she would like the school administrators to investigate the particular incident reported. *Id.* ¶ 48. However, according to the slide deck on the Action Plan to Combat Racism, the Reporting System is separate from the LCPS disciplinary system.

### B. The SEA Selection Process

SEAs are selected based on nominations by school staff, administrators, fellow students, or themselves and, from the pool of nominated students, each middle and high school principal selects two or three students to serve as a SEA for one school year term, with new ones selected each year. Am. Compl., Ex. D (Student Equity Ambassador Information Packet) at 2. If more than three students show interest from any particular school, the selection process becomes a competitive one, without regard to race, based on "student attributes," which are listed as follows:

a.  Honest and able to speak the truth, while also listening;

b.  Have "a passion for social justice" and are willing to serve;

c.  Are sympathetic and sensitive;

d.  Have the respect and credibility of their peers; and

e.  Will be empowered by this opportunity and have the potential for leadership.

*Id*. at 3. Selected students will be expected to "be responsible for amplifying the voice of Students of Color by engaging in discussions about student stories/experiences regarding issues of racism, injustice and inequity" and "serve as equity ambassadors for their school." *Id.* Although an initial version of the SEA program stated that "[t]his opportunity is open to all Students of Color," *id.* at 2, under the SEA program as adopted, all students may be considered for selection as SEAs. *See* Am. Compl. at ¶ 41.

4

Plaintiffs are either parents of current LCPS students or parents of students who had enrolled their children elsewhere when the Amended Complaint was filed on August 30, 2021, but who intended at that time to enroll them in LCPS in the next school year and who are or will be subject to the Defendant's policies challenged in this case.  The Plaintiffs' children hold views about important public issues that they believe conflict with LCPS' definition of social justice.  *Id.* ¶ 60.  Ostensibly at the core of that belief is that Plaintiffs and their children are opposed to the ideology known as Critical Race Theory ("CRT"), which they allege teaches that white people are evil or oppressors and that our nation's institutions are inherently racist.  *Id.* ¶ 61.  Instead, they believe that everyone is equal and that we should strive for a color blind society.  Plaintiffs assert they have taught their children to treat everyone with respect and dignity regardless of their race.  *Id.*  Plaintiffs' children wish to speak out on topics such as CRT, race, and gender identity, but their

> views on these subjects are often not shared by other residents or young people Loudoun County . . . [and] when others have shared views similar to the Plaintiffs and their children on CRT, race, gender identify [sic], and other controversial political issues, that speech has prompted vitriolic, threatening, and persecutorial responses from others in Loudoun County, including within the LCPS community.

*Id.* ¶¶ 62- 63.  As a result, Plaintiffs "are concerned that if [their child] shares [his/her] views . . . on CRT, race, human sexuality, and other controversial political issues, they will be reported and investigated for 'bias incidents.'"  *Id.* ¶ 65.  They are also concerned that such a report, investigation, and public disclosure could negatively impact their children's standing in the school community or ruin their college prospects.  *Id.*  Based on these concerns, they believe that the Reporting System violates the free speech rights of their children.

Plaintiffs do not allege explicitly whether their children have applied for or intend to apply for selection as an SEA or have an interest in becoming an SEA.  However, Plaintiffs

J.A. 132

allege that their children would not qualify for the SEA program as originally conceived or practically implemented. *Id.* ¶ 59.

On June 2, 2021, Plaintiffs filed their Complaint. [Doc. No. 1]. On June 25, 2021, Plaintiffs filed a Motion for Preliminary Injunction, [Doc. No. 9], which, after briefing and a hearing on July 30, 2021, the Court denied on August 13, 2021, [Doc. No. 24]. On August 16, 2021, LCSB filed its Answer and on August 18, 2021, the Court issued its Order denying Plaintiffs' motion for a preliminary injunction, which is incorporated herein by reference as background to the pending Motion and also for its analysis of the substantive law pertaining to Plaintiffs' Equal Protection and First Amendment claims [1]

On August 30, 2021, Plaintiffs filed an Amended Complaint, alleging that (1) the SEA Program violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against students on the basis of race (Count I); (2) the SEA Program violates the First Amendment's guarantee of freedom of speech because it discriminates on the basis of viewpoint by requiring that SEAs express a government-approved orthodox viewpoint in order to participate in the Program (Count II); (3) the SEA Program violates the Equal Protection Clause because it discriminates on the basis of viewpoint (Count III); (4) the Reporting System violates the First and Fourteenth Amendments because it chills speech through content based speech restrictions (Count IV); and (5) the Reporting System violates the First and Fourteenth Amendments because it chills speech through viewpoint discrimination (Count V).

---

[1] In its Order denying the preliminary Injunction, the Court held, *inter alia,* that Plaintiffs had failed to sufficiently establish that they would succeed on the merits. In that regard, the Court observed that Plaintiffs had failed to make the required showing that (1) the SEA Program was motivated, adopted or implemented with an intent or purpose to discriminate against white students in violation of the Equal Protection Clause of the Fourteenth Amendment; or (2) that the LCSB had officially endorsed, adopted, or excluded viewpoints, particularly when associated with the other character trait criteria used and the lack of any investigation or inquiry into the substance of a particular students' views as part of the selection process. *See* [Doc. No. 24].

Plaintiffs seek: (1) a declaration that the SEA Program impermissibly discriminates on the basis of race; (2) a declaration that the SEA Program impermissibly discriminates on the basis of viewpoint in violation of the First Amendment and the Equal Protection Clause; (3) a declaration that the Bias Reporting System impermissibly discriminates on the basis of speech content and viewpoint; (4) an injunction preventing LCSB from operating the SEA Program; and (5) an injunction preventing LCSB from operating the Reporting System.[2]  On September 13, 2021, Plaintiffs filed the pending Motion to Dismiss.  [Doc. No. 37].  On November 10, 2021, the Court held a hearing on the Motion, following which it took the Motion under advisement.

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994).  A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).  In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff."  *Id.*; *see also Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007).  In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which

---

[2] Plaintiffs also seek nominal damages, costs and attorney's fees under 42 U.S.C. § 1988, and such other relief to which Plaintiffs may be entitled.  [Doc. No. 30].  On June 25 and 28, 2021, Plaintiffs also filed a Motion to Proceed Anonymously and a related Motion of Plaintiffs for Court to Judicially Notice Certain Facts in Support of their Motion to Proceed Anonymously, [Doc. Nos. 7, 8, 11], which were granted on July 28, 2021, [Doc. No. 22].

require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."

### III.  ANALYSIS

Plaintiffs have challenged the SEA selection process and the Bias Reporting form on Equal Protection and First Amendment grounds. Overall, Plaintiffs summarized their challenge as follows:

> [B]asic principles like the First Amendment have not stopped the Loudoun County School Board from prescribing exactly what shall be orthodox for its students. LCPS is all-in on a curricular framework that expects students to speak, act, and think in line with a particular ideology. Any dissent from that ideology can be labeled as "bias" and anonymously reported to the speech police, a group of handpicked students who share the LCPS administration's ideology, charged to pass judgment on those classmates that their peers turn in.
>
> In the name of "dismantling systemic racism," LCPS has implemented explicit racial distinctions between its students. The official LCPS "Action Plan to Combat Systemic Racism" creates a new position of "Student Equity Ambassador" ("SEA"), which is limited to certain students on account of their race, and discriminates against students on the basis of their viewpoint. The Board has also implemented a viewpoint discriminatory "bias reporting system" that chills students' speech on matters of important public concern. Each of these policies violates the Constitution's guarantees of free speech and equality before the law. Plaintiffs, parents in LCPS, sue on behalf of their minor children to put a stop to these constitutional violations.

Am. Compl. at ¶¶ 2-3.

### A. Plaintiffs' Equal Protection Claims (Counts I and III)

In Counts I and III, Plaintiffs assert an Equal Protection claim pursuant to 42 U.S.C. § 1983 on the grounds that the SEA program, which does not contain an explicit racial classification, nevertheless discriminates against white students on the basis of race (Count I) and also discriminates based on viewpoint (Count III).  More specifically in support of their Equal Protection challenges, Plaintiff make the following conclusory allegations:

- LCPS' Student Equity Ambassador program is an invidious racial classification that discriminates against students on the basis of race.  Am. Compl. ¶ 75.

- LCPS has a policy and practice of apportioning the benefits of the Student Equity Ambassadors program among students on account of their race.  *Id.* ¶ 76.

- There is no compelling government interest in LCPS discriminating among students on account of their race.  *Id.* ¶ 77.

- The Student Equity Ambassador program is not narrowly tailored to serve any government interest, especially when the SEA program is tied to race, but its bias-investigation mandate includes bias based on gender, gender identity, sexuality, and political beliefs.  *Id.* ¶ 78.

- There is no important government interest in defining the Student Equity Ambassadors program based on race.  *Id.* ¶ 79.

- The Student Equity Ambassadors program is not substantially related to any government interest.  *Id.* ¶ 80.

To assert an Equal Protection claim based on race, as in Count I, Plaintiffs must allege facts that make plausible that the challenged policy (1) was enacted with discriminatory intent; and (2) has an actual discriminatory impact.  *See N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020); *Monroe v. City of Charlottesville*, 579 F.3d 380, 388 (4th Cir. 2009).  To determine whether a statute was enacted with discriminatory intent, the

J.A. 136

challenger first bears the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Raymond*, 981 F. 3d at 303 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).  "Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision: (1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–69).  Only if the challengers have met their burden of showing discriminatory intent does the Court reach the second step where "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" racial discrimination.  *Id.* (quoting *Hunter*, 471 U.S. at 228).

Plaintiffs do not specifically allege that the SEA program was enacted with a discriminatory intent.  Rather, Plaintiffs contend that such an intent can be reasonably inferred from the Exhibits attached to the Amended Complaint, and the plausibility of Plaintiffs' claim must therefore be evaluated based on the substance of those exhibits.  In that regard, Plaintiffs allege that with its Action Plan, which outlines "a complex set of initiatives to implement an ideological orthodoxy across public schools in Loudoun County[,]" Am. Compl. ¶ 24, the LCSB is on "an ideological mission," as seen in its "LCPS Comprehensive Equity Plan," attached as Exhibit C, *id.* at ¶ 25 (the "Equity Plan"). More specifically, Plaintiffs reference the Equity Plan's statements that (1) the LCPS "calls for all students, staff, families, and other members of our community to engage in the disruption and dismantling of white supremacy, systemic racism, and hateful language and actions based on race, religion, country of origin, gender identity, sexual orientation, and/or ability[;]" (2) the "LCPS rejects racist and other hateful behavior and language, recognizing that it encourages discrimination, hatred, oppression, and violence[;] and (3) "the [Action Plan] has a laser focus on systemic racism, oppression, and the

need for the disruption and dismantling of ineffective systems." *Id.* ¶¶ 25, 26. Plaintiffs also

reference certain proposals listed in the Action Plan, [3] *Id*. at ¶ 26 , and  a description of the SEA

program that appeared briefly on the LCSB website before the actual Plan was adopted, which

stated that the SEA program was open to students of color,[4] the response of a school

administrator to a parent's question about the program,[5] and the comments by an SEA.[6]

Notwithstanding Plaintiffs' conclusory allegations and characterizations, the Exhibits

attached to the Amended Complaint do not make plausible that the SEA program was adopted

with a discriminatory intent.  As stated in the Action Plan, it was adopted following the issuance

of a Report, attached as Exhibit A, prepared by an outside consultant after a series of focus group

sessions and interviews at twenty-four LCPS schools that included elementary, middle, and high

school students, staff, parents and administrators.  As Plaintiffs allege, that Report concluded that

"there are limited opportunities for Black/African -American and Muslim students to convene in

a network of social cultural support[]" and recommended that LCPS "establish student affinity

groups at all levels to support the social and cultural identities of student students of color[]" to

---

[3] Those initiatives are alleged to include proposals to (1) "[p]rohibit the wearing/flying the flags, images or symbols on LCPS property that represent racist or hateful ideology," (2) "[f]inalize the Protocol for Responding to Racial Slurs and Hate Speech in Schools," (3) "consider the potential renaming of the Loudoun County High School mascot, the Raiders," together with 15 "action items" that include (a) "developing racial literacy; raising racial consciousness", (b) "build . . . racial consciousness," (c) finalize a "protocol for responding to racial incidents when they incur in our schools", (d) "reduce racial/ethnicity discipline disproportionality," (e) setting quotas for "racially diverse interview panels" for hiring, (f) "meet[ing] biannually" with only "LCPS staff members of color" to "connect and offer a safe space to listen and learn," with a "Remaining Question[] under Consideration" on "What is the participation option for a non-Person of Color (who desires to serve as allies) to engage in these sessions?" and (g) revising "hiring protocols, practices, and resources for hiring managers to include but not limited to setting forth requirements for racially  diverse interview panels." Am. Compl. ¶¶ 26, 27.

[4]  *See* Am. Compl. ¶ 33 ("The 'Process for Selecting Student Equity Ambassadors' included as its first guideline for selection of SEAs that '[t]his opportunity is open to all Students of Color.'") (quoting LCPS' original "Student Equity Ambassador Information Packet," attached to the Am. Compl. as Ex. D)).

[5] *See* Am. Compl. ¶¶ 40–41 ("On November 5, 2020, emails were published between a concerned parent and an administrator at LCPS. The parent asked about the SEA program, and whether their child, who is not a student of color, was eligible to apply. . . .  The LCPS administrator responded "[t]hough all students (white or otherwise) are more than welcome to potentially serve as ambassadors, their focus is to raise the voice of their classmates of color during these meetings.") (quoting emails attached to the Am. Compl. as Ex. F)).

[6] *See* Am. Compl. ¶¶ 51–52 (describing a presentation made by SEAs that cites examples of microaggressions, including "denial[s] of racial reality" such as "I don't think that white privilege exists" and asserting "a framework of 'colorblindness'").

J.A. 138

serve as "a formal structure that serves as a network of care for marginalized student populations and establishes a safe place for students to unpack feelings and emotions in times of social cultural conflict." Am. Compl. ¶ 22. The substance of the Action Plan does not make plausible that these initiatives are intended to be at the expense of white students or are intended to disadvantage white students, but rather to promote a more inclusive educational environment by addressing discrimination and the lingering effects of past discrimination. Plaintiffs rely heavily on the original description of the program, which stated that the opportunity was "open to all Students of Color," Am. Compl. ¶¶ 33–34, but that description was short lived and the SEA program as adopted is open to all students, *see id.* ¶ 41.

The Amended Complaint also fails to allege facts that make plausible that the SEA program has a discriminatory impact. Plaintiffs allege that "only seventeen percent [who] identified as 'white only' [were selected as SEAs], despite 'white only' students making up forty-seven percent of the LCPS enrollment." *Id.* ¶ 45. But there are no factual allegations with respect to the racial/ethnic makeup of the schools from which the two to three students were selected or who applied or were considered from those schools or to what extent the two to three slots from each of the schools were filled through a competitive process. And as Plaintiffs have alleged with respect to their own children, white students may have decided not to apply for reasons other than race. *See, e.g.*, *id.* ¶¶ 13-17. For these reasons, Plaintiffs have failed to state an Equal Protection claim as a matter of law; and Count I will be dismissed for failure to state a claim.

In Count III, Plaintiffs assert that the SEA program violates the Equal Protection Clause because it discriminates on the basis of viewpoint. That claim must be assessed within the context in which the SEA program operates, which, as Plaintiffs have alleged, is a nonpublic forum. *See* Am. Compl. ¶ 85.

There is no fundamental right of access to a non-public forum and the SEA program needs only a rational relationship to a legitimate government purpose. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) (holding "[t]he school district's policy [with respect to a non-public forum] need only rationally further a legitimate state purpose.").

Among the purposes of the SEA program alleged in the Complaint, as reflected in the Exhibits, are addressing "racist and hateful behavior," *id*. at ¶ 25, "dismantle[ing] systemic racism," *id.* at ¶ 3, and "amplify[ing] the voices of students of color" with respect to stories/experiences regarding issues of racism, injustice and inequity," *id.* at ¶ 36; Ex. D at 3. These are clearly legitimate pedagogical/state purposes. Indeed, Plaintiffs do not allege that LCSB's purposes in adopting the SEA program are not legitimate, and at the hearing held on the Motion, Plaintiffs acknowledged that the LCSB may permissibly sponsor a non-public forum that facilitates discussions about the role of race within the school environment, as experienced by students of color. Rather, Plaintiffs only contend that the selection criteria for SEAs are not substantially or rationally related to any government interest, *see* Am. Compl. ¶ 80.

The LCSB has adopted selection criteria for SEAs that are substantially and rationally related to legitimate state purposes, viz., SEAs will be selected who are "honest and able to speak the truth," have "a passion for social justice and are willing to serve," "sympathetic and sensitive," "have the respect and credibility of their peers," and "will be empowered by this opportunity and have the potential for leadership." *See Perry*, 460 U.S. at 54, 55 (stating that, for the purposes of analyzing an Equal Protection claim based speech, "not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used").

In sum, while the specific course chosen by the LCSB to promote a more inclusive, non-discriminatory environment can be reasonably debated, addressing the effects of invidious

13

discrimination within the educational environment is clearly a legitimate pedagogical concern and the SEA program, and its selection criteria for SEAs, are clearly rationally and substantially related to that purpose.  As the Fourth Circuit has recognized, local school boards, not the courts, have the responsibility and obligation to assess how best to advance those pedagogical concerns. *See Robertson v. Anderson Mill Elementary School*, 989 F.3d 282, 289 (2021) ("[I]t is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom.  Instead, it is the school board, whose responsibility includes the well-being of the students, that must make such determinations.") (quoting *Lee v. York Cnty. Sch. Div*, 484 F. 3d 687, 700 (4th Cir. 2007).

Nor do Plaintiffs state a plausible Equal Protection claim even if a "passion for social justice" is viewed as having embedded in it some aspects of a substantive viewpoint.[7]  In *Hazelwood School District v Kuhlmeier*, the United States Supreme Court articulated the general principle that school officials "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  484 U.S. 260, 273 (1988); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983) (stating a public school system "may draw distinctions which relate to the special purpose for which the property is used").  And as the Fourth Circuit recognized in *Buxton*, post-*Hazelwood*, the school system is permitted "to take the viewpoints expressed in an interview into consideration when choosing between candidates in a competitive process."  *Buxton v. Kurtinitis*, 862 F.3d 423, 430 (4th Cir. 2017).  For the above reasons, Plaintiffs have failed to allege facts that make plausible their Equal Protection claim in Count III.

---

[7] As the Fourth Circuit observed in *Robertson*, neither the Supreme Court nor the Fourth Circuit has decided whether restrictions on school-sponsored student speech must be viewpoint neutral under *Hazelwood* and other Circuits are split on the issues.  *See Robertson*, 989 F.3d at 290.

J.A. 141

### B. Plaintiffs' First Amendment Claims (Counts II, IV, and V)

In Count II, Plaintiffs allege that in violation of the First Amendment, the SEA program conditions a student's participation as a SEA on a certain viewpoint, specifically, a "passion for social justice," and therefore imposes unconstitutional viewpoint discrimination.  Viewpoint discrimination is "discrimination in which the government targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Judson v. Bd. of Supervisors of Mathews Cty., Virginia*, 436 F. Supp. 3d 852, 865 (E.D. Va.), *aff'd*, 828 F. App'x 180 (4th Cir. 2020).

Plaintiffs concede that the SEA program is a nonpublic forum, Am. Compl. ¶ 85, and do not allege that the "Share, Speak Up, Speak-out" sessions sponsored by the LCSB is necessarily an impermissible government activity.  As mentioned above, at the hearing on the Motion, Plaintiffs agreed that it is constitutionally permissible for the LCSB to sponsor a non-public forum to afford students of color an opportunity to discuss how race has affected their lives and educational experiences.  They contend, however, that the Defendant may not discriminate based on viewpoint in deciding who can participate in that non-forum.  And that by including within the selection criteria, a "passion for social justice," it does just that.

There are no allegations in the Amended Complaint concerning what the substance of that unconstitutionally required viewpoint is.  At the hearing, when pressed, Plaintiffs stated that the required "passion for social justice" viewpoint imposed a "liberal" or "progressive" viewpoint without any further detail.[8]  But by simply listing "a passion for social justice" as one of multiple selection criteria in a competitive process, Plaintiffs have not sufficiently alleged facts that make plausible that the LCSB "targets not subject matter, but particular views taken by

---

[8] Although Plaintiffs allege in the Amended Complaint Critical Race Theory as a viewpoint is in conflict with their own views on racial equality, Plaintiffs have not alleged that the SEA program adopts Critical Race Theory as the required viewpoint and stated at the Preliminary Injunction hearing that their claims are not based on the teaching or promotion of Critical Race Theory.  *See* [Doc. No. 24] at n.12.

15

speakers on a subject." *Rosenberger*, 515 U.S. at 829.  The Plaintiffs have alleged nothing other than the existence of a selection factor that targets a certain subject matter, with no further allegations concerning how it is understood or applied by school administrators involved in the selection process.  For example, there are no allegations that SEA candidates are questioned or investigated about what their "social justice" views are or should be.  And in the abstract, as it is presented here, that selection criterion appears no more viewpoint specific than would a required "passion" for "fairness" or "equality." And as the Court observed in denying Plaintiffs' motion for preliminary injunction, that factor appears more related to a disposition than a particular viewpoint.

In sum, Plaintiffs' First Amendment claim essentially reduces to a relatively straight-forward issue: whether listing "a passion for social justice" as one of the SEA selection criteria imposes a particular viewpoint to participate in the program in violation of the First Amendment. The Court concludes that simply including "a passion for social justice" as a selection factor, which is essentially all that Plaintiffs have alleged, does not sufficiently allege a violation of the First Amendment. [9]

Nor have Plaintiffs' alleged a plausible First Amendment violation even if the SEA selection criteria references particular viewpoints, given its use of the selection criteria for the purposes of allocating a limited number of slots within a competitive process, the broad range of substantive views that can be embraced within that selection criteria,  the clear pedagogical concerns over which the SEA program was adopted, and the close relationship between the section criteria and the purpose of the non-public forum in which those viewpoints are to be

---

[9] Plaintiffs have alleged that certain student ambassadors have expressed very specific views on the role of race and how race should be taken into account.  *See* Am. Compl. ¶¶ 51–52 (describing a presentation made by SEAs that cites examples of microaggressions , which includes "denial[s] of racial reality" such as "I don't think that white privilege exists" and asserting "a framework of 'colorblindness'").  But as the Court observed in its Preliminary Injunction Order, those views have not been alleged or shown to be the required viewpoints for selection as a SEA.

expressed.  *See Buxton v. Kurtinitis*, 862 F.3d 423, 429-30 (4th Cir. 2017); *see also Robertson v. Anderson Mill Elementary School*, 989 F.3d 282, 288 (2021) (stating school officials' regulations of student speech is constitutionally valid so long as it is "reasonably related to legitimate pedagogical concerns") (citing *Hazelwood Sch. Dist. v. Kulmeier*, 484 U.S. 260, 273 (1988) (internal quotations omitted).

Accordingly, Plaintiffs have failed to allege that the SEA program amounts to unconstitutional viewpoint discrimination in violation of the First Amendment.

In Counts IV and V, Plaintiffs allege that the Bias Incident Reporting System violates the First Amendment.  To bring a First Amendment overbreadth claim, Plaintiffs must show they have standing, which can be done by showing either (1) "that [their children] intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a credible threat that the policy will be enforced against them when they do so;" or (2) "[their children] may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

The question is whether the Bias Incident Reporting System chills protected speech sufficiently and without adequate justification to violate the First Amendment.  Here, Plaintiffs have failed to allege facts that make plausible that the Bias Incident Reporting System will harm them in any way.  Plaintiffs have not alleged that there have been any disciplinary incidents initiated as a result of the reporting forms; or that any alleged incidents have even passed beyond the Equity Office for an investigation.  Nor have they alleged facts that make plausible any claim that their children are being subjected to any greater risk of discipline through the Bias Reporting System than the School's disciplinary system, which Plaintiffs do not challenge.

Plaintiffs allege more generally that their children refrain from expressing their views for fear of an adverse reaction from their peers and school administrators.  But, as reflected in Plaintiffs own allegations, that self-censorship would exist separate and apart from the Bias Reporting system, *see* Am. Compl. at ¶¶ 18, 62, 62; and the mere prospect of future injury through the Bias Reporting System is not sufficient to confer standing.  *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (stating one element of standing is that injury must be "'likely,' as opposed to merely 'speculative'"). Because Plaintiffs have failed to allege facts that make a credible threat of enforcement plausible as a result of any permissible speech, they cannot show that they have standing to bring their First Amendment claims.[10]

### III.    CONCLUSION

For the above reasons, it is hereby

ORDERED that the Motion to Dismiss First Amended Complaint [Doc. No. 37] filed by Defendant Loudoun County School Board be, and the same hereby is, GRANTED and this action is DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record.

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 22, 2022

---

[10] In opposing dismissal, Plaintiffs argue generally that they should have the opportunity to develop facts to support their claims and would expect to present, *inter alia*, expert testimony concerning what "a passion for social justice" really refers to.  But it has long been recognized that a plaintiff may not file claims with the hopes of developing the necessary factual support for those claims through discovery.  *See In re Kunstler*, 914 F.2d 505, 515 (4th Cir. 1990) (stating discovery is appropriate "to reveal *additional* facts to support claims which are well grounded in fact," however, it is inappropriate "to use discovery to support . . . claims for which there is *no* factual support") (emphasis in original).  That principle has particular application to actions, such as this, which, by the nature of the allegations, have the potential to substantially disrupt the educational environment through discovery, including depositions, which would likely be aimed at students, parents, teachers and administrators.

J.A. 145

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **Patti H Menders et al** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:21-cv-00669-AJT-TCB |
| | ) |
| | ) |
| **Loundon County School Board** | ) |
| | ) |
| Defendant | ) |

### <u>JUDGMENT</u>

Pursuant to the Order of this Court entered on February 15, 2022 and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendant

Loundon County School Board and against the Plaintiffs Patti Menders, Scott Mineo and Jane

Doe #2.


FERNANDO GALINDO, CLERK OF COURT


By:_____/s/_____
              Samantha Williams
              Deputy Clerk


Dated: 2/15/2022
Alexandria, Virginia

J.A. 146

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Plaintiff Patti Menders, on behalf of her minor child R.M, Plaintiff Scott Mineo on behalf of his minor child A.M., and Plaintiff Jane Doe #2 on behalf of her minor child Jane Doe #5, <br><br>    Plaintiffs, <br><br> v. <br><br> Loudoun County School Board, <br><br>    Defendant. | Case No. 1:21-cv-00669-AJT-TCB |

## PLAINTIFFS' NOTICE OF APPEAL

NOTICE is hereby given that Plaintiff Patti Menders, on behalf of her minor child R.M, Plaintiff Scott Mineo on behalf of his minor child A.M., and Plaintiff Jane Doe #2 on behalf of her minor child Jane Doe # 5 in the above named case appeal to the United States Court of Appeals for the Fourth Circuit this Court's Judgment (February 15, 2022, Dkt. 55) and its Memorandum Opinion and Order (January 19, 2022, Dkt. 52).

DATED:  February 17, 2022.    Respectfully submitted,

                /s/ Jeffrey D. Jennings
                Jeffrey D. Jennings (VSB No. 87667)
                Daniel R. Suhr (*pro hac vice*)
                Liberty Justice Center
                141 W Jackson Blvd Ste. 1065
                Telephone (312) 263-7668

Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org
dsuhr@libertyjusticecenter.org


*Attorneys for Plaintiffs*

2

J.A. 148

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Stacy Haney
Andrew Selman
Haney Phinyowattanachip PLLC
Shaney@haneyphinyo.com
aselman@haneyphinyo.com

*Counsel for Defendant Loudoun County School Board*

DATED: February 17, 2022

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings (VSB No. 87667)
Liberty Justice Center
141 W Jackson Blvd Ste. 1065
Telephone (312) 263-7668
Facsimile (312) 263-7702
jjennings@libertyjusticecenter.org

*Attorneys for Plaintiffs*

J.A. 149